# 22-1006-cv

# United States Court of Appeals

*for the*

# Second Circuit

VANS, INC., VF OUTDOOR, LLC.,

*Plaintiffs-Appellees,*

– v. –

MSCHF PRODUCT STUDIO, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

DAVID H. BERNSTEIN
MEGAN K. BANNIGAN
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

– and –

WILLIAM D. PATTERSON
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue,
  Suite 3300
Chicago, Illinois 60611
(312) 321-9100

*Attorneys for Defendant-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Appellant MSCHF Product Studio, Inc. ("MSCHF") certifies that MSCHF has no parent corporation and that no publicly held corporation owns ten percent or more of MSCHF's corporate stock.

## <u>TABLE OF CONTENTS</u>

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED ............................................. 2

STATEMENT OF THE CASE ............................................................. 3

SUMMARY OF ARGUMENT .......................................................... 15

STANDARD OF REVIEW ............................................................... 20

ARGUMENT .................................................................................. 21

I.    Vans' Lanham Act Claims Are Precluded by the First Amendment ...............21

    A.   *Rogers* Applies to *Wavy Baby*...................................................22

    B.   *Wavy Baby* Passes the *Rogers* Test ...........................................34

II.    The Preliminary Injunction Is an Unconstitutional Prior Restraint on MSCHF's Expression. ...........................................................61

III.    The District Court Erred in Requiring MSCHF to Escrow Its Gross Revenues and in Failing to Require Vans to Post Security. ...................................62

CONCLUSION ............................................................. 64

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ................................................................30

*AKF, Inc. v. AvantGarde Senior Living*,
  No. 21-cv-188, 2021 WL 2662070 (N.D.N.Y. Apr. 29, 2021)............................63

*Alexander v. United States*,
  509 U.S. 544 (1993) ........................................................ 18, 61

*AM Gen. LLC v. Activision Blizzard, Inc.*,
  450 F. Supp. 3d 467 (S.D.N.Y. 2020) ................................................28

*Am.'s Best Fam. Showplace Corp. v. N.Y.C., Dep't of Bldgs.*,
  536 F. Supp. 170 (E.D.N.Y. 1982)..................................................28

*American Exp. Fin. Advisors Inc. v. Thorley*,
  147 F.3d 229 (2d Cir. 1998) ......................................................20

*Arias v. Solis*,
  754 F. Supp. 290 (E.D.N.Y. 1991)..................................................64

*Bery v. N.Y.C.*,
  97 F.3d 689 (2d Cir. 1996) ................................................ 22, 29

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................25

*Brown v. Elec. Arts, Inc.*,
  2009 WL 8763151 (C.D. Cal. Sept. 23, 2009)......................................28

*Brown v. Elec. Arts, Inc.*,
  724 F.3d 1235 (9th Cir. 2013) ................................... 35, 36, 41

*Bulman v. 2BKCO, Inc.*,
  882 F. Supp. 2d 551 (S.D.N.Y. 2012) ........................................ 56, 57

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996) ......................................................52

iii

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ................................................................. 23, 34

*Capcom Co., Ltd. v. MKR Grp., Inc.*,
2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ......................................28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ................................................................30

*Chaquico v. Freiberg*,
274 F. Supp. 3d 942 (N.D. Cal. 2017)................................................31

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ................................................................29

*Cliffs Notes v. Bantam Doubleday Dell Pub. Grp.*,
886 F.2d 490 (2d Cir. 1989) ...................................................... passim

*Corning Inc. v. PicVue Elecs., Ltd.*,
365 F.3d 156 (2d Cir. 2004) ..................................................... 19, 64

*Dillinger, LLC v. Elec. Arts, Inc.*,
2011 WL 2457678 (S.D. Ind. June 16, 2011) ......................................28

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2021) ..................................................... 31, 43

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008) ................................................... 28, 36

*Fierce, Inc. v. Franklin Covey Co.*,
2019 WL 1453573 (W.D. Wash. April 2, 2019)....................................31

*Gruner + Jahr USA Pub. v. Meredith Corp.*,
991 F.2d 1072 (2d Cir. 1993) .....................................................49

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................63

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) ..................................................... 19, 63

iv

*Harley Davidson, Inc. v. Grottanelli*,
    164 F.3d 806 (2d Cir. 1999) ........................................................... 23, 32

*Hermes Int'l v. Rothschild*,
    2022 WL 1564597 (S.D.N.Y. May 18, 2022) ....................................28

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996) .................................................................44

*Kensington Pub. Corp. v. Gutierrez*,
    2009 WL 4277080 (S.D.N.Y. Nov. 10, 2009) ....................................31

*Lang v. Ret. Living Pub. Co.*,
    949 F.2d 576 (2d Cir. 1991) ....................................................... passim

*Lemme v. Nat'l Broadcasting Co., Inc.*,
    472 F. Supp. 2d 433 (E.D.N.Y. 2007) .......................................... 31, 56

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
    507 F.3d 252 (4th Cir. 2007) .................................................. 25, 40, 48

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ......................................... 29, 40

*Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*,
    No. 10-cv-1611, 2012 WL 1022247, (S.D.N.Y. Mar. 22, 2012) ........57

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    156 F. Supp. 3d 425 (S.D.N.Y. 2016) .......................................... passim

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) ...........................................................62

*Malden Amusement Co. v. City of Malden*,
    582 F. Supp. 297 (D. Mass. 1983).....................................................29

*Mattel, Inc. v. MCA Recs., Inc.*,
    296 F.3d 894 (9th Cir. 2002) .............................................................41

*Maxim's, Ltd. v. Badonsky*,
    772 F.2d 388 (7th Cir. 1985) .............................................................48

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,
239 F.3d 172 (2d Cir. 2001) ................................................................62

*Miller v. Easy Day Studios Pty Ltd.*,
2021 WL 4209205 (S.D. Cal. Sept. 16, 2021) ...................................28

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*,
74 F. Supp. 3d 1134 (N.D. Cal. 2014).................................................28

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
246 F.3d 183 (2d Cir. 2001) ................................................................20

*New York Ass'n Inc. v. Perlmutter Pub. Inc.*,
1996 WL 465298 (N.D.N.Y. July 19, 1996).......................................28

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
269 F.3d 114 (2d Cir. 2001) ................................................................56

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971) ................................................................... 18, 62

*Plus Prod. v. Plus Disc. Foods, Inc.*,
722 F.2d 999 (2d Cir. 1983) ................................................................49

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961) ................................................................40

*Radiance Found., Inc. v. N.A.A.C.P.*,
786 F.3d 316 (4th Cir. 2015) ...............................................................44

*Reflex Media, Inc. v. Pilgrim Studios, Inc.*,
2018 WL 6566561 (C.D. Cal. Aug. 27, 2018) ....................................31

*Reply All Corp. v. Gimlet Media, LLC*,
843 F. App'x 392 (2d Cir. 2021) .........................................................53

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ............................................................................30

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) ....................................................... passim

*Romantics v. Activision Pub., Inc.*,
   574 F. Supp. 2d 758 (E.D. Mich. 2008) .............................................................28

*Roxbury Ent. v. Penthouse Media Grp., Inc.*,
   669 F. Supp. 2d 1170 (C.D. Cal. 2010) ..............................................................31

*Savin Corp. v. Savin Grp.*,
   391 F.3d 439 (2d Cir. 2004) ....................................................................... 48, 60

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
   970 F. Supp. 279 (S.D.N.Y. 1997) .....................................................................31

*Stern Elecs., Inc. v. Kaufman*,
   669 F.2d 852 (2d Cir. 1982) ...............................................................................29

*Tiffany and Co. v. Costco Wholesale Corp.*,
   971 F.3d 74 (2d Cir. 2020) .................................................................................20

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
   875 F.3d 1192 (9th Cir. 2017) .................................................................. 22, 28, 42

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ................................................................... 31, 40, 42

*Two Hands IP LLC v. Two Hands Am., Inc.*,
   No. 21-cv-3855, 2021 WL 4437975 (S.D.N.Y. Sept. 28, 2021).........................57

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*,
   683 F.3d 1266 (11th Cir. 2012) ..........................................................................28

*VIP Prods. LLC v. Jack Daniel's Props., Inc.*,
   953 F.3d 1170 (9th Cir. 2020) .................................................................. 26, 28, 33

*VIP Prods., LLC v. Jack Daniel's Props., Inc.*,
   291 F. Supp. 3d 891 (D. Ariz. 2018) ..................................................................33

*VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*,
   699 F. App'x 667 (9th Cir. 2017).......................................................................28

*Virgin Enters., Ltd. v. Nawab*,
   335 F.3d 141 (2d Cir. 2003) ...............................................................................50

*W.W.W. Pharm. Co. v. Gillette Co.*,
   984 F.2d 567 (2d Cir. 1993) ..................................................................58

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267 (S.D.N.Y. 1992) 27, 30, 34

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) .....................................20

**Statutes**

18 U.S.C. § 1292(a)(1) ..............................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1338(a) ..................................................................................1

**Other Authorities**

McCarthy on Trademarks and Unfair Competition § 11:85 (5th ed.) .............. 43, 45

Pierre N. Leval, *Trademark: Champion of Free Speech*,
   27 Colum. J.L. & Arts 187 (2003–04) ................................................25

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(A) ......................................1

Federal Rule of Civil Procedure 65(c) ......................................... 2, 19, 63

*Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002) ...............................40

Defendant-Appellant MSCHF Product Studio, Inc. ("MSCHF") appeals from the Order & Decision of the United States District Court for the Eastern District of New York, entered on April 29, 2022 (the "Order"). (Special Appendix ("SPA-") 1–18).

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"). This Court has jurisdiction over this appeal pursuant to 18 U.S.C. § 1292(a)(1) because this is an interlocutory appeal from an order granting an injunction.

This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), which provides that "the notice of appeal . . . must be filed with the district clerk within 30 days after entry of . . . the order appealed from." The District Court entered the Order granting the plaintiff's motion for a preliminary injunction on April 29, 2022. MSCHF filed its Notice of Appeal with the district court clerk on May 2, 2022.

## STATEMENT OF ISSUES PRESENTED

MSCHF presents the following issues for review:

1. Whether the District Court erred in holding that Plaintiffs-Appellants Vans, Inc. and VF Outdoor, Inc. ("Vans") are likely to succeed on the merits of their trademark infringement claim against MSCHF's *Wavy Baby* artwork, given that the District Court failed to apply the Second Circuit's *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), precedent governing the First Amendment's limitations to Lanham Act liability for expressive works like *Wavy Baby*, and where MSCHF's references to Vans' trademarks are relevant to its expression and are not explicitly misleading.

2. Whether the District Court violated the First Amendment in imposing a prior restraint on MSCHF's artistic expression, by compelling MSCHF to remove archival images of its *Wavy Baby* artwork from its website and app, and by prohibiting MSCHF from displaying its artwork in scheduled art exhibitions.

3. Whether the District Court erred in granting a preliminary injunction without first directing Vans to post security or making a finding that no security was necessary, as required by Federal Rule of Civil Procedure 65(c).

4. Whether the District Court erred in ordering MSCHF to escrow its gross revenues from *Wavy Baby* orders, in contravention of Federal Rule of Civil Procedure 65, where the ordered relief bears no relevance to the harm

purportedly suffered by Vans or the relief that Vans requested in its
Complaint.

## STATEMENT OF THE CASE

### A.    MSCHF Is a World-Renowned Art Collective

Appellant MSCHF is a heralded American art collective that comments on
contemporary society through its art.  In the tradition of Marcel Duchamp and Ai
Weiwei, MSCHF's art falls within the "cultural readymade" art movement, in
which artists recontextualize everyday objects to create art and cultural
commentary.  MSCHF has been invited to speak about its art at universities, and its
artworks have been featured in museums around the world, sold at auction houses,
discussed in industry and academic panels, and commented on by numerous media
sources, art critics, and academics.  (Joint Appendix ("A-") 272).  Among other
media attention, *The New York Times* dubbed MSCHF "the Banksys of consumer
culture," *Digital Trends* concluded that MSCHF makes "pop art for the internet
age," and CNN describes MSCHF as a headline-making "art collective" that
specializes in "a series of irreverent art projects."  (A-487 ¶ 13).

MSCHF's stated artistic mission is to "start a conversation about consumer
culture . . . by participating in consumer culture."  (A-486–87 ¶ 12).  In 2022 alone,
MSCHF artworks have critiqued the music industry (Drop 73); U.S. politics (Drop
72); consumerism and digital media (Drops 66, 67, and 71) (A-519; A-522; A-525);

standardized testing (Drop 70); "Hallmark Holidays" (Drop 69); and the U.S. legal

system (Drop 68). (A-489 ¶ 18). Many of MSCHF's artworks are accompanied

by manifestos, which enhance, and become part of, the art. (*Id.*) For example,

MSCHF's *Blur* series began by displaying a blurred image of a stack of $20 bills

for sale. Once purchased, patrons discovered that the displayed image was not

blurry; instead, they had purchased a blurry 3D object. In an increasingly digitized

world, the piece challenges conceptions of the boundary between the digital and

physical worlds, while compelling MSCHF's customers to wonder why they buy

what they buy. (A-492-93 ¶ 25).

 

(A-490 ¶¶ 20). The auction house Phillips, which specializes in "the world's most important twentieth century and contemporary works of art," displayed a large version of *Blur* in its Manhattan lobby, noting that the piece critiques consumer culture by "interrogating our desire to read value into an object, and the tantalization of the unknown."



(A-504 ¶ 46).

Phillips is not the only industry-participant to give MSCHF's artworks acclaim. Among many other examples, a panel at Christie's, the world's leading art auction house, discussed MSCHF's *Birkinstock* shoe project and agreed that the work—created through the repurposing of disassembled Hermès Birkin bags onto

cork Birkenstock-like sandals—were not merely high fashion but undeniably "conceptual art." (A-495 ¶ 25; A-504 ¶ 48). International fashion and art agency *Highsnobiety* discussed MSCHF's art projects at length in a 2021 feature titled "The Museum of MSCHF: A Retrospective of the Creative Industry's Antiheroes." (A-503 ¶ 45). Both the Design Museum of London and the Exhibition Subversive Design NRW-Forum in Dusseldorf have featured MSCHF artworks, including its *Birkinstocks*, *Jesus Shoes*, and *Satan Shoes* pieces. (A-504 ¶ 47). MSCHF also holds invitations from Art Basel (one of the world's leading art fairs) and the Perrotin gallery (which ranks among the most renowned art galleries in the world) to exhibit its artwork (including *Wavy Baby*) later this year. (A-504–05 ¶ 49).

