# 22-1006-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

VANS, INC., VF OUTDOOR, LLC.,

*Plaintiffs-Appellees,*

— v. —

MSCHF PRODUCT STUDIO, INC.,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF *AMICI CURIAE* OF INTELLECTUAL
## PROPERTY PROFESSORS IN SUPPORT OF APPELLANT

MARK A. LEMLEY
STANFORD LAW SCHOOL
*Attorneys for Amici Curiae of
    Intellectual Property Professors*
559 Nathan Abbott Way
Stanford, California 94305
(650) 723-4605

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF *AMICI* ........................................................................1

SUMMARY OF ARGUMENT .................................................................1

    I.    Companies Increasingly Communicate Expressive Messages Through Their Own Branding.......................................................2

    II.    Rogers Properly Provides Special Protection to Expressive Works ..............................................................................13

    III.    Nominative Use and Confusion ........................................24

CONCLUSION ..................................................................................27

Appendix A – List of Signatories ......................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996) ....................................................................18

*Brown v. Electronic Arts, Inc.*,
  724 F.3d 1235 (9th Cir. 2013) ........................................17, 18, 19, 21

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...........................................................10, 12, 25

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*,
  886 F.2d 490 (2d Cir. 1989) ..............................................................16

*Dillinger LLC v. Electronic Arts Inc.*,
  No. 1:09-cv-1236, 2011 WL 2457678 (S.D. Ind. June 16, 2011) .................19, 21

*Dr. Seuss Enterprises LP v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) ..............................................................23

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008) .......................................................*passim*

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.*,
  No. 18 CIV. 11434(AKH), 2019 WL 8405265 (S.D.N.Y. June 3, 2019)............25

*ETW Corp. v. Jireh Pub., Inc.*,
  332 F.3d 915 (6th Cir. 2003) ...............................................16, 18, 23

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) .............................................................16

*Fortres Grand Corp. v. Warner Bros. Entertainment Inc.*,
  947 F. Supp. 2d 922 (N.D. Ind. 2013), *aff'd on other grounds*,
  763 F.3d 696 (2015)..........................................................................16

*Gordon v. Drape Creative, Inc.*,
  909 F.3d 257 (9th Cir. 2018) ...............................................16, 17, 18

*International Information Systems Security Certification Consortium v. Security Univ.*,
  823 F.3d 153 (2d Cir. 2016) ...............................................................24

*Laugh It Off Promotions CC v. S. Afr. Breweries Int'l*,
  2005 (1) SA 144 (CC) (S. Afr.) ............................................................. 11

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
  507 F.3d 252 (4th Cir. 2007) ................................................................. 13

*Mattel v. Walking Mountain Productions*,
  353 F.3d 792 (9th Cir. 2003) ................................................................. 20

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (9th Cir. 2002) ............................................... 16, 17, 18, 23

*MilSpec Monkey Inc v. Activision Blizzard*,
  74 F. Supp. 3d 1134 (N.D. Cal. 2014) ................................................... 21

*Nike, Inc. v. "Just Did It" Enters.*,
  6 F.3d 1225 (7th Cir. 1993) ................................................................... 13

*Rebellion Developments Ltd v. Stardock Entertainment Inc.*,
  No. 12-12805, 2013 WL 1944888 (E.D. Mich. May 9, 2013) .............. 21

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ...........................................................*passim*

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) ............................................................... 27

*Twentieth Century Fox Television v. Empire Distr.*,
  875 F.3d 1192 (9th Cir. 2017) ............................................... 16, 20, 22

*University of Alabama Bd. of Trustees v. New Life Art, Inc.*,
  683 F.3d 1266 (11th Cir. 2012) ...................................................... 16, 17

*VIP Prod. LLC v. Jack Daniel's Properties, Inc.*,
  953 F.3d 1170 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1054 (2021) ................. 17

*Volkswagen AG v. Dorling Kindersley Pub. In.*,
  614 F. Supp. 2d 793 (E.D. Mich. 2009) ........................................... 17, 18

*Westchester Media v. PRL USA Holdings, Inc.*,
  214 F.3d 658 (5th Cir. 2000) ................................................................. 16

iii

**Statutes & Other Authorities:**

U.S. Const., Amend. I ...................................................................*passim*

Alice Cary, *Gucci's "Hacking" of Balenciaga Is a Fashion Power Move—And Finally Available to Shop*, VOGUE (Nov. 15, 2021) ...............................8

Bruce P. Keller & Rebecca Tushnet, *Even More Parodic Than the Real Thing: Parody Lawsuits Revisited*, 94 TRADEMARK REP. 979 (2004) ...........................14

Complaint, *Nike, Inc. v. Customs by Ilene, Inc.*, No. 5:21-cv-01201 (C.D. Cal. July 19, 2021) ......................................7

Cult Canvas, Sotheby's, Oct. 21, 2021 ......................................................5

Deven R. Desai, *From Trademarks to Brands*, 64 FLA. L. REV. 981 (2012)...................................................................12

Deven R. Desai, *Speech, Citizenry, and the Market*, 98 MINN. L. REV. 455 (2013) ...............................................................11