Given MSCHF's penchant for critiquing the absurdities of consumer culture, "sneakerheads" have become a focal point for MSCHF's artistic expression. For most people, shoes are utilitarian objects: to be worn, to help balance and move, and to protect feet. Yet a $10 billion industry has grown around shoe collecting, and shoes are increasingly being purchased and displayed as works of art. (A-497–98 ¶¶ 29–31). As *The New York Times* and *CNN.com* explain, for "sneakerheads," shoes are expressive, typically only displayed, and rarely worn—like fine art, sneakers are seen as investments. (A-497–98 ¶ 30).

MSCHF has previously critiqued the consumerism inherent in sneakerhead culture, first with *Jesus Shoes* in 2019, then with *Satan Shoes* in 2021. These

projects critiqued "collab culture," the phenomenon of sneaker companies collaborating with *anyone*—including Jesus and Satan, as MSCHF's art postulates—to garner clout and shoe sales.



(A-498–99 ¶¶ 32–33; A-165). MSCHF continued its critique of sneaker culture in February 2022, with its *TAP3* project, which highlighted the litigious disposition of certain sneaker companies. (A-501 ¶ 37).



(A-432).

**B.**    *Wavy Baby*

On March 22, 2022, MSCHF announced its latest shoe-related expression: *Wavy Baby*, a limited-edition, wearable cultural readymade artwork that critiques consumerism, sneaker design, and the blurring boundaries between the digital and physical worlds—and pokes fun at Vans' role in those phenomena.  The artwork, accompanied by a manifesto, takes the form of a shoe—inspired by the Vans Old Skool skate shoe—distorted with an exaggerated, wavy sole and other features that contribute to the work's commentary.  (A-273–A-277; A-712).

8



(A-356 ¶ 33).

The *Wavy Baby* design process started with an image of *the* classic skate shoe—the Vans Old Skool.  MSCHF selected the Old Skool because Vans is both the most iconic, functional, cool skate shoe in history *and* a hyper-trendy, mass-consumed online commodity, beloved by consumeristic sneakerheads and the masses alike.  No other shoe embodies these dichotomies—niche and mass taste, functional and trendy, utilitarian and frivolous—as perfectly as the Old Skool, which made it the ideal shoe for MSCHF's interrogation of consumer desire.  (A-353 ¶ 24).  Vans also actively blurs the boundary between the physical and the virtual, selling "digital shoes" and "digital skate gear" for avatars in the Internet "metaverse" (*i.e.*, certain video game characters can be dressed in Vans).  With *Wavy Baby*, MSCHF purposely inverted that process, translating a virtual image back into physical goods—thereby flipping Vans' project on its head.  (A-502 ¶ 40).

Inspired by their *Blur* series, the artists at MSCHF placed an image of an Old Skool shoe into Photoshop and applied the "liquify" digital filter to the image. MSCHF's design transformed an iconic, practical skate shoe into a "cultural readymade," evocative of Duchamp's modern art practices. (A-349–51 ¶¶ 9–18). Although MSCHF invoked Old Skool as the cultural anchor, *Wavy Baby* is unlike anything Vans—or any other shoe company—has produced. *Wavy Baby* is exceedingly wavy, as the exaggerated warning label on the sole proclaims.



(A-357 ¶ 35). *Wavy Baby* is obviously not designed for skateboarding, or even for walking down stairs; the shoe is not intended for everyday wear. (A-368–75 ¶ 61).

Through this design, MSCHF forces questions on sneaker culture by participating in the culture. Rather than offering a functional sneaker to sneakerheads, as MSCHF's manifesto explains, *Wavy Baby* is "a complete distortion of an entire object that is itself a symbol." (A-364 ¶ 49). Although wearable, *Wavy Baby* is not, nor is it intended to be a replacement for, a standard sneaker. It is a collectible, meant to be displayed, either in collections or on the foot during high-profile events. (A-362–67 ¶¶ 47–59).

10

*Wavy Baby* also questions consumers' relationship between the physical and digital worlds, and how goods like Old Skools become mass-commodities in the digital age. How did a brand that, as Vans claims, "embod[ies] Southern California counterculture," (A-158), become bland *mass* culture? And why did it retreat from actual, physical shoes to digital shoes? By "smash[ing] the digital and the physical together in an object," *Wavy Baby* inverts (and critiques) that retreat, translating virtual shoes back into physical goods, leaving behind a warped remnant. (A-502 ¶ 40). *Wavy Baby*'s unique branding also features a humorous rendering of former President George W. Bush falling off a Segway, reinforcing MSCHF's critique of the role of technology in complicating and destabilizing our lives.

 

(A-360 ¶ 41).

With *Wavy Baby*, MSCHF deliberately carries forth the spirit of surrealist artist René Magritte, who in 1929 released *The Treachery of Images*, a painting of

an object that *looks* like an early twentieth century smoking pipe but, bafflingly, bears the inscription "Ceci n'est pas une pipe" (i.e., "This is not a pipe"). Just as Magritte's painting probed the line between two-dimensional representation and the "real world," *Wavy Baby* presents a three-dimensional sculpture that alludes to, but is not, a skate shoe. As MSCHF wrote in its manifesto, "This is not a skate shoe – Ceci n'est pas une chaussure de skate." (A-364 ¶¶ 49–50).

The public's reaction to *Wavy Baby* demonstrates that MSCHF's statements were understood. Even before MSCHF released its manifesto, the public recognized the surrealist critique of reality, with the shoe blog *SneakerFreaker* noting that *Wavy Baby* creates a "Dali-esque" impression. (A-381 ¶ 83). Appearing to take literally MSCHF's tongue-in-cheek directive in its *Wavy Baby* manifesto to "get liquid, with our assets, our diets, and our shoes," and in an unsubtle allusion to Salvador Dali, *Highsnobiety* posted a video to TikTok "melting" Vans Old Skool shoes in a microwave to create their own version of *Wavy Baby*. (A-383–84 ¶ 88). Another video posted on TikTok suggests that wearing *Wavy Baby* would transplant a person into an absurd, digitized world. (A-382 ¶ 86). These posts (and many others) demonstrate that the message inherent in *Wavy Baby* has been understood, while furthering the ideas raised by MSCHF.

*Wavy Baby* is a work of contemporary art, a centerpiece for discourse, and the result of nearly a year of innovation and creativity. Like the other footwear-

related artworks in MSCHF's collection, *Wavy Baby* is destined for art galleries and museums—and is scheduled to be a part of multiple exhibitions this year—but its purpose remains to critique sneaker culture, addressing both our consumerist instincts and our perception of reality.  (A-273–77).

### C.    Vans' Lawsuit

On April 14, 2022, Vans filed a Complaint, (A-12–68), claiming *inter alia* that *Wavy Baby* infringes its trademark rights.  Vans then moved for a temporary restraining order and a preliminary injunction.  (A-144–49).  MSCHF opposed Vans' motion, arguing, among other things, that its *Wavy Baby* work is protected by the First Amendment through the test this Court articulated in *Rogers v. Grimaldi*, 875 F.2d 994, to prevent the Lanham Act from encroaching on the freedom of expression.  (A-270–71; A-278–82).

On April 18, 2022, MSCHF launched the *Wavy Baby* project, as scheduled, offering a limited number of *Wavy Baby* works—4,306 in total—for sale during a one-hour period to users of MSCHF's proprietary app for $220 (an amount that is three times more expensive than a standard Old Skool sneaker).  (A-813 ¶ 3; A-376; A-746; A-869).

### D.    The District Court's Order

On April 29, 2022, the District Court granted Vans' motion for a preliminary injunction.  (SPA 1–18) (the "Order").  The Court held that Vans was likely to

13

succeed on the merits of its trademark infringement claim because *Wavy Baby* was

likely to cause consumer confusion as to the source of the goods.  At the hearing,

the Court recognized the serious questions going to MSCHF's First Amendment

defense, stating:

> [I]f [MSCHF] had one pair of Wavy Baby shoes that were in the
> Metropolitan Museum or the Brooklyn Museum that would be one
> thing, and if you had a million issues of Wavy Baby shoes that would
> be another.  But you're at 4,000 which is not exactly Brooklyn
> Museum rare Calder on the one hand, nor is it on the other side a
> million pairs of shoes on the other.  So you're somewhere in between.

(A-869–70 at 55:19–56:1).  But the Court never addressed those issues in its Order.

Instead, it considered only whether *Wavy Baby* was a "successful parody" (that is,

whether it was not confusing because consumers would understand it was a parody

not made by Vans), ruling that, because *Wavy Baby* was not a successful parody,

"[w]hatever the actual artistic merits of the Wavy Baby shoes," the First

Amendment did not apply.  (SPA-12).

The District Court entered a broad injunction that prohibits any display by

MSCHF of its *Wavy Baby* artwork.  The Order:

- Prohibited MSCHF from fulfilling orders for *Wavy Baby* works (or
  colorable imitations or reconstructions) or from advertising, marketing,
  promoting, offering to sell, selling, distributing, or taking orders for
  *Wavy Baby*;

14

- Directed MSCHF to cancel any open orders of *Wavy Baby*; and

- Directed MSCHF to escrow its gross revenue from any orders that cannot be canceled, "so that . . . [MSCHF] may return those funds to customers who ordered [*Wavy Baby*] under the mistaken belief that Vans was the source of the shoes or otherwise approved or sponsored [*Wavy Baby*]."

(SPA 17–18). The District Court's Order did not direct Vans to post security, nor did the Order find that no security was necessary, as required by Federal Rule of Civil Procedure 65(c).

In compliance with the Order, MSCHF removed content from its website and its mobile app that displayed images of *Wavy Baby*. The injunction prohibits MSCHF from sending *Wavy Baby* to museums and galleries, including the Perrotin Gallery and Art Basel, each of which are scheduled to display *Wavy Baby* in MSCHF exhibitions later this year. The Order creates a gap in the published record of MSCHF's historical art projects and censors MSCHF's artistic message.

## SUMMARY OF ARGUMENT

This Court should vacate the District Court's injunction because the First Amendment precludes Vans' claims and the injunction imposes an unconstitutional prior restraint on MSCHF's right to engage in artistic expression, including its right to display its artwork in art exhibitions.

15

The District Court erred in holding that Vans was likely to succeed on the merits of its trademark infringement claim, because Vans' claims are precluded by the First Amendment. As this Court held in *Rogers v. Grimaldi*, the Lanham Act must be "construe[d] . . . narrowly" to expressive works to prevent the Act from encroaching on First Amendment interests. 875 F.2d at 998. Accordingly, the First Amendment precludes Lanham Act claims against expressive works, as long as the use of the trademark is relevant to the expression and not explicitly misleading. *Id.* at 998–99.

Because *Wavy Baby* is artistically expressive—as both a work of social commentary and a parody of Vans—*Rogers* applies. *Wavy Baby* includes artistic speech on its face, but, even more significantly, it is *itself* artistic expression. The exaggerated, cartoonishly wavy sole, side stripe, and stitching, as well as the reference to President Bush, are both humorous to look at and demonstrative of MSCHF's social commentary and parodic vision. As an entire work, *Wavy Baby* critiques the prototypical skate shoe: the Vans Old Skool. MSCHF's references to Vans' marks are transformative, embodying MSCHF's critique of Vans' role in furthering consumerism in sneaker culture and in blurring the boundaries between the physical and digital worlds.

Despite the expressive nature of *Wavy Baby*, the Order failed to address this Court's First Amendment jurisprudence, declaring instead that *Wavy Baby*

16

artworks are not protected by the First Amendment, "[w]hatever the[ir] actual artistic merits," because *Wavy Baby* "do[es] not meet the requirements for a successful parody" under trademark law. (SPA-12). That holding directly contradicts this Court's precedents by conflating parody analysis under trademark law with *Rogers* analysis under the First Amendment. Where a work gives rise to no likelihood of confusion (as in the case of a "successful parody"), trademark law provides a sufficient basis to dismiss infringement claims, without requiring application of the First Amendment and the *Rogers* test. In contrast, where there is a likelihood of confusion that could give rise to Lanham Act liability (as in the case of an "unsuccessful parody"), a First Amendment analysis becomes necessary. *See Cliffs Notes v. Bantam Doubleday Dell Pub. Grp.*, 886 F.2d 490, 494 (2d Cir. 1989). The District Court failed to acknowledge this distinction between trademark law and First Amendment jurisprudence, addressing only the former. In other words, the District Court rejected MSCHF's First Amendment defense without addressing the First Amendment at all. That was legal error.

Had the District Court applied *Rogers* in this case, it would have found that Vans cannot possibly succeed on its Lanham Act claims as a matter of law, because *Wavy Baby*'s allusions to Vans' marks are relevant to MSCHF's expression and they are not explicitly misleading as to the source of *Wavy Baby*. **First**, *Wavy Baby* is a commentary on and a critique of Vans, so it easily passes

*Rogers*'s "appropriately low threshold" of "minimal artistic relevance." *Rogers*, 875 F.2d at 999. ***Second***, MSCHF's allusions to Vans' marks are not explicitly misleading as to the source of *Wavy Baby*, because MSCHF made no "explicit indication," "overt claim," or "explicit misstatement" as to the source of the artwork. *Id.* at 1001. To the contrary, *Wavy Baby* explicitly identifies MSCHF, not Vans, as the source of *Wavy Baby*. MSCHF never claimed an affiliation with Vans or represented that Vans was involved with the *Wavy Baby* project. Accordingly, *Wavy Baby* is not explicitly misleading, and the Order should be vacated and the case dismissed.