Drip Creationz (last visited Jan. 24, 2022) ...............................................7

Ian Servantes, *Lebron James & Nike Want You to Draw All Over Your AF1*, HighSnobiety (2019)........................................................................8

James Gibson, *Risk Aversion and Rights Accretion in Intellectual Property Law*, 116 YALE L.J. 882 (2007) ............................................................... 13-14

Jeff Ng, *"Jeff Staple" Nike Dunk Low Pro SB Dual Signed by Jeff Staple, Cult Canvas,* Sotheby's...........................................................................8

Jimm Lasser, Obama Force One (2008), Phillips Gallery .........................5

Leah Chan Grinvald, *Shaming Trademark Bullies*, 2011 WIS. L. REV. 625 ......................................................................14

Mark A. Lemley & Sari Mazzurco, *The Exclusive Right to Customize?*, 101 B.U. L. Rev. (forthcoming 2022) ....................................................9

Mark Wilson, *This Artist Turns Old Nikes into Sculptural Marvels Made of Moss, Bark, and Rock*, FAST COMPANY (Oct. 22, 2021) ........................6

MC Lars, NO LOGO (Horris Records & Oglio Records 2009).................3

Naomi Klein, NO LOGO (1999) .................................................................2

Oscar Holland & Jacqui Palumbo, *Lil Nas X's Unofficial 'Satan' Nikes Containing Human Blood Sell Out in Under a Minute*, CNN (Mar. 28, 2021)............................................................................3

Rebecca Tushnet, *Looking at the Lanham Act: Images in Trademark and Advertising Law*, 48 HOUS. L. REV. 861 (2011).............................................................12

Regina Schaffer-Goldman, *Cease and Desist: Tarnishment's Blunt Sword in Its Battle Against the Unseemly, the Unwholesome, and the Unsavory*, 20 FORDHAM INTELL. PROP. MEDIA & Ent. L.J. 1241 (2010) ..............................14

Shantell Martin, *Shantell Martin's worn and drawn upon Converse All Stars*, Phillips Gallery ..............................................................................5

Sonia K. Katyal, *Semiotic Disobedience*, 84 WASH. U. L. REV. 489 (2006) ...................................................3, 12

Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473 (2013) .........................................................3

Theheyyman, *Fuck Mags* (2012), Phillips Gallery...................................6

Tongue + Chic Sneakers x Artists, Sneakers x Artists Exhibition 16 July – 31 August, Phillips Gallery, 2018................................................................5

## INTEREST OF AMICI

Amici are intellectual property professors at law schools throughout the United States.  We have no professional or pecuniary interest in the outcome of this case, but we have an academic interest in seeing that the law develops in a way that serves the public interest and the purposes of trademark law.[1]  A full list of amici is attached as Appendix A.

## SUMMARY OF ARGUMENT

Customization and art are essential parts of the modern sneaker market. Shoe designers mock, comment on, and pay homage to each other.  Those modifications are expressive speech the law should protect.  The district court erred by dismissing the First Amendment concerns that motivate expression in the sneaker world.  It should have applied *Rogers v. Grimaldi*, 875 F.2d 974 (2d Cir. 1987), which provides heightened protection to expressive works.  *Rogers* precludes liability here.

Alternatively, even if MSCHF was forced to navigate the traditional likelihood of confusion analysis, the district court should have applied this Court's nominative use doctrine to a sneaker that was clearly designed to refer to and

---

[1]  No party and no one other than the undersigned wrote any part of this brief or made any monetary contribution towards it.  All parties have consented to the filing of this amicus brief.

comment on the Van's shoe. Doing so changes the likelihood of confusion analysis in important ways that undermine the district court's injunction.

## I.      Companies Increasingly Communicate Expressive Messages Through Their Own Branding

Brands shape our communities and define our values. And while the traditional economic account views brands as conveying information unidirectionally — from producer to consumer — brands also convey information *about* the consumer and allow members of the public to communicate to each other. By selling branded products, producers enable us to brand ourselves. Indeed, in the modern world of luxury brands this is arguably the primary function of brands. Traditional trademarks serve as the source of goods and therefore protect the customer from fake goods. By contrast, Nike swooshes, red shoe bottoms, and Chanel purse logos are not really about ensuring purchasers make the right decision, but about allowing purchasers to tell the rest of the world about that decision. Were it otherwise, known counterfeits wouldn't be so popular. Brands, then, don't just help trademark owners speak; they help all of us speak. Indeed, that speech is so common that refusing to wear brand names is itself a recognized countercultural statement.[2]

---

[2]   *See, e.g.*, NAOMI KLEIN, NO LOGO (1999) (recounting popular movements designed to counter the message of dominant brands by, among other things,

Not surprisingly, therefore, cultural commentary about brands itself increasingly takes the form of speaking through branded goods. Stacey Dogan and Mark Lemley call this "parody as brand." Stacey L. Dogan & Mark A. Lemley, *Parody as Brand*, 47 U.C. Davis L. Rev. 473 (2013).