The Order should also be vacated for the independent reason that the District Court's injunction is an unconstitutional prior restraint on MSCHF's artistic expression. The Order required MSCHF to remove content from its archival website and app regarding *Wavy Baby*, and prohibited MSCHF from promoting its *Wavy Baby* artwork (including by displaying *Wavy Baby* at MSCHF's Art Basel and Perrotin exhibitions later this year). The Order thus constitutes a prior restraint on MSCHF's rights to speak truthfully about and display its art. *See Alexander v. United States*, 509 U.S. 544, 550 (1993). The District Court failed to present any lawful basis for its prior restraint and has thus failed to rebut the "heavy presumption" against its constitutional validity. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971). Accordingly, the Order is unconstitutional

18

and should be vacated on that basis alone.

The District Court also erred in requiring MSCHF to escrow its gross revenues. No authority permits the District Court to require the escrow of MSCHF's gross revenues. Even if the District Court were to limit the escrow order to MSCHF's net profits, it would still be contrary to law, because it is not "ancillary to the final relief" sought by Vans in this case, and because the return of MSCHF's revenues to confused consumers is unrelated to any harm purportedly suffered by Vans and to any remedies sought in Vans' complaint. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131–33 (2d Cir. 2014).

Lastly, the District Court erred in failing to require Vans to post security, or to find that no security was required, as required by Federal Rule of Civil Procedure 65(c). *See Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004).[1]

---

[1] MSCHF has petitioned the District Court to reverse its decisions with respect to the escrow requirement and the absence of a bond, but those motions have not yet been resolved. MSCHF reserves the right to supplement its arguments with respect to these issues if and when the District Court rules on the pending motions.

## STANDARD OF REVIEW

The District Court's decision to grant a preliminary injunction is reviewed for abuse of discretion. *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 167 (2d Cir. 2001). A district court abuses its discretion, *inter alia*, when it applies the wrong legal standard. *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001). Whether the District Court failed to apply the correct legal standard is subject to *de novo* review because "[q]uestions of law decided in connection with requests for preliminary injunctions . . . receive the same de novo review that is appropriate for issues of law generally." *American Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998). Likewise, insofar as the District Court's likelihood-of-confusion analysis is relevant to this Court's First Amendment analysis, the District Court's "determinations as to each *Polaroid* factor and its ultimate balancing of those factors" are subject to *de novo* review. *Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 86 (2d Cir. 2020).

**ARGUMENT**

**I.    Vans' Lanham Act Claims Are Precluded by the First Amendment**

The District Court erred in holding that Vans was likely to succeed on the merits of its trademark infringement claim, because Vans' claims are precluded by the First Amendment.  As this Court held in *Rogers*, when an allegedly infringing work is expressive, the Lanham Act must be "construe[d] . . . narrowly" to prevent the Lanham Act from encroaching on First Amendment interests.  875 F.2d at 998.  Under the First Amendment, even where there is a likelihood of consumer confusion,[2] expressive works like *Wavy Baby* cannot give rise to Lanham Act liability if the use of the plaintiff's mark is (1) relevant to the expression and (2) not explicitly misleading as to the source of the works.  *Id.* at 999.

---

[2]  For the reasons briefed before the District Court, MSCHF does not believe that confusion is likely.  MSCHF offered *Wavy Baby* for sale only through a one-hour drop and only through its proprietary app.  Purchasers of *Wavy Baby* works knew that they were buying the work from MSCHF, not from Vans, and there is no evidence whatsoever that any of the purchasers were confused.  Vans has offered evidence of third-party commentary through social media posts, but none of that is evidence of any confusion by a purchaser, either through the MSCHF drop or through secondary market sales.  *Wavy Baby* is so exaggerated, and is such an obvious parody of Vans' Old Skool sneaker, that no reasonable consumer purchasing the shoe could believe that it is from Vans.  However, any such confusion is irrelevant because the First Amendment protects MSCHF's right to make and distribute this shoe regardless of confusion.  For that reason, MSCHF focuses on its First Amendment defenses in this interlocutory appeal.

### A.    *Rogers* **Applies to** *Wavy Baby*

*Rogers* is broadly applicable to "Lanham Act claims against works of artistic expression."  *Cliffs Notes*, 886 F.2d at 495.  The *Rogers* test thus applies to trademark infringement claims related to artworks, even if those artworks take the form of commercial products.  *See Bery v. N.Y.C.*, 97 F.3d 689, 695 (2d Cir. 1996) ("Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection."); *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1195 (9th Cir. 2017) (applying *Rogers* to shirts and champagne glasses).

*Wavy Baby* is artistically expressive—as both a work of social commentary and a parody of Vans—so *Rogers* applies.  MSCHF placed its artistic speech on the face of *Wavy Baby* itself, in the form of political commentary reminding us of our fraught relationship with technology (*i.e*., a caricature on the heel patch of George W. Bush falling off a Segway) and parody (*i.e.*, the "warning sticker" attached to the bottom of each work).  But even more significantly, *Wavy Baby* is *itself* MSCHF's artistic expression.  MSCHF designed *Wavy Baby* to have an exaggerated, cartoonishly wavy sole, which is both humorous to look at and expressive of MSCHF's parodic vision.  The wavy sole conforms to the wavy aesthetic of *Wavy Baby* as a whole, with its wavy side stripe and stitching; as an

entire work, it pokes fun at the prototypical skate shoe: the Vans Old Skool. MSCHF's parodic references to Vans' marks are transformative, embodying MSCHF's critique of Vans' role in furthering consumerism in sneaker culture and blurring the boundaries between the physical and digital worlds. Essential to MSCHF's message is its warping of Vans' highly functional shoe design (a core feature of which is a flat bottom) to be deliberately anti-utilitarian; the fact that *Wavy Baby* is uncomfortable to wear and difficult to walk in (let alone skateboard in) is part of the art. The evidence in the record demonstrates that *Wavy Baby* shoes are not functional for anything but to be a point of interest for a photoshoot, an accessory on the red carpet, or a collectible piece to be displayed on a shelf.

The context surrounding *Wavy Baby* further highlights MSCHF's artistic expression. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 589 (1994) ("In parody, as in news reporting, context is everything." (internal citation omitted)); *see also Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir. 1999). MSCHF is an art collective whose works have been featured in art galleries and discussed in the art world and mass media alike; it is well-known for its social commentary and parody that critiques brand owners like Vans. MSCHF released a manifesto with *Wavy Baby*—as MSCHF does with most of its artworks— functioning like an artist statement accompanying an art exhibition and underscoring MSCHF's artistic motivations. Further demonstrating its expressive

qualities, *Wavy Baby* debuted as a featured element in the music video *Freaky Deaky*, by music stars Tyga and Doja Cat, where *Wavy Baby* fosters a sense that the world in the video is surreal, unstable, and wavy.



(A-277).

Despite the inherently expressive nature of *Wavy Baby*, the Order failed to address this Court's standard for evaluating trademark claims against works of artistic expression. Instead, the Court declared that *Wavy Baby* artworks are not subject to First Amendment protections, "[w]hatever the[ir] actual artistic merits." (SPA-12). This holding is contrary to well-established law. Rather than considering this Court's First Amendment jurisprudence, the District Court rejected MSCHF's First Amendment defense because it (erroneously) failed to consider that *Wavy Baby* has artistic merit and instead held that *Wavy Baby* "do[es] not meet the requirements for a successful parody" under a traditional trademark

24

law analysis. *Id.* The District Court's analysis thus improperly conflates parody analysis under trademark law with *Rogers* analysis under the First Amendment.

The Order purported to follow cases like *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425 (S.D.N.Y. 2016) and *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007) (SPA-12–13), but the courts in those cases did not need to address the First Amendment. Rather, those cases analyzed whether the defendants' works were subject to Lanham Act liability under principles of *trademark law—i.e.,* whether, when accounting for the parodic nature of the allegedly infringing works, there was likely to be confusion under a traditional trademark analysis. Where a work gives rise to no likelihood of confusion—as was the case in both *My Other Bag* and *Haute Diggity Dog—* trademark law provides a sufficient basis to dismiss trademark infringement claims, without consideration of the First Amendment and the *Rogers* test. *See My Other Bag*, 156 F. Supp. 3d at 443 ("[T]here is no triable issue of fact on the likelihood of confusion."); *Haute Diggity Dog*, 507 F.3d at 263 ("[Louis Vuitton] has failed to demonstrate any likelihood of confusion. Accordingly, we affirm the district court's grant of summary judgment in favor of Haute Diggity Dog on the issue of trademark infringement."); *see also Bond v. United States*, 572 U.S. 844, 855 (2014) (it is prudent for a court "not decide a constitutional question if there is some other ground upon which to dispose of the case"); Pierre N. Leval,

*Trademark: Champion of Free Speech*, 27 Colum. J.L. & Arts 187, 189 (2003–04) ("Where the trademark law, by its own terms, protects the unauthorized use of another's trademark, there is no need to turn to the Constitution to justify a judgment in the alleged infringer's favor.").

In contrast, a *Rogers* analysis becomes *necessary* where—as in *Rogers*, *Cliffs Notes*, and *VIP Products*, among other cases—there is some likelihood of consumer confusion, such that Lanham Act liability could arise but for the First Amendment. *See Rogers*, 875 F.2d at 1001; *Cliffs Notes*, 886 F.2d at 494–95; *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1175–76 (9th Cir. 2020) (*Rogers* applies, even where the district court had found a 29% rate of consumer confusion).[3] The District Court failed to acknowledge this distinction between trademark law and First Amendment jurisprudence, addressing only the former. In other words, the District Court rejected MSCHF's First Amendment defense through the lens of trademark law, without considering the First Amendment at all.

The District Court's holding that *Wavy Baby* is not a "successful parody" should have triggered the application of *Rogers* and a First Amendment analysis, not foreclosed it. *See, e.g.*, *Cliffs Notes*, 886 F.2d at 494 (where the defendant's

---

[3] In *My Other Bag*, the defendant had raised a First Amendment defense, and the parties briefed the *Rogers* test, but the court did not need to reach the First Amendment issue in granting the defendant's motion for summary judgment because there was no likelihood of confusion. *See My Other Bag*, 156 F. Supp. 3d 425, 443 (S.D.N.Y.), No. 14-3419, Dkts. 73, 86.

work is a "poor parody," it is "vulnerable under trademark law, since the customer will be confused," so *Rogers* provides the appropriate test in such cases to balance trademark and First Amendment interests). "Successful" parodies cannot give rise to liability for trademark infringement, because they give rise to little or no likelihood of confusion. Unsuccessful parodies, however, are still subject to First Amendment protection. *See id.* As Judge Leval recognized in *Yankee Publishing*, *Rogers* applies equally to successful parodies and unsuccessful parodies:

> It is one thing to reject a First Amendment claim because the court disbelieves the claim that a communicative message was intended. It is quite another to reject a First Amendment claim because the court gives low marks to the success of the literary device. Courts are ill equipped to pass literary judgments.

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 281 (S.D.N.Y. 1992).

*Rogers* applies to all expressive works that are challenged under the Lanham Act, regardless of medium or functionality. *Rogers* listed types of works that it deemed "indisputably works of artistic expression [that] deserve protection"— "[m]ovies, plays, books, and songs"—but that is not an exhaustive list of expressive mediums warranting First Amendment protection. *Rogers*, 875 F.2d at 997. Indeed, the same year *Rogers* was decided, this Court held that *Rogers* is "generally applicable to Lanham Act claims against works of artistic expression," without restriction as to the medium of expression. *Cliffs Notes*, 886 F.2d at 495.

27

Courts across the country, including courts in this Circuit, have thus applied

*Rogers* to other expressive consumer goods, including dog toys and champagne

glasses.[4]  As these cases show, as contemporary artists use new mediums of

expression, courts have extended *Rogers* accordingly.  For example, since the

*Rogers* test was created in 1989, courts have routinely applied *Rogers* to mass-

market, functional, expressive consumer goods like video games[5] (which, prior to

*Rogers*, were considered mere entertainment goods outside the bounds of the First

Amendment[6]).  The medium of expression is irrelevant to the application of *Rogers*;

rather, the question is whether the challenged work is expressive.

---

[4]  *See, e.g.*, *VIP Prods.*, 953 F.3d 1170 (rubber dog toy); *Twentieth Century Fox*, 875 F.3d at 1195 (shirts and champagne glasses); *New York Ass'n Inc. v. Perlmutter Pub. Inc.*, 1996 WL 465298 (N.D.N.Y. July 19, 1996) (shirts, blank note cards, holiday greeting cards); *Hermes Int'l v. Rothschild*, 2022 WL 1564597, at *3 (S.D.N.Y. May 18, 2022) (NFTs of handbags); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266 (11th Cir. 2012) (calendars).

[5]  *See E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008); *VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*, 699 F. App'x 667 (9th Cir. 2017); *Dillinger, LLC v. Elec. Arts, Inc.*, 2011 WL 2457678 (S.D. Ind. June 16, 2011); *Miller v. Easy Day Studios Pty Ltd.*, 2021 WL 4209205 (S.D. Cal. Sept. 16, 2021); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467 (S.D.N.Y. 2020); *Capcom Co., Ltd. v. MKR Grp., Inc.*, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008); *Brown v. Elec. Arts, Inc.*, 2009 WL 8763151 (C.D. Cal. Sept. 23, 2009); *Romantics v. Activision Pub., Inc.*, 574 F. Supp. 2d 758 (E.D. Mich. 2008); *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134 (N.D. Cal. 2014).

[6]  *See, e.g.*, *Am.'s Best Fam. Showplace Corp. v. N.Y.C., Dep't of Bldgs.*, 536 F. Supp. 170, 174 (E.D.N.Y. 1982) (video games are "pure entertainment" that "contain so little in the way of particularized form of expression that video games cannot be fairly characterized as a form of speech protected by the First Amendment.") (quoting *Stern Elecs., Inc. v. Kaufman*, 669 F.2d 852, 857 (2d

28

Also irrelevant to whether *Rogers* applies is that MSCHF sold *Wavy Baby* for a profit (albeit a very small one in this case). (*See* A-298); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection" to which speech is entitled "is not diminished merely because the . . . speech is sold rather than given away."); *Bery*, 97 F.3d at 695 ("The sale of protected [art] is also protected."). Almost every case in which courts have applied *Rogers*—including *Rogers* itself—has involved a commercial product. By its own framing, *Rogers* applies to "hybrid" works that "combin[e] artistic expression and commercial promotion," where the artistic and commercial aspects are "inextricably intertwined." 875 F.2d at 998. Thus, although the Fellini film at issue in *Rogers* was released commercially in theaters (and there was evidence showing that the title of the film confused consumers into thinking that Ginger Rogers endorsed the film), this Court held that Rogers's Lanham Act claims were precluded. *Rogers*, 875 F.2d at 997; *see also Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 174 (S.D.N.Y. 2012) (*Rogers* applied where challenged film grossed $580 million).