As with many things brand-related in popular culture, shoes have led the way. In the spring of 2021, rapper and fashion icon Lil Nas X worked with MSCHF to release a limited line of Satan Shoes, a repurposed Nike sneaker to which he had added a pentagram, an upside-down cross, a biblical reference to Satan . . . and a drop of human blood. Despite the price ($1,018, a reference to the Luke 10:18 bible verse) the 666 pairs of shoes sold out in under a minute.[3]

---

exposing brand hypocrisy); MC Lars, No Logo (Horris Records & Oglio Records 2009) (mocking the mocking of brand hypocrisy). Indeed, the act of subverting the meaning of a brand is itself speech-significant. *See* Sonia K. Katyal, *Semiotic Disobedience*, 84 Wash. U. L. Rev. 489, 554-68 (2006).

[3] Oscar Holland & Jacqui Palumbo, *Lil Nas X's Unofficial 'Satan' Nikes Containing Human Blood Sell Out in Under a Minute*, CNN (Mar. 28, 2021), https://www.cnn.com/style/article/lil-nas-x-mschf-satan-nike-shoes/index.html.



Lil Nas X's Satan Shoes were perhaps the highest profile example of aftermarket sneaker customization, but they fall into a flourishing category of creative expression that blurs the line between commercial activity (i.e., selling sneakers) and art. Another example in this category is Jimm Lasser's "Obama Force One."



Lasser created these custom Nike Air Force 1 sneakers to "mark what he considered the most significant moment in the history of his generation, the election of President Obama." He took a pair of authentic Nike sneakers and

transformed them into a commemorative sculpture by adding customized rubber soles engraved with two portraits of President Obama and the phrase, "A Black man runs and a nation is behind him."[4] Lasser's Obama Force Ones have been displayed in gallery exhibitions and featured in the Phillips Gallery auction, "Tongue + Chic Sneakers x Artists." The Phillips auction, and another held by famed auction house Sotheby's, featured an array of works by artists who use branded sneakers as a medium for their own creative expression.[5] For example, Shantell Martin used Converse All Stars as a canvas for her drawn-line work that "question[s] boundaries and draw[s] viewers into larger conversations."[6] Nicholas Avery refaced and added internal lights to a pair of Nike Air Force 1s—creating

---

[4] Jimm Lasser, Obama Force One (2008), Phillips Gallery, https://www.phillips.com/detail/jimm-lasser/NY011118/9.

[5] Tongue + Chic Sneakers x Artists, Sneakers x Artists Exhibition 16 July – 31 August, Phillips Gallery, 2018, https://www.phillips.com/auctions/auction/NY011118; Cult Canvas, Sotheby's, Oct. 21, 2021, https://www.sothebys.com/en/buy/auction/2021/cult-canvas.



[6]

Shantell Martin, *Shantell Martin's worn and drawn upon Converse All Stars*, Phillips Gallery, https://www.phillips.com/detail/shantell-martin/NY011118/3.

what he called "Fuck Mags"—to capture the outrage of true sneaker heads at the exorbitant price of the Air Mags Nike released in 2012.[7]

While some of these customized sneakers may conceivably continue to be worn rather than treated as art pieces, other artistic customizations render their underlying product functionally useless. Consider Christophe Guinet's ("Monsieur Plant") plant sculptures: recycled old Nikes reskinned with moss, bark, and flowers.[8]

---



[7]

Theheyyman, *Fuck Mags* (2012), Phillips Gallery,
https://www.phillips.com/detail/theheyyman/NY011118/8.

[8]  Mark Wilson, *This Artist Turns Old Nikes into Sculptural Marvels Made of Moss, Bark, and Rock*, Fᴀsᴛ Cᴏᴍᴘᴀɴʏ (Oct. 22, 2021),
https://www.fastcompany.com/90688814/this-artist-turns-old-nikes-into-sculptural-marvels-made-of-moss-bark-and-rock.



Not all sneaker customizations are works of footwear fine art. The vast and growing market for customized footwear encompasses a broad spectrum of alterations, additions, and re-designs. Customizers, as they're known within sneaker culture, sometimes purchase branded sneakers and apply their own colorways, illustrations, and design elements. For instance, Drip Creationz, a California-based customizer, altered Nike Air Force 1 sneakers with new fabrics and print designs, from bandanas and butterflies to Chester, the Cheetos Cheetah.[9] And the Shoe Bakery sells "Red Velvet Sneakers": genuine Nike Air Force 1s customized to look like a frosted cake.[10]

---

[9] Complaint, *Nike, Inc. v. Customs by Ilene, Inc*., No. 5:21-cv-01201 (C.D. Cal. July 19, 2021). After the suit was filed, DripCreationz stopped altering genuine Nikes and began producing their own similar shoes to customize. Drip Creationz (last visited Jan. 24, 2022), https://www.dripcreationz.com/collections/artist-collection.

[10] https://shoebakery.com/collections/shoes/products/red-velvet-sneakers.