This result aligns with the Supreme Court's First Amendment jurisprudence, which does not distinguish between commercial and noncommercial *goods* but rather between commercial and noncommercial *speech*. Whenever the commercial

Cir. 1982)); *Malden Amusement Co. v. City of Malden*, 582 F. Supp. 297, 299 (D. Mass. 1983) (same).

29

aspects of a work are intertwined with artistic content, the First Amendment dictates that the trademark-using speech must be considered "noncommercial" (*i.e.*, speech that does more than propose a commercial transaction) and thus subject to full First Amendment protection. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech"); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980). Speech that takes the form of a product consumers are asked to buy—whether in the form of a book, movie, sculpture, dog toy, shoe, or anything else—is noncommercial and therefore protected under *Rogers*.

The fact that MSCHF created and sold 4,306 pieces of its limited-edition *Wavy Baby* work rather than a single piece also is legally irrelevant. This Court has recognized that the quantity of goods sold is irrelevant to the application of *Rogers*, even where the defendant sells *hundreds of thousands* of copies of the work. *See, e.g.*, *Cliffs Notes*, 886 F.2d at 493 (defendant had produced and planned to sell 150,000 copies of *Spy Notes* parody); *Yankee Publ'g*, 809 F. Supp. at 274 (defendant circulated over 400,000 copies of challenged work).

Also misplaced is the Order's reliance on the question of whether MSCHF's expressive work is of the same general class of good as Vans' shoes. The District

Court erroneously held that MSCHF's First Amendment defense is "sharply limited" because the *Wavy Baby* artwork is a "competing product" with Vans' Old Skool sneakers. (SPA-13). In reaching this erroneous conclusion, the Order mischaracterizes both the nature of the goods at issue (they simply do not compete because *Wavy Baby* is a work of art, not a sneaker for everyday wear) and this Court's holding in *Harley Davidson*, 164 F.3d 806 (which was not a First Amendment case and has no bearing on the application of *Rogers*). (*See* SPA-12–13). Even if both goods were shoes for everyday wear, this Court and others have long applied *Rogers* to expressive works that "compete" at this level of generality. *See, e.g.*, *Cliffs Notes*, 886 F.2d at 495–97 (*Rogers* applied even though both parties sold books); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1370, 1379 (2d Cir. 1993) (same).[7] The relevant question remains the same regardless of the goods at issue: whether the defendant's product is expressive.

---

[7] *See, e.g.*, *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2021), *cert. denied*, 141 S. Ct. 2803 (2021) (both parties sold books); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) (plaintiff sold book; defendant sold audiobook); *Kensington Pub. Corp. v. Gutierrez*, 2009 WL 4277080 (S.D.N.Y. Nov. 10, 2009) (both parties sold books); *Lemme v. Nat'l Broadcasting Co., Inc.*, 472 F. Supp. 2d 433 (E.D.N.Y. 2007) (both parties produced TV shows); *Reflex Media, Inc. v. Pilgrim Studios, Inc.*, 2018 WL 6566561 (C.D. Cal. Aug. 27, 2018) (both parties produced reality TV shows); *Chaquico v. Freiberg*, 274 F. Supp. 3d 942 (N.D. Cal. 2017) (both parties were musicians); *Roxbury Ent. v. Penthouse Media Grp., Inc.*, 669 F. Supp. 2d 1170 (C.D. Cal. 2010) (both parties produced films); *Fierce, Inc. v. Franklin Covey Co.*, 2019 WL 1453573 (W.D. Wash. April 2, 2019) (both parties sold books).

*Harley Davidson* itself supports the principle that the proximity of a defendant's goods to the plaintiff's goods is irrelevant under *Rogers*. At issue in that case was defendant's blatant use of plaintiff's trademarks to advertise its own competing motorcycle services. Although the defendant raised a parody defense, this Court correctly held that the defendant's use was not a parody at all (let alone an "artistic alteration") because the defendant "ma[de] no comment on Harley's mark" and instead "simply use[d] [Harley Davidsons' marks] somewhat humorously to promote his own products and services." *Harley Davidson*, 164 F.3d at 813. Because the defendant's use was non-expressive, the First Amendment did not apply. The *Harley Davidson* court expressly distinguished this Court's First Amendment jurisprudence—*i.e.*, *Cliffs Notes*, 886 F.2d 490 and *Rogers*, 875 F.2d 994, which each involved "expressive works aim[ing] [their] parodic commentary at a trademark or a trademarked product." *Harley Davidson*, 164 F.3d at 812. It is in this context of *non-expressive* use, like a trademark for competing motorcycle services—and *only* in this context—that a parody defense is "sharply limited" *as a matter of trademark law*. *Id.* at 813. On the other hand, where works are expressive, this Court has repeatedly affirmed the application of *Rogers as a matter of First Amendment law*. Because *Wavy Baby* is an expressive good that references Vans' marks for social commentary and parody rather than as

32

a trademark to advertise mundane, competing services, *Rogers* and *Cliffs Notes*, not *Harley Davidson*, are the applicable precedent.

Relying on its erroneous interpretation of *Harley Davidson*, the District Court attempted to distinguish *VIP Products*, in which the Ninth Circuit held that a $15 rubber dog toy in the shape of a Jack Daniel's whiskey bottle was expressive and subject to *Rogers*. (SPA-13); *see also VIP Prods.*, 953 F.3d at 1174. The District Court held that *VIP Products* was inapplicable here because, "[u]nlike in the case at bar, the dog toy [in *VIP Products*] does not occupy the same market as Jack Daniels whiskey," but "[i]f Jack Daniels made milk bones the Holmesian Dog would have a different bark." (SPA-14). That ruling is wrong as a matter of both fact and law because Jack Daniels had a long-running licensing program for dog products, including leashes, collars, and doghouses. *See VIP Prods., LLC v. Jack Daniel's Props., Inc.*, 291 F. Supp. 3d 891, 898 (D. Ariz. 2018). Partially on that basis, the district court in *VIP Products* granted an injunction, *id.* at 910, but the Ninth Circuit vacated the injunction because *Rogers* applies where "artistic expression is at issue," regardless of the types of goods at issue and regardless of whether the parties occupy the same markets. *VIP Prods.*, 953 F.3d at 1174.

The District Court also attempted to distinguish *VIP Products* because "the dog toy [in *VIP Products*] incorporates clear puns and parodic references and displays clear distinctions between the products, making the parody more

discernable and overt." (SPA-14). Even if it were true that MSCHF's specific message is not as clear on the face of the *Wavy Baby* works as was the message on the *VIP Products* dog toys (and it is not true, because the heel tag, the sole sticker, and the work as a whole clearly communicate MSCHF's message), the application of *Rogers* does not rest on the clarity of a work's expression. *See Campbell*, 510 U.S. at 583 ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed" (quoting *Yankee Publ'g*, 809 F. Supp. at 280)). Because the *Wavy Baby* is expressive, the First Amendment applies. The District Court thus erred in not applying—or even considering—*Rogers*.

## B. *Wavy Baby* Passes the *Rogers* Test

Had the District Court considered *Rogers* in this case, it would have found that Vans cannot succeed on its Lanham Act claims as a matter of law, because *Wavy Baby* passes both prongs of the *Rogers* test. *See Cliffs Notes*, 886 F.2d at 497 (vacating the district court's injunction because *Rogers* applied and the work at issue passed the *Rogers* test as a matter of law).

### 1. *MSCHF's references to Vans' marks are relevant to MSCHF's artistic expression.*

The first prong of *Rogers* requires the use of the plaintiff's mark to be "artistically relevant" to the defendant's expression. *See Rogers*, 875 F.2d at 1006. To demonstrate artistic relevance, a party must show only that its use of the mark

at issue is "minimal[ly]" relevant to the work. *Id.* at 1000. In other words, the standard is "appropriately low" and will be met unless the use of the mark has "no artistic relevance to the underlying work whatsoever." *Rogers*, 875 F.2d at 999; *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) ("[E]ven the slightest artistic relevance" is enough to pass *Rogers*).

MSCHF's *Wavy Baby* easily clears that bar as a matter of law. As MSCHF explained in its manifesto, its declarations, and in a podcast submitted to the District Court, *Wavy Baby* is a warped rendition of Vans' Old Skool, the prototypical skate shoe, made for the specific purpose of critiquing consumerism in sneaker culture and Vans' outsized role in that culture, as well as Vans' efforts to translate physical goods into digital goods (a process that MSCHF reversed with *Wavy Baby*). (*See* A-502 ¶ 40). MSCHF's references to Vans' Old Skools are not only relevant but are *essential* to its expressive purpose.

### 2. MSCHF's references to Vans' marks are not explicitly misleading.

The use of a mark satisfies the second prong of *Rogers* unless the use is "explicitly misleading," which this Court defined as being an "explicit indication," "overt claim," or "explicit misstatement" as to "authorship, sponsorship, or endorsement." *See Rogers*, 875 F.2d at 999–1001, 1006.

(a)    *Rogers*'s "Explicitly Misleading" Standard

As the Court explained in *Rogers*, "explicitly misleading" means that a use "*explicitly* denote[s] authorship, sponsorship, or endorsement" and is not merely "*ambiguous* or only *implicitly* misleading." *Rogers*, 875 F.2d at 999–1000, 1005 (emphasis added). As the *Rogers* court explained, naming a song "Bette Davis Eyes" might implicitly suggest that Bette Davis had endorsed the work or had a role in producing it, but such an *implicit* suggestion is not *explicitly* misleading. *Id.* at 999–1000. Thus, confusion surrounding an expressive work cannot contribute to liability under the Lanham Act unless the defendant made an "explicit indication," "overt claim," or "explicit misstatement" that caused the confusion. *Id.* at 1001. Accordingly, "to be relevant [to this second prong], evidence must relate to the nature of the behavior of the [defendant], not the impact of the use" on consumers. *Brown*, 724 F.3d at 1245; *see also E.S.S.*, 547 F.3d at 1100 ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading" under *Rogers*.).

    (b)    MSCHF has made no explicit misstatement as to the source of *Wavy Baby*.

Applying these standards, MSCHF's allusions to Vans' marks are not explicitly misleading as a matter of law because MSCHF made no explicit indication, overt claim, or explicit misstatement as to the source of the artwork or Vans' lack of involvement in the project. Although MSCHF designed *Wavy Baby*

36

to evoke Vans' Old Skool shoes and to further its expression, it did so in a way that made clear that *Wavy Baby* is a MSCHF artwork, not a Vans shoe. MSCHF never claimed an affiliation with Vans or represented that Vans was involved with the *Wavy Baby* project. Consumers purchased *Wavy Baby* works—for three-times the price of a typical Vans sneaker—exclusively from MSCHF's proprietary platforms, which consumers had to find and download first, and on which MSCHF's branding is plainly obvious. At no time has MSCHF's website or mobile app contained any mention of Vans. *Wavy Baby* works were shipped in a *Wavy Baby*-branded box that prominently displayed the names of MSCHF and Tyga, MSCHF's collaborator for this work ("MSCHF x Tyga"), and is significantly larger than a Vans shoebox.



(A358–59 ¶ 39).

The *Wavy Baby* box also displayed a large caricature of George W. Bush falling off a Segway, which is unlike anything present in Vans' branding. Reinforcing the reference to President Bush's stumble and that *Wavy Baby* is for our unstable world, MSCHF replaced Vans' "Off the Wall" logo on the heel of the shoe with the caricature of Bush falling off a Segway. (A-360 ¶ 41).

Not only is there no explicitly misleading message, but also there is an explicit assertion that *Wavy Baby* is from MSCHF and Tyga, not from Vans. When consumers open the *Wavy Baby*-branded box, the first thing they see is a yellow MSCHF-branded card laying on top of tissue paper.

 

(A-361 ¶ 44) (Old Skool at left, *Wavy Baby* at right). "Wavy Baby" and "MSCHF x Tyga" (which designates that *Wavy Baby* is a collaboration between MSCHF and Tyga, and not with Vans) are prominently displayed on the packaging and insole of the *Wavy Baby* works.

38

For all of these reasons, *Wavy Baby* is not explicitly misleading as a matter of law. *See Cliffs Notes*, 886 F.2d at 496 (because the *Spy Notes* book had a different logo, price, marketing plans, and prominently displayed their own name, concerns that some consumers might be confused, or might think that *Cliffs Notes* itself produced the works, did not establish that it was "explicitly misleading" and did "not justify the injunction").

### (c) The *Polaroid* Factors Do Not Apply

Despite *Rogers*'s clear guidance on the meaning of "explicitly misleading," some district courts in this Circuit have cited *Twin Peaks*, 996 F.2d 1366, for the proposition that explicit misleadingness should be assessed through a modified version of trademark law's standard likelihood-of-confusion factors (outlined in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)), requiring that a finding of likelihood of confusion must be "particularly compelling" to qualify as explicitly misleading. *See, e.g.*, *Warner Bros.*, 868 F. Supp. 2d at 179. Application of the *Polaroid* factors in this context renders the *Rogers* test insufficiently protective of First Amendment rights and difficult to administer (given the vagueness and inherently subjective application of the "particularly compelling" standard), especially at early stages of a litigation where the inability to seek dismissal of a Lanham Act claim will chill artistic speech.