Brands themselves also participate in custom sneaker culture.[11] Nike has engaged in collaborations with a number of sneaker artists to create and sell limited-release sneakers, such as Jeff Staple's 2005 "NYC Pigeon" Nike Dunk Low Pro SB, which is recalled as "one of the wildest Nike drops in history."[12] Staple's design was inspired by "the ubiquitous NYC pigeon," and it featured an outsole with a pigeon-foot color and a pigeon embroidered on the heel.

---

[11] Major fashion houses are also getting in on cross-brand customization as cultural "hacking." *See* Alice Cary, *Gucci's "Hacking" of Balenciaga Is a Fashion Power Move—And Finally Available to Shop*, VOGUE (Nov. 15, 2021), https://www.vogue.com/article/balenciaga-gucci-collaboration.

[12] Jeff Ng, *"Jeff Staple" Nike Dunk Low Pro SB Dual Signed by Jeff Staple, Cult Canvas*, Sotheby's, https://www.sothebys.com/en/buy/auction/2020/cult-canvas/jeff-ng-jeff-staple-nyc-pigeon-nike-dunk-low-pro; Ian Servantes, *Lebron James & Nike Want You to Draw All Over Your AF1*, HighSnobiety (2019), https://www.highsnobiety.com/p/lebron-james-uninterrupted-nike-air-force-1/.



Still others have commented on the customization itself. For instance, when Warren Lotas tweaks the Nike logo on a pair of Pigeon dunks to turn it into the Friday the 13th horror movie mask, the transformation to the logo is minimal, but it's still artistic.



These examples and others are discussed in detail in Mark A. Lemley & Sari Mazzurco, *The Exclusive Right to Customize?*, 101 B.U. L. Rev. (forthcoming 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4020549.

The point is not that all these examples are the same as Wavy Baby.  They aren't.  Some take existing shoes and modify them; others, like the Freddie Krueger shoes, make a new shoe that at first glance looks like the old one.  Rather, the point is that sneakers are an important and fertile ground for art, expression, commentary, and parody.

Parody has social value as critical speech. As the Supreme Court has explained, "Like less ostensibly humorous forms of criticism, [parody] can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 579 (1994). As the Supreme Court has recognized, to do its job, a parody must borrow substantially from the target of its scorn. *Id*. at 587-89. It must borrow at least enough to evoke the work in the mind of the observer. Yet that's not all — the borrower can take *more* than necessary to evoke the work, as long as it's done to further the parody and doesn't come so close to the original that it morphs into a substitute (rather than a parody) of the original work.  *See id.* at 588 ("Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original.").

Brands that parody have a dual target: the brand itself and the phenomenon of branding. Given the prevalence of branding and its economic and social impact, commentary about both brands and branding is a matter of public concern. *See, e.g.*, *Laugh It Off Promotions CC v. S. Afr. Breweries Int'l* 2005 (1) SA 144 (CC) at 62 para. 105 (S. Afr.) (Sachs, J., concurring) ("The companies that own famous trademarks exert substantial influence over public and political issues, making them and their marks ripe and appropriate targets for parody and criticism."); Deven R. Desai, *Speech, Citizenry, and the Market*, 98 MINN. L. REV. 455 (2013) ("Like other public figures, corporations affect public affairs, take political positions, engage in matters of public concern and public controversy, and have reputations."). If they succeed in the market, moreover, these parodic brands most likely do so not because they confuse someone who thinks they are buying their Satan Shoes from Nike but because they offer some value to consumers — because their message resonates with a substantial audience. Just as prestige brands confer value to consumers who want to project an image of exclusivity, so brand parodies bring utility to consumers seeking to project a more rebellious or sardonic message. Further, if brands are part of a conversation between consumers, not just with trademark owners, brand parodies allow others to participate in that conversation with a different, unapproved message.

Those who develop brands-as-parody may well be benefiting from the appeal of a famous brand, but they don't cause the kind of harm that trademark law is designed to address. These brands-as-parody, moreover, offer a valuable form of social commentary. Even more than non-commercial forms of parody, the subversive use of a parody *as* brand invites critical reflection on the role of brands in society and the extent to which we define ourselves by them. *See, e.g.*, Katyal, *supra* (discussing brand parodies as a form of cultural disobedience); Rebecca Tushnet, *Looking at the Lanham Act: Images in Trademark and Advertising Law*, 48 HOUS. L. REV. 861, 891-95 (2011) (noting special need of commentators to access expressive aspects of visual marks); *cf.* Deven R. Desai, *From Trademarks to Brands*, 64 FLA. L. REV. 981, 999-1009 (2012) (exploring personal role of brands in culture).

Incorporating a parody into a brand serves expressive goals that could not be realized through ordinary, non-branding speech. Many — perhaps most — branding parodies have a doubly subversive message. They are using a brand not only to lampoon the targeted brand, but also to call attention to the pervasiveness of branding in our society. Parodies, in general, replicate the central features of a particular work to "reference and ridicule" the work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 (1994). Brand parodies do more: they not only borrow from the trademark itself, but they also appropriate the device of branding

and employ it to make us think critically about the role of brands in our culture. The dog chew toy in *Louis Vuitton*, for example, "pokes fun at the elegance and expensiveness of a LOUIS VUITTON handbag" but also "irreverently presents haute couture as an object for casual canine destruction." Or so thought the Fourth Circuit, at least. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261 (4th Cir. 2007); *see also Nike, Inc. v. "Just Did It" Enters*., 6 F.3d 1225, 1231 (7th Cir. 1993) ("[S]ome purchasers might resent paying a premium to be a walking billboard and would relish the opportunity to mock trendy folks who wear labels on their sleeves.").