As explained above, the *Rogers* test need only be applied when some likelihood of consumer confusion is present. *See Cliffs Notes*, 886 F.2d at 494 (where the defendant's work is a "poor parody," it is "vulnerable under trademark law, since the customer will be confused," so *Rogers* provides the "correct approach" in such cases to balance trademark and First Amendment interests); *cf. My Other Bag*, 156 F. Supp. 3d at 443 (not addressing *Rogers* where there was no likelihood of confusion); *Haute Diggity Dog*, 507 F.3d at 263 (same). Requiring only that the plaintiff show a heightened degree of consumer confusion would render both *Rogers* and artists' rights to comment on our commercial culture a nullity. *See Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (in the context of expressive works, the traditional likelihood-of-confusion test "fails to account for the full weight of the public's interest in free expression"). For this reason, "the *Polaroid* test is at best awkward in the context of" expressive works. *Cliffs Notes*, 886 F.2d at 495 n.3.

Tellingly, despite survey evidence showing that a portion of the public would misunderstand Rogers's involvement in *Ginger & Fred*, the *Rogers* court did not perform a *Polaroid* analysis. *Rogers* instead held that, despite the evidence of confusion, the confusion was "not engendered by any overt claim" and that the defendants' use was therefore not explicitly misleading. 875 F.2d at 1001; *see also Brown*, 724 F.3d at 1245–46 (survey evidence showing that the majority of

consumers believe that identifying marks cannot be included in games without permission "changes nothing" in the *Rogers* analysis in the absence of an affirmative, explicitly misleading claim). As the Ninth Circuit explained, "[w]e must ask not only about the likelihood of consumer confusion but also whether there was an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused such consumer confusion," or else courts would "conflate[] the second prong of the *Rogers* test with the general [] likelihood-of-confusion test, which applies outside the *Rogers* context of expressive works." *Twentieth Century Fox*, 875 F.3d at 1199.

Furthermore, applying the *Polaroid* factors to determine whether the plaintiff's showing of confusion is "particularly compelling" is unworkably vague. How could a court—much less an artist—know whether application of the *Polaroid* factors would render confusion *particularly* compelling? Rather than requiring artists and courts to go through a multi-factored analysis (which would almost always preclude a motion to dismiss or for summary judgment), courts should instead simply ask whether there is an overt or explicitly false statement of affiliation. Anything less would elevate the Lanham Act's confusion analysis above the First Amendment's protection of expression.

For all of these reasons, application of the *Polaroid* factors to determine whether *Wavy Baby* is explicitly misleading is inappropriate.

41

    (d)    Vans has made no showing—let alone a "particularly compelling" showing—that *Wavy Baby* is likely to engender any likelihood of confusion among relevant consumers.

Even if the *Polaroid* factors supply one appropriate means to analyze whether *Wavy Baby* is explicitly misleading, liability cannot attach unless the likelihood of confusion is "particularly compelling" enough to outweigh MSCHF's constitutional right to create and sell its art. *Twin Peaks*, 996 F.2d at 1379. In the context of expressive works, *Polaroid* "should be applied with proper weight given to First Amendment considerations." *Cliffs Notes*, 886 F.2d at 495 n.3. Demonstrating mere consumer confusion alone under *Polaroid* is not sufficient to qualify as "explicitly misleading," because "somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression." *Id.* at 495; *see also Dr. Seuss*, 983 F.3d at 462. The District Court ignored these standards, erroneously concluding that *Wavy Baby* was likely to cause consumer confusion, based on its misapplication of the legal standards and its clear error in assessing the facts. There is simply no evidence in the record of likelihood of confusion among prospective or actual purchasers, or any other relevant parties,[8] let alone a *particularly compelling* likelihood of confusion.

---

[8]    *See Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) ("Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.").

        (i)     The strength of Vans' marks weighs in MSCHF's favor.

The District Court made no finding as to the strength of Vans' marks. Even if Vans' marks are strong, they are narrow and confined to their specific design because there is substantial evidence in the record that the market is flooded with shoes that look very similar to Vans' Old Skool—including shoes that incorporate a similar upper, a waffle sole, and/or a side "jazz" stripe.



(A-300–01; A-364–65 ¶¶ 51–52) (showing as a few examples, clockwise from top left, Vans' Old Skool, Revenge X Storm, Converse Cons One Star, and MSCHF's *Wavy Baby*); (Def.'s Ex. from April 27, 2022 Hearing ("Podcast") at 1:09:08–1:09:17); *Lang*, 949 F.2d at 581 (extensive third party use of similar marks weighs against a finding that plaintiff's mark is strong); McCarthy on Trademarks and Unfair Competition ("McCarthy") § 11:85 (5th ed.) ("In a 'crowded' field of look-

alike marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd.").

Furthermore, if Vans' marks are strong, then they are ripe for MSCHF's critique. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996) (the strength of plaintiff's mark weighed against confusion); *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 324–25 (4th Cir. 2015) ("[T]he strength of the mark and the similarity between the marks often work in reverse for cases of parody and satire as compared to a standard infringement case.").

> (ii) *Wavy Baby* is sufficiently dissimilar to Vans' Old Skools.

The District Court recognized MSCHF's "distortion of [Vans'] original marks" but nonetheless found "striking visual similarities between the Old Skool shoes and the Wavy Baby shoes and their respective packaging." (SPA 7–8). The District Court did not identify which elements it believed created "striking visual similarities," and given that MSCHF distorted or discarded *every* element of Vans' purported trademarks and trade dress, the District Court's conclusion is clearly erroneous. Regardless of whether the goods are viewed "serially" or simultaneously (which has no relevance to the analysis), a simple comparison of the goods shows that they are sufficiently dissimilar to dispel any confusion. *Wavy Baby* does not directly reproduce *any* of Vans' alleged trademarks. (A-283). The wavy sole of *Wavy Baby* is radically different from the classic flat skate shoe sole

44

that defines the Old Skool. The wavy side stripe on *Wavy Baby* is radically different from the straight, jazz stripe on the Old Skool. The *Wavy Baby* works are large, thick, and clunky. The shoelaces, stitching, and packaging are different from the Old Skool's. *Wavy Baby*'s box and red tag show a caricature of President Bush falling off a Segway, which bears no similarity to Vans' logo. (*See* A-359–60). In short, the differences between MSCHF's *Wavy Baby* and Vans' sneakers are anything but subtle. These differences "build[] significant distance" between the Vans shoes and *Wavy Baby*, supporting a finding that confusion is unlikely. *See My Other Bag*, 156 F. Supp. 3d at 435.



(A-374 ¶ 61).

Furthermore, even if some small number of consumers view *Wavy Baby* works in a post-sale context—which is highly unlikely, given that only 4,306 *Wavy Baby* pieces were sold and were spread across all fifty U.S. states and forty-eight different countries (A-716)—the market is flooded with shoes that look very similar to Old Skools, which heightens consumer awareness that even subtle

differences between shoes can signal that they come from a different source. (A-300–01; A-364–65 ¶¶ 51–52); McCarthy § 11:85 (in a crowded field, "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other").

In any event, the fact that *Wavy Baby* works bear some resemblance to Vans' Old Skool design is not just permissible—it is *essential* to MSCHF's expression about Vans and its Old Skool sneakers. Such reminiscence is not sufficient for a finding of infringement, or even a finding that the "similarity" factor favors Vans. Indeed, in order for any parody to be a parody, it *must* reference another party's mark. *See Cliffs Notes*, 886 F.2d at 494 ("A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody."). MSCHF did just that with the *Wavy Baby* project.

(iii)     MSCHF created <em>Wavy Baby</em> in good faith.

The District Court concluded that the "good faith of the Defendant is indeterminable." (SPA-11). This holding ignores substantial testimony in the record that MSCHF designed, produced, and sold *Wavy Baby* works as a good faith parody of and social commentary on Vans Old Skools, similar to all of its artworks. (*See, e.g.*, A-366; A-503; Podcast at 38:14–38:24).

46

(iv)     *Wavy Baby* purchasers are more sophisticated than
         the general public.

Contrary to the Order's holding, the "sophistication of the buyers" factor
weighs in MSCHF's favor because the purchasers of *Wavy Baby* are more
sophisticated than members of the general public.  The District Court surmised,
without explanation or citation to the record, that *Wavy Baby* works were
purchased by the unsophisticated "general public."  (SPA-9).  But this finding is
clearly erroneous, as it contradicts the evidence in the record demonstrating that
the 4,306 collectible pieces of art were purchased by a relatively small and
relatively sophisticated segment of consumers, who are likely to display the works
as artworks and collector's items and who are likely to be attuned to the
differences between *Wavy Baby* and Vans sneakers.  (*See, e.g.*, A-285–86; A-747).

The District Court failed to account for the high price point of *Wavy Baby*—
$220 for a single pair—which renders the relevant consumers presumptively
sophisticated.  *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004)
("[W]here the cost of the defendant's [] product is high, the courts assume that
purchasers are likely to be more discriminating than they might otherwise be.")
(quoting *Maxim's, Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985)).  It is
implausible that any reasonably prudent purchaser could spend $220 on a pair of
*Wavy Baby* works while thinking they were purchasing a pair of Vans sneakers,

which typically retail for approximately $60. *See Haute Diggity Dog*, 507 F.3d at 260–61 (difference in price between goods weighs against likelihood of confusion).

Like the books at issue in *Cliffs Notes*, *Wavy Baby* "is not likely to be bought as an impulse purchase." 886 F.2d at 496. In fact, they ***could not possibly*** have been bought on an impulse. The 4,306 pairs of *Wavy Baby* were sold ***exclusively*** through MSCHF's proprietary app and website, both of which bear distinctive MSCHF branding. In order to purchase a *Wavy Baby* work, a consumer had to know of MSCHF or the *Wavy Baby* project, download MSCHF's proprietary MSCHF app, set up an account in MSCHF's app, access the MSCHF app during the one-hour drop period on April 18, receive a raffle ticket from MSCHF, receive a MSCHF-branded email notification that they were a winner, and only then receive *Wavy Baby*. (A-748 ¶ 50). *Wavy Baby* was not offered to the mass public. No consumer could stumble upon *Wavy Baby* or purchase them by mistake.

The District Court committed clear error in dismissing as "merely supposition" MSCHF's allegations that *Wavy Baby* works were unlikely to be purchased by unsophisticated members of the public and that purchasers instead were likely to primarily consist of "sneaker, streetwear, and art collectors, who keep their collections in boxes or displayed on shelves . . . who pay close attention to the minute details of the goods they collect." (SPA-9; A-285). Far from mere supposition, MSCHF's allegations were based on its deep knowledge of its fanbase

48

and the market for its artwork, including its past sneaker-related artworks, and its understanding of the difficulty of purchasing *Wavy Baby*. (A-285). Further, where a defendant aims its goods at a specific segment of the population, as MSCHF did by aiming its *Wavy Baby* works at sneakerheads, the purchasers are more likely to be sophisticated. *See, e.g.*, *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993) (purchasers of newsstand magazines aimed at parents are "reasonably sophisticated consumers"); *Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir. 1983) ("[T]he buyer of vitamins and health foods is likely to be somewhat discriminating and sophisticated").

The District Court faulted MSCHF for failing to allege that there was a "barrier to entry" that could prevent non-sophisticated members of the public from purchasing *Wavy Baby*. (SPA-8). But the market circumstances, about which there is extensive evidence in the record, rendered such a technical barrier unnecessary. The class of *Wavy Baby* purchasers (whether sophisticated sneaker collectors or otherwise) is necessarily a narrow, self-selecting group of consumers who went through a multi-step process to obtain a raffle ticket for a high-priced, collectible work of art and could not plausibly have started or completed that process without understanding that *Wavy Baby* was created by MSCHF, not Vans.

The District Court cites *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003), for the proposition that "[r]etail customers . . . are not expected to

49

exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination." (SPA-9). That proposition is both plainly true and irrelevant. MSCHF's patrons are not mere "retail customers" shopping for mass-market goods at shopping mall kiosks. Furthermore, there are varying degrees of sophistication within the category of "retail customers," as *Virgin Enterprises* recognized. *See* 335 F.3d at 151 ("[P]urchasers of cellular telephones and the service plans [are] likely to give greater care than self-service customers in a supermarket," but finding the factor neutral because "neither side had submitted evidence on the sophistication of consumers"). In any event, contrary to the District Court's suggestion, (SPA-9), consumers need not be "professional buyers" to be sophisticated enough to mitigate any risk of confusion.

Furthermore, there is no evidence in the record supporting the District Court's finding that MSCHF engaged in a "broad advertising campaign for the Wavy Baby shoes in conjunction with Tyga, an artist with a significant fan base." (SPA-9). To the contrary, like with all of its art, MSCHF engaged in very limited promotion. In accordance with MSCHF's standard practice with regard to its artworks, MSCHF published *one* Instagram post and *one* Twitter post relating to *Wavy Baby*. (A-714). MSCHF also released a certain number of promotional pairs, including to the rapper Tyga, who wore *Wavy Baby* in his *Freaky Deaky* video and published some TikTok videos and Instagram stories relating to *Wavy Baby*. (A-

724). Even if some *Wavy Baby* purchasers were driven to purchase *Wavy Baby* as a result of this sparse promotion, as the District Court surmised, (SPA-9), such a finding does not support the District Court's assertion that such purchasers were unsophisticated members of the general public, as they still would have needed to complete the same time-consuming process as all other purchasers. Only a dedicated fan or art collector is likely to go to such time, trouble, and expense.

(v)  The *Wavy Baby* artwork and Vans' Old Skool sneakers are not proximate goods.

The District Court clearly erred in applying the "proximity of the products" factor, which considers "whether and to what extent the two products compete with each other," accounting for "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). *Wavy Baby* works do not compete in any meaningful sense with Vans' Old Skool skate shoes, as demonstrated by the stark differences in the goods themselves, their distinct classes of consumers, and their distinct channels of sale.

The District Court incorrectly concluded that the goods are proximate because "[b]oth products are sneakers." (SPA-10). Although *Wavy Baby* works are wearable, there is substantial evidence in the record that *Wavy Baby* pieces are not sneakers in the sense that Vans' Old Skools are sneakers. (*See* A-747–52). All of Vans' Old Skool shoes, including all limited-edition versions, have a flat bottom

51

so that they function as skate shoes (even if they also are collectible). (A-746).