Trademark holders, of course, would prefer not to face this kind of ridicule of their brands or their branding practices. But trademark law does not exist to suit the needs of trademark holders; it aims to promote broader social objectives.

## II. Rogers Properly Provides Special Protection to Expressive Works

Confusion is a fact-specific inquiry, often heavily reliant on manipulable survey evidence and subject to an ever-expanding notion of what it takes to confuse. If confusion over whether the defendant needed a license is actionable, then virtually any brand evocation invites an expensive and unpredictable trial. Even if the law could guarantee the right result at trial, many parodists are small companies without the will or resources to fight a case all the way to trial. See, for example, James Gibson, *Risk Aversion and Rights Accretion in Intellectual*

*Property Law*, 116 YALE L.J. 882 (2007). For application to trademark parody cases, see Regina Schaffer-Goldman, *Cease and Desist: Tarnishment's Blunt Sword in Its Battle Against the Unseemly, the Unwholesome, and the Unsavory*, 20 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1241 (2010).[13] Many will cave in and abandon their parodies rather than hire a lawyer even if they were almost certain to prevail in court. *See, e.g.,* Leah Chan Grinvald, *Shaming Trademark Bullies*, 2011 WIS. L. REV. 625.

Aware of this problem, this Court pioneered the *Rogers v. Grimaldi* test as a way to protect expressive works from having to face the costly and uncertain process of defending a likelihood of consumer confusion case. In *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), the Second Circuit considered a false endorsement claim brought by the American dancer Ginger Rogers against the Italian film director Federico Fellini. Fellini's film, "Ginger & Fred," told the story of two fictional retired Italian cabaret performers who impersonated Ginger Rogers and Fred Astaire as part of their cabaret act. Rogers claimed the film's title created the false impression that Rogers was associated with the film or that the film was about her. Viewed strictly through the lens of consumer confusion, this was a plausible claim. Even if it was unlikely people would think Ginger Rogers made

---

[13] For discussion of this problem, *Cf.* Bruce P. Keller & Rebecca Tushnet, *Even More Parodic Than the Real Thing: Parody Lawsuits Revisited*, 94 TRADEMARK REP. 979, 995-97 (2004) (copyright cases).

the film, it was entirely plausible people would think it was about her or that, even if it wasn't, she had consented to let Fellini use her name.  And while watching the film might dispel that confusion, courts have permitted trademark infringement claims based on "initial interest" confusion.

Nonetheless, this Court held that Rogers could not prevail as a matter of law whether or not consumers were confused.  The court reasoned that when it comes to expressive works such as films, "the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  *Id*. at 999. To achieve this balance, the Court created what's now known as the *Rogers* test. It held that the use of a mark in the title of an expressive work will be protected by the First Amendment "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."  *Id*. Since then, the *Rogers* test has

been adopted by a plurality of circuit courts[14] and extended to protect uses of trademarks *within* expressive works as well as in their titles.[15]

Rogers requires the defendant to show, as a threshold matter, that her work is expressive; then, the burden passes to the plaintiff to prove one of the two elements of the test—that either the plaintiff's mark "has no artistic relevance to the underlying work whatsoever" or the defendant "explicitly misleads as to the source or the content of the work." *Gordon v. Drape Creative, Inc*., 909 F.3d 257, 264 (9th Cir. 2018). If the plaintiff can do neither, the defendant's use is noninfringing. Confusion doesn't matter.

---

[14] *See Westchester Media v. PRL USA Holdings, Inc*., 214 F.3d 658, 664–665 (5th Cir. 2000); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 (6th Cir. 2003); *Fortres Grand Corp. v. Warner Bros. Entertainment Inc*., 947 F. Supp. 2d 922, 931–932 (N.D. Ind. 2013), *aff'd on other grounds*, 763 F.3d 696 (2015); *Mattel, Inc. v. MCA Records, Inc*., 296 F.3d 894, 898 (9th Cir. 2002); *University of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1277 (11th Cir. 2012). *But cf. Facenda v. N.F.L. Films, Inc*., 542 F.3d 1007, 1018 (3d Cir. 2008) (declining to decide whether to adopt the *Rogers* test).

[15] *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 495 (2d Cir. 1989). The Sixth, Ninth, and Eleventh Circuits have all reached the same conclusion. *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc*., 547 F.3d 1095, 1099 (9th Cir. 2008) ("Although this test traditionally applies to uses of a trademark in the title of an artistic work, there is no principled reason why it ought not also apply to the use of a trademark in the body of the work."); *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc*., 683 F.3d 1266, 1278 (11th Cir.2012); *ETW*, 332 F.3d at 928 n. 11; *Fortres Grand Corp*., 947 F. Supp. 2d at 931. *See also Twentieth Century Fox Television v. Empire Distr*., 875 F.3d 1192, 1196 (9th Cir. 2017).