*Wavy Baby*, by definition, is not a skate shoe, and its wavy sole renders it

unsuitable and non-functional for daily use, let alone skateboarding. (A-747). The

few images on MSCHF's website portraying the minimally functional *Wavy Baby*

being worn on a skateboard were clear parody. A high-heel shoe and a football

cleat are not proximate goods merely because they are both types of footwear. *See*

*My Other Bag*, 674 F. App'x at 18 (noting "the lack of market proximity" of two

bags in finding no likelihood of confusion). The goods are not interchangeable,

and they are not complementary.

The District Court also failed to consider the substantially different channels

through which the goods are sold. Vans shoes are available on the mass market,

from major third-party retailers, including Zappos, Foot Locker, Kohls, and

Amazon. (A-286). In contrast, *Wavy Baby* was briefly available for sale

exclusively through MSCHF's proprietary platforms. (A-703). Although both

were sold on the Internet, that does not render the markets proximate. *Reply All*

*Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) ("'[T]he fact

'[t]hat the goods or services of the parties are both found on the [i]nternet proves

little, if anything, about the likelihood that consumers will confuse similar marks

used on such goods or services.") (quoting McCarthy § 24:53.50). Furthermore,

whereas Vans sells millions of Old Skool shoes each year through dozens of third-

party sources, (A-13 ¶ 3), MSCHF held a one-time drop of 4,306 *Wavy Baby* limited artworks through a single source.  (A-813 ¶ 3).

Moreover, the District Court failed to address the fact that the goods are sold to different types of consumers.  Whereas Vans' shoes are sold on the open market to the general public, *Wavy Baby* purchasers were a self-selecting group of consumers who downloaded the MSCHF app and who are likely to be both sneakerheads and MSCHF fans—none of whom are likely to be confused as to the source.  (A-286; A-712–13).

Finally, the District Court clearly erred in its reliance on excerpts of a podcast interview by MSCHF employee Lukas Bentel in concluding that *Wavy Baby* is proximate to, and competitive with, Old Skool.  During the interview, Mr. Bentel repeatedly described the artistic vision for *Wavy Baby*, stating that "[w]e're definitely coming at [*Wavy Baby*] from more of an artist lens . . . even though we have a sneaker program (it's a brand), we see ourselves as an artist group and we've been operating as an artist group for years at this point and we do see [*Wavy Baby*] as an extension of that artist practice that we've had."  (Podcast at 26:50–27:18).  Mr. Bentel also explained that, in contrast to the *Jesus Shoes* and *Satan Shoes*, which were customized Nike sneakers, MSCHF had taken the time and effort to design and manufacture *Wavy Baby* from scratch.  (*Id*. at 24:56–25:17).  In this context, Mr. Bentel stated that *Wavy Baby* was thereby "transcending into

more of a straight sneaker space," where "[we] make them ourselves." (*Id*. at 36:45–37:16). The District Court clearly erred in cherry-picking this quote out of context to conclude that *Wavy Baby* is proximate to Vans' sneakers. (*See* SPA-10). Rather, Mr. Bentel repeatedly distinguished MSCHF's *Wavy Baby* works from Vans' sneakers, in that the former is an artwork whereas the latter is a mere sneaker: "[*Wavy Baby*] isn't even a skate shoe—this is a fashion piece or an art object in my mind. . . . [*Wavy Baby*] a different category of space [than a Vans shoe]." (Podcast at 49:45–50:04, 1:08:39–1:08:48.) MSCHF created the MSCHF Sneakers app as a platform to collect and archive its shoe-related artworks— including *Jesus Shoes*, *Satan Shoes*, *TAP3*, and *Wavy Baby*—given MSCHF's recurring commentaries on sneakerhead culture and various specific sneaker brands, and the acclaim its sneaker artworks had previously received, not to compete with established shoe companies like Vans in terms of either commercial status or type of product. (A-286). In short, it is clear from the context of the podcast that *Wavy Baby* is *not* proximate to the Vans Old Skool.

(vi)     Vans will not bridge the gap.

Vans did not argue to the District Court that it would likely bridge the gap, and the District Court made no finding on this factor. (*See* A-167 n.1). There is no evidence in the record that Vans would ever deviate from the uniform, utilitarian, flat-soled skate shoe design that it has sold for approximately fifty years—let alone

54

deviate to something wavy, uncomfortable, and minimally functional. (*See* A-745–47). This factor weighs against a finding of likelihood of confusion.

> (vii)  Vans presented no evidence of actual confusion among relevant consumers.

The District Court concluded that "Plaintiffs have sufficiently demonstrated actual consumer confusion" but did not cite *any* evidence of relevant confusion. (SPA-8).  The relevant population for finding "actual confusion" is not *consumers in general* but rather *actual or potential purchasers* for a good or service.  *See Lang*, 949 F.2d at 583 ("Trademark infringement protects only against *mistaken purchasing decisions* and not against confusion generally.") (emphasis added); *see also Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 562–63 (S.D.N.Y. 2012) ("In assessing whether an alleged infringement has resulted in 'actual confusion,' courts must focus on whether [the] prospective purchaser—and not other industry members or general members of the public—are likely to be deceived.").  In support of its finding of actual confusion, the District Court cited three types of evidence, none of which support a finding of actionable confusion.

First, the Order cited "[m]ultiple independent sources [that] commented on the similarity between the Old Skool shoes and the Wavy Baby shoes," presumably referring to two articles cited by Vans.  (SPA-8; A-175).  But rather than demonstrating confusion, commenting on the similarity between goods demonstrates a *lack* of confusion, because the commenters recognized that the

55

goods came from different sources despite similarities between the goods. *See Lemme*, 472 F. Supp. 2d at 450 (emails demonstrating that "authors knew of the existence of [defendant's] show as separate and distinct from Plaintiff's show . . . evidence consumer knowledge, not confusion") (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001)). Both articles cited by Vans explicitly identified *Wavy Baby* as being produced by MSCHF, not Vans. (A-287). Nor are the articles cited by Vans evidence of confusion affecting purchasing decisions, which is required to satisfy the actual-confusion *Polaroid* factor. *Lang*, 949 F.2d at 583.

Second, the District Court cited, without explanation, "[c]onsumers [who] have misunderstood the source of the Wavy Baby shoes as a collaboration between Plaintiffs and Defendant." (SPA-8). The only evidence in the record that could possibly support such a finding is the anonymous Twitter and Instagram comments posted following articles about Vans' lawsuit, cited by Vans. But this evidence is irrelevant to a finding of actual confusion, as this Court has made clear that the relevant consumers for purposes of the actual-confusion prong of the *Polaroid* analysis are *actual or prospective purchasers*, not the public at large. *Lang*, 949 F.2d at 583; *see also Bulman*, 882 F. Supp. 2d at 562–63. Moreover, courts in this Circuit have correctly recognized that anonymous social media posts are not probative of actual consumer confusion. *See Louis Vuitton Malletier, S.A. v.*

56

*Hyundai Motor Am.*, No. 10-cv-1611, 2012 WL 1022247, at \*24 (S.D.N.Y. Mar. 22, 2012) ("Louis Vuitton's arguably most probative evidence is a scattering of Twitter postings by unknown users," which does not "permit[] the Court to identify the presence or absence of actual confusion as a matter of law"); *Two Hands IP LLC v. Two Hands Am., Inc.*, No. 21-cv-3855, 2021 WL 4437975, at \*10 (S.D.N.Y. Sept. 28, 2021) (plaintiff's evidence of mistaken social media posts is insufficient to show actual confusion because, "[e]ven assuming the mistaken posts demonstrate confusion in the general sense, [n]o evidence links the confusion evinced by the [posts] to any potential or actual effect on customers' purchasing decisions," so it "is therefore not the type of confusion that can satisfy this *Polaroid* factor."). There is no evidence in the record that *any* of the commenters cited by Vans purchased or attempted to purchase *Wavy Baby* works, so the posts cannot support a finding of actual confusion.

Third, the District Court erroneously cited excerpts of the podcast interview with Mr. Bentel, where the host stated that "everyone I've spoken to about this shoe says . . . if I asked you to tell me what the person across the street was wearing, they'd say they're wearing a pair of Vans." (SPA-8). The District Court incorrectly summarizes this statement by concluding that "[t]he host of a show dedicated to the discussion of sneakers comments directly upon the actual confusion of the average consumer." (SPA-9). The host's comments were posed

as a speculative hypothetical about what people *would* say *if* they saw a pair of *Wavy Baby* works from across the street, not a report about what consumers *actually* think upon seeing *Wavy Baby* across the street. Such "wholly speculative" statements cannot be "indicative of actual confusion." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993). There is no evidence in the record whatsoever about what consumers in general (much less purchasers) think upon seeing an actual pair of *Wavy Baby* works. Furthermore, the "average consumer" is not the relevant baseline for a finding of actual confusion; instead, the relevant group of consumers are the actual or prospective *purchasers*, so speculation about what the average person might think upon hypothetically seeing *Wavy Baby* works from across the street is irrelevant. *See Lang*, 949 F.2d at 583.

In any event, Vans' purported examples of confusion are nowhere near enough to outweigh the great First Amendment concerns in this case. In *Rogers* itself, the plaintiff presented survey evidence indicating that some members of the public would be confused about the film at issue, "[b]ut that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." 875 F.2d at 1001. The entire purpose of *Rogers* is to protect First Amendment interests even when there is a likelihood of confusion, and even some evidence of *actual* confusion.

(viii)  The quality-of-the-goods factor is neutral.

The District Court also erred in concluding that the "quality of product"

factor weighed in Vans' favor.  (*See* SPA-11).  The District Court cites "variation

in quality" between *Wavy Baby* and Vans shoes, owing to "particular deficiencies"

in *Wavy Baby* works that are "not apparent in Old Skool shoes," such as "red

coloring of the heel patch showing through the Wavy Baby shoe's white

background, and misalignment of the black stripe bordering the upper sidewall of

the shoe." *Id.*



(*See* A-788–89).  If such minute and inconsequential elements could render *Wavy*

*Baby* "low quality" under this *Polaroid* factor, then this factor would weigh

*against* a finding of confusion, as a matter of law.  "A marked difference in

quality . . . actually tends to *reduce* the likelihood of confusion in the first instance,

because buyers will be less likely to assume that the senior user whose product is

high-quality will have produced the lesser-quality products of the junior user."

*Savin*, 391 F.3d at 460–61 (emphasis added).  Accordingly, the District Court's findings of "deficiencies" in *Wavy Baby* works undermines its conclusion that this factor weighs in Vans' favor.

In any event, contrary to the District Court's Order, MSCHF never "noted" any "risk of injury to wearers" associated with *Wavy Baby* works.  (SPA-11). MSCHF instead alleged that, although the wavy construction renders *Wavy Baby* unsuitable for skateboarding and that wearers would need to be more cautious when walking down stairs than if they were wearing sneakers, the warning label on the bottom of the works was part of its parody rather than an accurate reflection of the risk to wearers.  (A-280).

(ix)    The *Polaroid* factors weigh in MSCHF's favor.

The District Court erred in concluding that the *Polaroid* factors weigh in favor of an injunction.  (*See* SPA-11).  The District Court applied the wrong legal standards and misapplied the law to the facts as to nearly all *Polaroid* factors.  In any case, even if the District Court were correct in its conclusions, any likelihood of confusion in this case cannot establish a ***particularly compelling*** likelihood of confusion.  The District Court thus erred in granting the injunction, as Vans is unlikely to succeed on the merits of its trademark infringement claim.  Indeed, Vans' claim should be dismissed as a matter of law under the First Amendment and *Rogers*.

## II.     The Preliminary Injunction Is an Unconstitutional Prior Restraint on MSCHF's Expression.

By forcing MSCHF to take down its archival website and app content regarding *Wavy Baby*, and by prohibiting MSCHF from promoting its *Wavy Baby* artwork by any means and in any context (including by displaying *Wavy Baby* at MSCHF's Art Basel and Perrotin exhibitions later this year), the Order constitutes an unconstitutional prior restraint on MSCHF's speech.  (*See* A-504–05 ¶ 49); *Alexander*, 509 U.S. at 550 ("Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."); *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1160 (9th Cir. 2000) (the First Amendment protects the right to display art).  As a prior restraint, the Order is subject to "a heavy presumption against its constitutional validity."  *Org. for a Better Austin*, 402 U.S. at 419; *see also Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 178 (2d Cir. 2001) ("[T]he First Amendment strongly disfavors injunctions that impose a prior restraint on speech").  For the reasons articulated above with regard to MSCHF's First Amendment defense, the District Court failed to present any lawful basis for its prior restraint on MSCHF's expression and has thus failed to rebut the heavy presumption against its constitutional validity.  Accordingly, the Order is unconstitutional and should be vacated.

### III. The District Court Erred in Requiring MSCHF to Escrow Its Gross Revenues and in Failing to Require Vans to Post Security.

The Order directs MSCHF to escrow all of its revenue from *Wavy Baby* "so that . . . [MSCHF] may return those funds to customers who ordered [*Wavy Baby*] under the mistaken belief that Vans was the source of the shoes or otherwise approved or sponsored [*Wavy Baby*]." (SPA-17–18). This issue was not briefed by the parties. Neither Vans nor the district court cited any legal authority that would permit the district court to require such an extraordinary and punitive measure—nor could they, because no such authority exists. An order to escrow *net profits* (not gross revenues) might be appropriate where the plaintiff seeks lost profits, but *only* where those profits will help ensure the availability of funds to provide the plaintiff's requested equitable relief. *See Gucci*, 768 F.3d at 131 ("[District courts] maintain the equitable power to [issue a prejudgment asset freeze] . . . where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ***ancillary to the final relief***.") (emphasis added); *AKF, Inc. v. AvantGarde Senior Living*, No. 21-cv-188, 2021 WL 2662070, at *4 (N.D.N.Y. Apr. 29, 2021) (refusing to order defendant's profits placed in escrow because the courts "have 'no authority' under Rule 65 'to issue a preliminary injunction preventing [a defendant] from disposing of [its] assets" pending a claim for money damages) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 133 (1999)). An order to escrow net profits could be

appropriate only where the district court has found that the defendant likely would be unable to satisfy a judgment, which is not the case here. But even if limited to MSCHF's net profits, that relief would not be "ancillary to the final relief," because it is wholly unrelated to any harm purportedly suffered (or that purportedly will be suffered) by Vans. MSCHF's escrow of funds for the purpose of "return[ing] those funds to customers" is also inappropriate because it is unrelated to the remedies sought by Vans. (A-32–34). For example, Vans has not sought—nor could it seek—restitution to purportedly confused consumers.