Application of that test here is inconsistent with the district court's grant of an injunction.

*Expressive work.* For customization to even qualify for the *Rogers* test, it must be considered an "expressive work." Courts have been clear that "movies, plays, books, and songs" qualify as expressive works despite the fact that they are "sold in the commercial marketplace."[16] Courts have also added to this list video games,[17] paintings, prints, calendars, music,[18] pictures, drawings, engravings, sculptures,[19] greeting cards, [20] and even dog toys.[21] What matters is not that the

---

[16] *Rogers*, 875 F.2d at 997. A work "is not rendered non-expressive simply because it is sold commercially," *VIP Prod. LLC v. Jack Daniel's Properties, Inc*., 953 F.3d 1170, 1175 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1054 (2021);*Mattel, Inc. v. MCA Recs., Inc*., 296 F.3d 894, 906-07 (9th Cir. 2002) (Barbie Girl song was not purely commercial speech — it was intertwined with expressive elements and thus qualified as protected speech).

[17] *Brown v. Electronic Arts, Inc*., 724 F.3d 1235, 1241 (9th Cir. 2013).

[18] *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc*., 683 F.3d 1266, 1276 (11th Cir. 2012).

[19] *Volkswagen AG v. Dorling Kindersley Pub In*., 614 F. Supp. 2d 793, 809 (E.D. Mich. 2009).

[20] *Jack Daniels Properties Inc*., 953 F.3d at 1175 (quoting *Gordon*, 909 F.3d at 268–69) ("Even if the cards did not show great 'creative artistry,' they were protected under the First Amendment because the cards 'convey[ed] a humorous message through the juxtaposition of an event of some significance—a birthday, Halloween, an election—with the honey badger's aggressive assertion of apathy.'").

[21] *Id.* ("Like the greeting cards in Gordon, the Bad Spaniels dog toy, although surely not the equivalent of the Mona Lisa, is an expressive work. . . . The toy communicates a 'humorous message,' . . . using word play to alter the serious phrase that appears on a Jack Daniel's bottle—'Old No. 7 Brand'— with a silly

works take the form of a traditional media but that they "communicate ideas—and even social messages" – in a manner similar to other expressive media. *Brown*, 724 F.3d at 1241 ("In determining whether a work is expressive, we analyze whether the work is 'communicating ideas or expressing points of view.'); *Gordon*, 909 F.3d at 268 ("[A greeting] card certainly evinces '[a]n intent to convey a particularized message ..., and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'). "[V]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection." *Bery v. City of New York*, 97 F.3d 689, 695 (2nd Cir. 1996).

The fact that the art uses a commercial product as a canvas arguably should not matter. Even art produced to make money still counts as art, not commercial speech. *Mattel*, 296 F.3d at __. "It is . . . no matter that the dissemination of speech takes place under commercial auspices." *Id.*; *see also Volkswagen*, 614 F. Supp. 2d at 809; *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924 (6th Cir. 2003).

---

message—'The Old No. 2.' The effect is 'a simple' message conveyed by 'juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.' . . . The fact that VIP chose to convey this humorous message through a dog toy is irrelevant.").

As the examples we discuss in Part I make clear, sneakers are today a vibrant canvas for political and artistic communication.  True, they are products, just like greeting cards and dog toys.  But they are also means for people to express themselves.  A consumer's choice of sneakers, like all aspects of clothing, is a way to express their style and individuality, to be different in their Air Force 1s.  The wide array of sneaker customizations is evidence of the importance of that expression.  But under *Rogers*, the definition of expressive works is quite broad; it is enough that the MSCHF sneakers can be viewed as expressive works at all.

*Artistic relevance.* The *Rogers* test protects only creative uses of trademarks that are "artistically relevant" to the expressive work. Much like the threshold requirement that a work be expressive, the first prong of the *Rogers* test is capacious. Courts typically hold an expressive use satisfies this standard if the mark's "artistic relevance" is "above zero."  *Dillinger LLC v. Electronic Arts Inc*., No. 1:09-cv-1236, 2011 WL 2457678, at *6 (S.D. Ind. June 16, 2011); *ESS Entertainment 2000, Inc v. Rock Star Videos, Inc*., 547 F.3d 1095, 1100 (9th Cir. 2008); *Brown*, 724 F.3d at 1245. Courts have found marks to be "artistically relevant" to an expressive work when they serve the work's artistic purpose, construed broadly, whether or not the expressive work is primarily "about" the trademark owner.