Further, Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order ***only*** if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" (emphasis added). Here, the District Court failed to make any assessment of the damage that is likely to be sustained by MSCHF if this Court finds that MSCHF was wrongfully enjoined and that the Order was improvidently granted. *See Corning*, 365 F.3d at 158 (district court violated Rule 65(c), which "allows a preliminary injunction to become effective *only* upon the applicant's positing of an amount that the district court determines adequate" and requires "the district court . . . to make this determination *before* it enter[s] the preliminary injunction") (emphasis added); *Arias v. Solis*, 754 F. Supp. 290, 295 (E.D.N.Y.

63

1991) ("[A] court's failure to require the posting of security could be reversible error").

## **CONCLUSION**

For the foregoing reasons, this Court should vacate the District Court's injunction, and Vans' claims should be dismissed.

Dated: June 17, 2022               Respectfully submitted,
     New York, New York

DEBEVOISE & PLIMPTON LLP

By: /s/ David H. Bernstein_____

David H. Bernstein
Megan Bannigan
919 Third Ave.
New York, New York 10022
Tel: (212) 909-6696
Fax: (212) 521-7696
dhbernstein@debevoise.com
mkbannigan@debevoise.com

SWANSON, MARTIN & BELL, LLP
William D. Patterson
330 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 321-8445
wpatterson@smbtrials.com

*Attorneys for Defendant-Appellant*
*MSCHF Product Studio, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,996 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in Times New Roman 14-point font.

Dated: June 17, 2022
     New York, New York

Respectfully submitted,

By: <u>/s/ David H. Bernstein      </u>

65

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify pursuant to Fed. R. App. P. 25(d) that, on June 17, 2022, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system, and thereby caused the foregoing Brief to be served upon counsel for Appellees by electronic mail generated by the Court's CM/ECF system in accordance with Local Rule 25.1(h).

Dated: June 17, 2022
       New York, New York

Respectfully submitted,

By: <u>/s/ David H. Bernstein</u>

    David H. Bernstein

**SPECIAL APPENDIX**

i

**TABLE OF CONTENTS**

**Page**

Decision and Order of the Honorable William
    Kuntz, II, dated April 29, 2022, Appealed From ...   SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VANS, INC. and VF OUTDOOR, LLC,                     :
                                                    :
                    Plaintiffs,                     :
                                                    :
          v.                                        :        **DECISION & ORDER**
                                                    :        22-CV-2156 (WFK) (RML)
MSCHF PRODUCT STUDIO, INC.,                          :
                                                    :
                    Defendant.                      :
-----------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**
Before the Court is a motion by Vans, Inc. and VF Outdoor, LLC (collectively, "Plaintiffs" or
"Vans") seeking a temporary restraining order and preliminary injunction against MSCHF
Product Studio, Inc. ("Defendant") related to its sale of the "Wavy Baby" shoes, which Plaintiffs
assert, *inter alia,* infringe their trademarks and trade dress in violation of the Lanham Act. For
the following reasons, the Court GRANTS Plaintiffs' motion for a temporary restraining order
and a preliminary injunction.

# BACKGROUND

This action arises out of a collaboration between Defendant and Michael Stevenson, who

uses the stage name "Tyga," to design, to develop, and to sell the "Wavy Baby" shoes.

Plaintiffs assert those activities violate their intellectual property rights by incorporating

Plaintiffs' trademarks and trade dress. *See* Compl. ¶ 7, ECF No. 1. The Defendant released four

thousand three hundred and six (4,306) Wavy Baby shoes for sale on Monday, April 18, 2022, at

12:00 Noon. Rosendahl Decl. ¶ 11, ECF No. 27-3.

On April 14, 2022, Plaintiffs filed a Complaint against Defendant asserting six claims

for: (1) Federal Trademark Infringement in violation of 15 U.S.C. § 1114; (2) Federal Unfair

Competition and False Designation of Origin in violation of 15 U.S.C. § 1125(a); (3) Federal

Trademark Dilution in violation of 15 U.S.C. § 1125(c); (4) Unfair Trade Practices in violation

of New York General Business Law § 349; (5) Trademark Dilution in violation of New York

General Business Law § 360-1; and (6) Common Law Trademark Infringement and Unfair

1

**SPA-2**

Competition. *See* Compl.  Plaintiffs assert the Wavy Baby shoes and associated advertising infringe Plaintiffs' "jazz stripe" trademark (the "Side Stripe Mark"), "Flying-V" mark, "OFF THE WALL" mark, waffle sole mark, and Vans footbed logo (collectively, the "Marks") and the Plaintiffs' Old Skool shoes trade dress, Off the Wall trade dress, and shoe box trade dress (collectively, the "Trade Dress").  Pls. Mem. at 3, 14, ECF No. 12-1.

On April 15, 2022, Plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction to enjoin Defendant from: (1) releasing for sale to the public any of the Wavy Baby shoes or any colorful imitations or reconstructions thereof (collectively, the "Wavy Baby shoes"); (2) fulfilling orders for any of the Wavy Baby shoes; (3) using Vans' Old Skool Trade Dress or Side Stripe Mark, or any mark that is confusingly similar to Vans' marks and trade dress or that is a derivation or colorable imitation or recreation thereof, regardless of whether used alone or with other terms or elements; (4) referring to or using any of the Marks, Trade Dress, or derivations and colorable imitations or recreations thereof in any advertising, marketing, or promotion; and, (5) instructing, assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to above, or taking any action that contributes to any of the activities referred to above.  Pls. Mot. at 4, ECF No. 12. Plaintiffs requested the Court to order Defendant to place in escrow any funds received from all orders taken to date for the Wavy Baby shoes so that, if Plaintiffs prevail in this action, Defendant is able to return those funds to customers who ordered the Wavy Baby shoes under the mistaken belief Vans was the source of the shoes or otherwise approved or sponsored the shoes. Finally, Plaintiffs sought permission to file with the Court within thirty (30) days after entry of the injunction a report in writing under oath detailing the manner and form in which Defendant has complied with the injunction. Pls. Mot. at 5.

2

SPA-3

In assessing Plaintiffs' motion for injunctive relief, this Court has reviewed the submissions of Plaintiffs and Defendant, including their memoranda, declarations, and exhibits, as well as the amicus curiae brief submitted by Harvard Law Professor Rebecca Tushnet.  The Court also considered carefully the oral arguments made by counsel at the hearing held on April 27, 2022.

## DISCUSSION

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. ___ 138 S.Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)).  "To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'"  *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).

"The Second Circuit has not definitively ruled on whether a Court should consider the [balance of the hardships and the public interest as] set forth in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006), and *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008), in evaluating preliminary injunctions in the trademark infringement context." *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1092, 2015 WL 845711, at *2 (S.D.N.Y. Feb. 26, 2015) (Furman, J).  However, "'*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context,' and some district courts have applied the additional two factors in the trademark and trade dress

3

infringement context as well." *Id.* (quoting *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010)). Accordingly, the Court also considers those factors here.

## I.        Likelihood of Success on the Merits or Serious Questions Going to the Merits

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).  "In order to establish a valid Lanham Act claim based on trademark or trade dress infringement, a party must show, first, that the trademark or trade dress is valid and entitled to protection, and second, that defendant's use of the trademark or trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services." *Barefoot Contessa Pantry, LLC,* 2015 WL 845711, at \*3 (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, 696 F.3d 206, 216–17 & n.9 (2d Cir. 2012)).

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  However, "[b]ecause the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, . . . its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815–19 (2d Cir. 1979); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)) (emphasis in original).

4

## A. Plaintiffs' Marks Merit Protection

Courts analyzing trademark infringement claims first "look to see whether plaintiff's mark merits protection. In order for a trademark to be protectable, the mark must be 'distinctive' and not 'generic.' A mark is said to be 'inherently' distinctive if '[its] intrinsic nature serves to identify a particular source." *Christian Louboutin S.A.*, 696 F.3d at 216 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)) (alteration in original). A mark inherently not distinctive may instead "'acquire' distinctiveness by developing 'secondary meaning'"—that is, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). Federal registration of a trademark is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark." *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017); 15 U.S.C. § 1057(b).

"Trade dress" is a "category that originally included only the packaging, or 'dressing' of a product, but . . . has been expanded . . . to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000). A product's trade dress is protected "if it is not functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace." *Shandong Shino Food Indus. Co., Ltd. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 253 (E.D.N.Y. 2021) (Brodie, C.J.) (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001)). Secondary meaning may be shown by: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited

media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Christian Louboutin S.A.,* 696 F.3d at 226.

The Court finds Plaintiffs have established a likelihood of prevailing in their argument the Marks and the Trade Dress merit protection.  Plaintiffs' Marks are registered, *see* Wimmer Decl. ¶¶ 9, 15, Exs. 1–4, 6–7, ECF No. 12-2, and therefore prima facie valid and protectable. *See Matal v. Tam*, 137 S. Ct. at 1753.  Plaintiffs have also sufficiently demonstrated a likelihood of success in asserting their trade dress has acquired secondary meaning.  In particular, Plaintiffs note consumer surveys have shown the Old Skool shoe trade dress is a unique source identifier for Vans, Pls. Mem. at 9; Wimmer Decl. ¶ 14, Ex. 5; the Marks have received unsolicited coverage in third-party publications and reports commenting on the design, Regan Decl. ¶¶ 18, 22–23, ECF No. 12-4; the Plaintiffs have sold over 200 million pairs of the Old Skool shoes since their introduction in 1977, Callahan Decl. ¶¶ 5–7; and the Plaintiffs have invested millions of dollars in advertising the Old Skool trade dress, Regan Decl ¶ 20.  Overall, Plaintiffs have sufficiently demonstrated a likelihood of showing "in the minds of the public," the Old Skool trade dress operates as an identifier of the source of the product.  *See Christian Louboutin S.A.*, 696 F.3d at 216.  Furthermore, Defendant has offered no argument disputing the validity of the Marks.

### B. Consumer Confusion

If a plaintiff's trademark is valid and protectable, courts must then "determine 'whether [the] defendant's use of a similar mark is likely to cause consumer confusion.'"  *Id*. at 217 (quoting *Dooney & Bourke, Inc.*, 454 F.3d at 115); *see also* 15 U.S.C. § 1114(1)(a)–(b).  In order to determine the likelihood of confusion, courts in the Second Circuit apply the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961): (1) the strength of

SPA-7

the trademark; (2) the degree of similarity between the two marks; (3) the proximity of the products and their competitiveness with one another; (4) the likelihood the prior owner may "bridge the gap" in the markets for the products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) the quality of defendant's product compared with the plaintiff's product; and (8) the sophistication of the buyers. *See id.* at 495.

"The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir.2009) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)). "No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is likelihood of confusion between the two parties' products." *Plus Prods. v. Plus Disc. Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir. 1983) (citing cases).

Considering the *Polaroid* factors here, the Court finds Plaintiffs have demonstrated a likelihood of prevailing on the issue of consumer confusion. In particular, the Court notes the striking visual similarities between the Old Skool shoes and the Wavy Baby shoes and their respective packaging. Defendant asserts while the Wavy Baby shoes are reminiscent of the Old Skool shoes, each purported use of Plaintiffs' Marks is distorted and thus different from the Old Skool shoes. Def. Mem. at 14, ECF No. 13; Wiesner Decl. ¶¶ 61–66, ECF No. 17. However, the Marks need not be identical, but rather only similar, for there to be a likelihood of confusion. "Whether simultaneous viewing by consumers is likely to result in confusion is not relevant when it is serial viewing that is at issue given the market context or the type of confusion claimed. In such a case, a district court must ask not whether differences are easily discernable

7

SPA-8

on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." *Burlington Coat Factory Warehouse Corp.*, 426 F.3d at 538. "The Lanham Act protects against several types of consumer confusion, including *point-of-sale* confusion, *initial interest* confusion, and *post-sale* confusion, and the *Polaroid* factors must be applied with an eye toward each of these." *Id.* at 537 n.2 (internal citations omitted) (emphasis in original). Here, Defendant's distortion of the original marks is insufficient to dispel consumer confusion.

Plaintiffs have sufficiently demonstrated actual consumer confusion. Multiple independent sources commented on the similarity between the Old Skool shoes and the Wavy Baby shoes. Consumers have misunderstood the source of the Wavy Baby shoes as a collaboration between Plaintiffs and Defendant. *See* Pls. Mem. at 22; Rosendahl Decl. ¶ 4; Pls. Reply Mem. at 1–2, ECF No. 27. In an episode of the "Complex Sneakers Podcast," entered into evidence during the April 27, 2022 hearing on this motion, and described as "the quintessential sneakerhead show," Tr. at 37, one of the show's hosts stated, in sum and substance, to Defendant's chief creative officer, Lukas Bentel,

> Everyone I've spoken to about this shoe says that if someone was walking down the street and . . . if I asked you to tell me what the person across the street was wearing, they'd say they're wearing a pair of Vans. . . . Just the fact that the average person wouldn't, unless you like, sat there and looked at it with, you know, a magnifying glass, and saw the label on the back and saw that it read this, but just like, if you walked across the office, if you were wearing a pair of those sneakers, it's a pair of Vans.

To which Mr. Bentel responded,

> Yes, these are the anchor of the shoe, like the base of the shoe before our transformation is of course a Vans, and I think there's no doubting that. And we are completely playing into that space, but there are a few things: number one I think it is a really unique transformation Vans would not ever have done. I wouldn't even say, like, I have a pair right now, and if you put them on and walked around,

8

> you'll see this is not the greatest foot-feeling shoe. . . . This in our mind is an image,
> it's sort of like if you want to . . . like if we're talking about things that are
> untouchable to us, frequently you would think, you know, like, big brands. You
> walk out, you look at the street, you're seeing just advertising everywhere, and
> these are the things that are untouchable. They're like sacred in some sense, and in
> the same sense we're just completely inundated by it all the time. So I think one of
> the things we really play on and like, play with is just trying to push those
> boundaries of like, what we as people interacting in the world can touch and mess
> with. So this is a play in that space, and we've had many other plays in that space
> previously that really range from very fine art-related things to some of these.