Expressive works that use a trademark for its expressive meaning satisfy this prong. Courts have acknowledged that some trademarks, for example Rolls-Royce, Band-Aid, and Barbie, "transcend their identifying purpose" and "enter public discourse and become an integral part of our vocabulary." *Twentieth Century Fox Television v. Empire Distr*., 875 F.3d 1192, 1197-98 (9th Cir. 2017); *Mattel v. Walking Mountain Productions*, 353 F.3d 792, 807 (9th Cir. 2003). The expressive use of culturally significant marks requires First Amendment protection to prevent "trademark owner[s] [from] assert[ing] a right to control how we express ourselves." *Empire*, 875 F.3d at 1197-98. Vans is a well-known shoe; its marks carry an expressive meaning within sneaker culture. Customizations like MSCHF's that use these marks for the cultural meaning they carry ought to satisfy the artistic relevance requirement, so long as there is a cultural and not merely a commercial message.

In any event, trademarks need not take on cultural significance to be "artistically relevant" to an expressive work. It is enough that the mark serves the expressive work's creative purpose, whatever it may be. For instance, in *ESS Entertainment*, the owners of a Los Angeles strip club called the "Play Pen" sued the makers of Grand Theft Auto for trademark infringement because they included in the game a cartoon-style strip club called the "Pig Pen." *ESS Entertainment 2000, Inc v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1097 (9th Cir. 2008). The Pig

Pen was a minor component of the game (and the Play Pen a minor establishment in Los Angeles); it was meant to set the stage for the game's fictional city of "los Santos" that lampooned the "seedy underbelly of Los Angeles and the people, business and places that comprise it." *Id*. The Ninth Circuit held the video game's use was artistically relevant to its purpose of creating the fictional city, even though the game as a whole was not *about* the Play Pen in any way. *Id.* at 1100.[22] In a similar case, the Ninth Circuit held that Twentieth Century Fox's use of the trademark-protected word "Empire" as the title and a major, recurring component of a television show about a New York-based record label qualified as artistically

---

[22] The reference to "Pig Pen" was, however, clearly a commentary on the term "Play Pen" used in the context of strip clubs appealing to male chauvinist pigs. Other video game cases have reached similar conclusions. *See, e.g., Dillinger*, 2011 WL 2457678 (holding Godfather games' use of "Dillinger" Tommy Guns was "artistically relevant" to the game's fictional gangster world because the "mental imagery" associated with Dillinger has more than zero relevance); *Brown*, 724 F.3d at 1243 (holding use of football player's likeness was relevant to realism of Madden NFL game even though the game includes likenesses of thousands of different current and former NFL players); Rebellion Developments Ltd v. Stardock Entertainment Inc., No. 12-12805, 2013 WL 1944888, at *5 (E.D. Mich. May 9, 2013) (holding game's use of the trademark-protected word "Rebellion" in its title was relevant to the game because within the game, players choose to align with "loyalist" or "rebel" factions in a civil war); *MilSpec Monkey Inc v. Activision Blizzard*, 74 F. Supp. 3d 1134, 1142 (N.D. Cal. 2014) (trademark-protected "angry monkey" patches used in a video game were relevant because they "represent[] part of an authentic universe of morale patches" used by military personnel).

relevant because the mark "support[ed] the themes and geographic setting of the work." *Empire*, 875 F.3d at 1199.[23]

Even if the sneaker customizers do not use the sneaker's mark for its cultural meaning, the sneaker's mark supports the customization's themes or artistic purpose. Thus, when Warren Lotas tweaks the Nike logo on a pair of Pigeon dunks to turn it into the Friday the 13th horror movie mask, the transformation to the logo is minimal, but it's still artistic.



Certainly the artistic relevance of the Wavy shoe, like the Lotas Nike shoe, is "above zero."

---

[23] By contrast, works that are "disguised commercial advertisements," *Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989), would not satisfy the *Roger*s test's first prong.

*Explicitly misleading.* The second prong of the *Rogers* test asks whether the defendant "explicitly misleads" as to the source or content of the work. The bar for representations or implications to be explicitly misleading is much higher than a normal likelihood of confusion analysis. That is to say, trademark must tolerate expressive uses of marks that only "implicitly suggest endorsement or sponsorship." *Rogers*, 875 F.2d at 999–1000. *See also ETW Corp. v. Jireh Pub.*, Inc., 332 F.3d 915, 937 (6th Cir. 2003) (holding third party's portraits of Tiger Woods and use of Woods' name on them contain no explicit misstatement as to source and so are not explicitly misleading, despite survey evidence suggesting actual confusion). Courts have interpreted this standard to require the defendant to "make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of the plaintiff's [mark]" within the expressive work. *Dr. Seuss Enterprises LP v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020)) ("The second prong of the Rogers test is a 'high bar that requires the use to be an explicit indication, overt claim, or explicit misstatement about the source of the work.'"); *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); *ESS Entertainment 2000, Inc v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008).

For aftermarket customization, customizations of branded consumer goods do not "explicitly mislead" purchasers into thinking the sneaker's maker is

responsible for the customization as well, unless the customizer makes other, explicit indications or claims to that effect. There is no indication of such an explicitly misleading statement in this case.

*Rogers* applies to MSCHF's expressive shoes. MSCHF does not explicitly mislead users as to any affiliation with Van's. That should end the inquiry without any need to address likelihood of confusion.