Complex Sneakers Podcast at 31:40–34:10. The host of a show dedicated to the discussion of

sneakers comments directly upon the actual confusion of the average consumer.

The Court finds the "sophistication of the buyers" factor weighs in Plaintiffs' favor.

Defendants sold the Wavy Baby shoes to the general public through self-service mediums

accessible without professional assistance, and shoes generally are a common consumer item.

Pls. Mem. at 24; Wimmer Decl. ¶¶25–26. "Retail customers . . . are not expected to exercise the

same degree of care as professional buyers, who are expected to have greater powers of

discrimination." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (internal

citations omitted). The Defendant engaged in a broad advertising campaign for the Wavy Baby

shoes in conjunction with Tyga, an artist with a significant fan base. It is likely at least some

buyers of the Wavy Baby shoes purchased them as a result of this public campaign, which

included a video in which Tyga appeared to microwave an Old Skool shoe to produce a Wavy

Baby shoe, Pls. Reply. at 6. Defendant argues few of the purchasers of the Wavy Baby shoes

were likely to be unsophisticated members of the general public, as the shoe was only available

for a short period of time on the Defendant's website and proprietary application. Def. Mem. at

16. This is merely supposition. Tr. at 8. Defendant has offered no persuasive rationale as to

why the Wavy Baby shoe's sale solely on Defendant's website and application poses such a

barrier to entry that only sophisticated consumers would have purchased the shoe.

9

SPA-10

Plaintiffs demonstrated sufficient proximity of the products in question.  Both products are sneakers marketed with similar skate-related imagery.  Plaintiffs regularly release special edition versions of the Old Skool shoes, including limited edition models developed in collaboration with artists, released in quantities similar to that of the Wavy Baby shoes, and at a closer price point of $180.00 as compared to the retail price of $220.00 for the Wavy Baby shoes.  *See* Pls. Mem. at 22; Def. Mem. at 16; Tr. at 79.  Defendant argues the Wavy Baby shoes are a "limited edition, collectible work of art," "likely to be kept in glass cases or on shelves," in contrast to the "simple and practical" Old Skool shoes, which are "meant to be worn." Def. Mem. at 17.  However, in his interview on the Complex Sneakers Podcast, when comparing the Wavy Baby shoes with prior shoes developed by the Defendant, Mr. Bentel stated,

> For better or for worse, we were thinking of those [prior shoes] as art pieces. I know now this is sort of transcending into more of a straight sneaker space. And so that is us sort of pushing those buttons a little more in some sense because I think we were told that we couldn't do certain things, and we said we're just going to figure out how to make them ourselves.  So that's sort of the impetus behind pushing, you know, an actual sneaker brand, MSCHF sneakers.

Complex Sneakers Podcast at 36:45–37:16.  Defendant's founder and chief executive officer, Gabriel Whaley, additionally stated Defendant has retained approximately 280 pairs of the Wavy Baby shoes which it had intended to use to "account for any fulfillment errors and to fulfill requests from museums and galleries for exhibitions." Supp. Whaley Decl. ¶ 14, ECF No. 22. Defendant stated during the April 27, 2022 hearing that the fulfillment errors refer to incorrect sizes being shipped.  Tr. at 57– 58.  However, Plaintiffs noted if the shoes were truly meant to be artworks to be displayed rather than worn, there would be no specific need for consumers to receive a particular size.  Tr. at 84.  Despite Defendant's assertions the Wavy Baby shoes belong in museums and galleries for exhibition, the production of 4,306 pairs of shoes places the Wavy Baby shoes on a mobile footing vastly different from one found at the Brooklyn Museum.

The variation in quality between the Wavy Baby shoes and the Plaintiffs' Old Skool shoe also weighs in favor of Plaintiffs. Plaintiffs highlight particular deficiencies in the Wavy Baby shoes not apparent in Old Skool shoes. The exhibits depict the red coloring of the heel patch showing through the Wavy Baby shoe's white background, and misalignment of the black stripe bordering the upper sidewall of the shoe, which could lead to consumer confusion regarding the quality expected from a Vans shoe. *See* Rosendahl Decl. ¶¶ 18-19. Both parties note the wavy construction of the shoes may create a risk of injury to wearers, a risk which Plaintiffs argue, and the Court agrees is likely to threaten Plaintiffs' reputation as a source of "high-quality, dependable footwear." Pls. Mem. at 23. Given the proximity of the products, the Court finds this factor weighs in favor of an injunction. On this record, the good faith of the Defendant is indeterminable; therefore this factor does not impact the assessment of the Court.

On balance, the *Polaroid* factors weigh in favor of Plaintiffs. The Court finds Plaintiffs have demonstrated the Wavy Baby shoes will likely cause consumer confusion. *See Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1277 (S.D.N.Y. 1994) (Cedarbaum, J.) ("the fact that the majority of factors weigh [in favor of] an injunction is significant").

## C.  First Amendment

Defendant's primary argument in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction is that Plaintiffs are not likely to succeed on the merits of their trademark claims because the Wavy Baby shoes are a parodic or artistic expression of Plaintiffs' Marks and Trade Dress and thus protected by the First Amendment. Plaintiffs argue, and the Court agrees, that Plaintiffs are likely to succeed on the merits with respect to Defendant's First Amendment arguments.

11

While Courts have "accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or a trademarked product, . . . [they] have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999) (limiting parodic use of a trademark where Defendant infringed the mark of a corporation which manufactures, sells, and offers repair services for motorcycles, in order to advertise his own motorcycle repair and parts business). "A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Cliffs Notes, Inc.*, 164 F.3d at 494. "The latter message 'must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement.'" *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 434–35 (S.D.N.Y. 2016) (Furman, J.) (quoting *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007)), *aff'd*, 674 F. App'x 16 (2d Cir. 2016). A successful parody "clearly indicates to the ordinary observer 'that the defendant is not connected in any way with the owner of the target trademark.'" *Id.* at 435 (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed.)). *See also Haute Diggity Dog, LLC*, 507 F.3d at 259 ("[I]t is this lack of confusion that a parodist depends upon to achieve the parody.").

Whatever the actual artistic merits of the Wavy Baby shoes, the shoes do not meet the requirements for a successful parody. Defendant argues the Wavy Baby shoes render "what could previously only be seen digitally into something physical" and "critique consumer culture and Vans' outsized role in that culture." Def. Mem. at 9; Whaley Decl. ¶ 40, ECF No. 18. While the Wavy Baby shoes convey their similarity and reference to the Old Skool shoe Marks,

the shoes do not sufficiently articulate an "element of satire, ridicule, joking or amusement" clearly indicating to the ordinary observer the Defendant is "not connected in any way with the owner of the target trademark." *My Other Bag, Inc.*, 156 F. Supp. 3d at 435.  Although Defendant included its own branding on the label and distorted the original Marks, the extensive similarities and overall impression overcome any such distinguishing features, as evidenced by actual confusion in the marketplace.  While the manifesto accompanying the shoes may contain protected parodic expression, the Wavy Baby shoes and packaging in and of themselves fail to convey the satirical message.

Defendant cites *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, noting the court held "defendant's use of [Louis Vuitton's famous] mark [on a tote bag called My Other Bag] is an obvious parody or pun, readily so perceived, and unlikely to cause confusion among consumers." Def. Mem. at 11 (quoting 156 F. Supp. 3d at 443).  The instant case is distinguishable: the satirical message presented by the Wavy Baby shoes is not readily perceived from the product without the accompanying manifesto or descriptions.  This contrasts with the play on the "well-known 'my other car . . .'" joke in *My Other Bag, Inc.*, 156 F. Supp. 3d at 435, which itself served to further distance the tote bag from a Louis Vuitton bag.  *Id.*  Defendant additionally offers as a comparison *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, wherein the Ninth Circuit concluded a rubber dog toy in the shape of a Jack Daniels whiskey bottle, featuring altered Jack Daniels trade dress, was expressive and shielded from trademark liability as a parody.  953 F.3d 1170, 1175–76 (9th Cir. 2020).  However, the Court finds this comparison unpersuasive.  Unlike in the case at bar, the dog toy does not occupy the same market as Jack Daniels whiskey, and where the infringement claim involves a competing product, "parodic use is sharply limited." *Harley Davidson, Inc.*, 164 F.3d at 813.  Further, the dog toy incorporates clear puns and

parodic references and displays clear distinctions between the products, making the parody more discernable and overt. If Jack Daniels made milk bones the Holmesian Dog would have a different bark.

Plaintiffs have sufficiently shown they are entitled to a preliminary injunction on the basis of their trademark infringement claims. Therefore, Court need not address whether Plaintiffs are likely to prevail on the merits of their claims of trademark dilution.

## II.   Irreparable Harm

"Irreparable harm is 'the single most important prerequisite' for relief." *Weaver v. Schiavo*, 750 Fed. App'x 59, 60 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Oliver v. New York State Police*, 812 Fed. App'x 61, 62 (2d Cir. 2020) (summary order) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999)). The moving party must demonstrate "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (citation omitted). Where a plaintiff alleging a trademark violation establishes a likelihood of success on liability, irreparable harm is presumed. *See* 15 U.S.C. § 1116(a). Once a mark is found protectable, "a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citation omitted); *see also Burlington Coat Factory Warehouse Corp.*, 426 F.3d 537; *Marks Org., Inc. v. Joles*,

14

784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (Wood, J.) (even absent a presumption of irreparable injury, "a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury."). Courts have found irreparable harm "where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement." *Microban Prods. Co. v. API Indus., Inc.,* No. 14–CV–41, 2014 WL 1856471, at *21 (S.D.N.Y. May 8, 2014) (Failla, J.).

Plaintiffs have spent forty-five years, and millions of dollars in advertisement and marketing, to develop the brand recognition and success the Old Skool shoes and associated Trade Dress enjoy today. Def. Mem. at 8; Regan Decl. ¶ 20. The Wavy Baby shoe developed by Defendant creates a strong risk of consumer confusion and irreparable harm to the consumer recognition and goodwill cultivated by Plaintiffs. Callahan Decl. ¶¶ 12-19.

Defendant's repeated assurances they will not develop, promote, or advertise allegedly infringing products "during the pendency of the litigation," failed to reassure the Court Plaintiffs will be secure from further harm absent injunctive relief. Tr. at 58, 60, 61, 62, 63. Defendant failed to make any representations it will not continue to produce iterations of the Wavy Baby shoes following the conclusion of the present litigation for one reason: it intends to do precisely that.

The Court therefore finds the Plaintiffs have sufficiently demonstrated a likelihood of irreparable harm.

**III.    Balance of the Hardships and Public Interest**

The Court "balance[s] the equities" by "exploring the relative harms to applicant and respondent, as well as the interests of the public at large." *Hartford Courant Co., LLC v.*

15

SPA-16

*Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (alterations omitted) (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (Thomas, J., concurring)).

The balance of the equities weighs decidedly in Plaintiffs' favor. Consumer confusion and potential loss to Plaintiffs in terms of sales, reputation, and goodwill threatens to cause Plaintiffs continuing harm. *See U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 511 Fed. App'x 81, 85 (2d Cir. 2013) (summary order) (recognizing that "ceding . . . control over [] reputation and goodwill" may constitute irreparable harm); *New York City Triathalon, LLC v. NYC Triathalon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (McMahon, J.) ("Prospective loss of [] goodwill alone is sufficient to support a finding of irreparable harm.") (citation omitted). Although Defendant argues Plaintiffs' losses are compensable with money damages, "remedies at law generally cannot adequately compensate a trademark plaintiff for its injuries" because "the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable[.]" *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Assoc., Inc.*, No. 10-CV-3314, 2015 U.S. Dist. LEXIS 84172, at *32 (S.D.N.Y. 2015) (Sweet, J.) (citing cases); *see NYP Holdings v. N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014) (Marrero, J.) (explaining "loss of control over one's reputation is neither calculable nor precisely compensable.") (citation omitted). Any harm to Defendant is significantly mitigated because Defendant agreed to cease selling the Wavy Baby shoes during the pendency of this action.

Moreover, while the public has an interest in free expression, "[t]he consuming public [also] has a protectable interest in being free from confusion, deception and mistake[.]" *NYP Holdings*, 63 F. Supp. 3d at 342 (citation omitted). The Plaintiffs have demonstrated the Defendant's sale and marketing of the Wavy Baby shoes causes a significant danger of consumer

16

confusion.  Accordingly, the Court finds the public interest also weighs in favor of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for a temporary restraining order and preliminary injunction, at ECF No. 12, is GRANTED.

(1) During the pendency of this action, Defendant and its officers, agents, employees, attorneys, and all other persons who are in active concert or participation with Defendant are prohibited from fulfilling orders for the "Wavy Baby" shoes and/or colorable imitations or reconstructions thereof (the "Prohibited Shoes");

(2) during the pendency of this action, Defendant, and any companies owned or controlled by Defendant, and its/their officers, agents, representatives, privies, principals, directors, shareholders, managing agents, owners, licensees, distributors, servants, attorneys, employees, affiliates, subsidiaries, parents, successors, and assigns, and all other persons who are in active concert or participation with any of them are prohibited from advertising, marketing, promoting, offering to sell, selling, distributing and/or taking orders for the Prohibited Shoes;

(3) Defendant shall reverse and/or cancel any orders for the Prohibited Shoes that have been placed as of the time of this Order;

(4) for any order that cannot be reversed and/or cancelled, Defendant must escrow any funds received from all orders taken to date for the Prohibited Shoes so that, if Vans prevails in this action, Defendant may return those funds to customers who ordered

17

SPA-18

Defendant's Prohibited Shoes under the mistaken belief that Vans was the source of the shoes or otherwise approved or sponsored the shoes; and

(5) Defendant must file with the Court within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 29, 2022
Brooklyn, New York

18