### III. Nominative Use and Confusion

Even if this Court does address confusion, notwithstanding *Rogers*, the district court erred by not doing so in the context of MSCHF's nominative use. MSCHF didn't create its own brand that happened to be similar to Van's; it modified the Vans marks precisely to talk about Vans. That is nominative use. In addressing nominative use, this Court considers all the likelihood of confusion factors, *plus* the three Ninth Circuit factors, *plus* the Third Circuit's somewhat different third factor. *International Information Systems Security Certification Consortium v. Security Univ.*, 823 F.3d 153, 168 (2d Cir. 2016).

The nature of MSCHF's use significantly affects how the digits of confusion should be applied. First, the expressive nature of the defendant's use should influence the entire inquiry into likelihood of confusion and dilution, just as it does for fair use in copyright law. Strength and similarity of marks, for example, should not serve their ordinary role of cutting in favor of confusion. If anything, for more

24

famous marks, the satire will arguably be more recognizable; and significant borrowing of the trademark may be important to the message being conveyed even if the defendant is not directly parodying the brand. *See* Ebony Media Operations, LLC v. Univision Commc'ns Inc., No. 18 CIV. 11434(AKH), 2019 WL 8405265, at *5 (S.D.N.Y. June 3, 2019).

Analysis of similarity should operate on a sliding scale, in which the stronger the expressive nature, the closer the marks may come to one another without this factor weighing in favor of confusion.  In order to present an effective parody of a trademark, it is necessary to borrow substantially from that mark. As long as a parodic character can "reasonably be perceived," *Campbell*, *supra*, similarity between the marks should not support a finding that consumers are likely to be confused.  Instead, the court must examine the defendant's use of the mark to determine whether it goes too far beyond the parodic purpose. If the parody pervades the defendant's use, as it does here, then substantial similarity between the marks is justified; if, however, the parody is hard to perceive and the taking is substantial, then this requirement might not be satisfied.

Second, in applying the Ninth Circuit nominative use factors adopted by this court in *International Information Systems*, the Court should determine whether the defendant did anything *beyond* mere use of the mark that suggests source-affiliation or sponsorship by the trademark holder. Precision on this last point is

critical: a reading of the Ninth Circuit test that permits evidence of confusion to defeat the defense would render nominative fair use a nullity. The third factor must refer to acts *beyond the parody itself* that cause confusion.

Third, the Court should absolutely reject the notion that *confusion as to permission* is ever actionable as a matter of trademark law. For all we know, some substantial portion of the public may assume that trademark holders have a legal right to prevent *any* unauthorized use of their mark. It would be odd lawmaking indeed if courts defined legal rules by what the public *thinks* the law is, regardless how misguided those perceptions may be. Of course, some amount of circularity is endemic in trademark law; the fact that infringement turns on the risk of consumer confusion makes it inevitable that the law will sometimes over-protect marks. But at least in the ordinary case, the claim of confusion has some plausible relevance to trademark law's goal of protecting consumer expectations about who makes or stands behind products. The fact that a consumer might mistakenly believe that a trademark holder gave permission to make fun of itself has nothing to do with that kind of confusion.

Finally, to the extent that the court perceives a parodic purpose but believes that the defendant's use of the mark exceeds that purpose and risks confusing the public, the court should resist the call for a complete injunction in favor of one that addresses the excesses while preserving the parody. Here, too, nominative fair use

offers useful precedent. As the Ninth Circuit held in *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010), courts considering nominative fair use cases should tailor injunctive relief to the particular excesses that create the risk of confusion. "At the very least," the court held, injunctions must be crafted to allow the defendant to achieve its nominative objectives. "Trademarks are part of our common language, and we all have some right to use them to communicate in truthful, non-misleading ways." *Id*. at 1185.

## CONCLUSION

The Court should vacate the preliminary injunction.

Dated June 23, 2022

/s/ Mark A. Lemley
MARK A. LEMLEY
STANFORD LAW SCHOOL
*Attorneys for Amici Curiae of*
*Intellectual Property Professors*
559 Nathan Abbott Way
Stanford, California 94305
(650) 723-4605

# Appendix A – List of Signatories[24]

Professor Barton Beebe
NYU School of Law

Professor Dan L. Burk
University of California Irvine School of Law

Professor Stacey L. Dogan
Boston University School of Law

Professor Bryan Frye
University of Kentucky College of Law

Professor Stefania Fusco
Notre Dame Law School

Professor Kristelia Garcia
University of Colorado School of Law

Professor James Gibson
University of Richmond School of Law

Professor Stacy M. Lantagne
Western New England University School of Law

Professor Christa Laser
Cleveland State University School of Law

Professor Mark A. Lemley
Stanford Law School

Professor Yvette Joy Liebesman
St. Louis University School of Law

---

[24]  Amici sign in their own capacity.  Institutions are listed for identification purposes only.

Professor Sandra Rierson
Thomas Jefferson School of Law

Professor Betsy Rosenblatt
University of Tulsa College of Law

Professor Jessica Silbey
Boston University School of Law

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 5,670 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
        June 23, 2022