RECORD NO.

# 22-1006

In The

# United States Court of Appeals

For The Second Circuit

## VANS, INC., VF OUTDOOR, LLC,

*Plaintiffs – Appellees*,

v.

## MSCHF PRODUCT STUDIO, INC.,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

———————

## BRIEF OF *AMICI CURIAE* AMERICAN APPAREL & FOOTWEAR ASSOCIATION, FOOTWEAR DISTRIBUTORS & RETAILERS OF AMERICA, COUNCIL OF FASHION DESIGNERS OF AMERICA, INC., AND ACCESSORIES COUNCIL IN SUPPORT OF PLAINTIFFS – APPELLEES

———————

John P. O'Herron
Zachary D. Cohen
Rachel W. Adams
THOMPSONMCMULLAN, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
(804) 649-7545

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the American Apparel & Footwear Association, the Footwear Distributors & Retailers of America, the Council of Fashion Designers of America, Inc., and the Accessories Council state that they are not publicly held corporations or other publicly held entities, that they do not have any parent corporations, and that no publicly held corporation or other publicly held entity holds 10% or more of their stock.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ..............................................................i

TABLE OF CONTENTS ........................................................................................ii

TABLE OF AUTHORITIES .................................................................................iii

INTERESTS OF AMICI ..................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 3

ARGUMENT....................................................................................................... 5

      I.     MSCHF'S *ROGERS* EXPANSION WILL CREATE AN
              INDUSTRY OF "EXPRESSIVE COUNTERFEITS."............................5

      II.    THE FOOTWEAR, APPAREL, AND FASHION ACCESSORIES
              INDUSTRIES ALREADY FACE A GLOBAL PROBLEM OF
              KNOCKOFFS AND COUNTERFEITS.............................................. 10

      III.   THE FOOTWEAR, APPAREL, AND FASHION ACCESSORIES
              INDUSTRIES NEED ROBUST IP PROTECTION ........................... 17

CONCLUSION ................................................................................................. 19

CERTIFICATE OF COMPLIANCE ................................................................. 20

CERTIFICATE OF FILING AND SERVICE ...................................................... 21

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Dr. Seuss Enter. LP v. ComicMix LLC,*
    983 F.3d 443 (9th Cir. 2020) ........................................................... 6

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.,*
    925 F.2d 174 (7th Cir. 1991) ........................................................ 18

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989) .................................................. *passim*

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. I ...................................................................... 3, 5, 7

## OTHER AUTHORITIES

Agreement on Trade-Related Aspects of Intellectual Property
Rights (TRIPS), sect. 4, art. 51 n.14 ...................................................... 11

Am. Apparel & Footwear Assoc., *Dupe Influencers: The
Concerning Trend of Promoting Counterfeit Apparel, Footwear,
and Accessories on Social Media* (May 2021),
www.aafaglobal.org/DupeInfluencers (last visited July 25, 2022) ......... 15

BARBARA KOLSUN & DOUGLAS HAND, THE BUSINESS AND LAW OF
FASHION AND RETAIL (1st ed. 2020) ........................................................ 12

Fact Sheet: President Biden's Safer America Plan (July 21, 2022),
https://www.whitehouse.gov/briefing-room/statements-
releases/2022/07/21/fact-sheet-president-bidens-safer-america-
plan/ ........................................................................................................ 14

iii

H. MARSHALL JARRETT, ET AL., PROSECUTING INTELLECTUAL PROPERTY CRIMES (4th ed.), www.justice.gov/file/442151/download (last visited July 27, 2022) ....................................................................... 6

Jonathan Hyman, et al., *If the IP Fits, Wear It: IP Protection for Footwear—A U.S. Perspective,* 108 Trademark Rep. 645 (2018) ..... 17, 18

Letter from Matt Priest, President and CEO of Footwear Distrib. & Retailers of Am., to Hon. Thom Tillis and Hon. Chris Coon, Senate Judiciary Comm. (Dec. 5, 2019), https://fdra.org/wp-content/uploads/2020/05/FDRA-Letter-of-Support-Counterfeit-Goods-Seizure-Act-of-2019-.pdf (last visited July 27, 2022) .................. 10

Letter from Matt Priest, President and CEO of Footwear Distrib. & Retailers of Am., to Hon. Daniel Lee, Office of the U.S. Trade Rep. (Jan. 31, 2022), https://fdra.org/wp-content/uploads/2022/02/FDRA_2022-Special-301_Review_Comment.pdf (last visited July 27, 2022).................... 13, 14

Letter from Stephen Lamar, President and CEO of Am. Apparel & Footwear Assoc., to Hon. Daniel Lee, Office of the U.S. Trade Rep. (Oct. 11, 2021), https://www.regulations.gov/comment/USTR-2021-0013-0023 (last visited July 27, 2022) ........................................ 10, 14, 15

Scott Hall, *10 Tips to Spot Counterfeit and Fake Goods While Holiday Shopping*, U.S. CHAMBER OF COMMERCE (Nov. 17, 2021), https://www.uschamber.com/intellectual-property/shopsmart .............. 12

U.S. CHAMBER OF COMMERCE, GLOBAL INTELLECTUAL PROPERTY CENTER, MEASURING THE MAGNITUDE OF GLOBAL COUNTERFEITING (2016), www.uschamber.com/assets/archived/images/documents/files/measuringthemagnitudeofglobalcounterfeiting.pdf (last visited July 27, 2022) ............................................................................................. 11, 12

iv

U.S. CUSTOMS AND BORDER PROT., INTELLECTUAL PROP. RIGHTS
SEIZURE STATISTICS: FISCAL YEAR 2020,
https://www.cbp.gov/sites/default/files/assets/documents/2021-
Sep/101808%20FY%202020%20IPR%20Seizure%20Statistic%20B
ook%2017%20Final%20spreads%20ALT%20TEXT_FINAL%20%2
8508%29%20REVISED.pdf (last visited July 27, 2022).................. 12, 13

U.S. Dept. of Commerce, Office of Inspector Gen., "USPTO Should
Improve Controls over Examination of Trademark Filings to
Enhance the Integrity of the Trademark Register," Final Report
No. OIG-21-033-A, Aug. 11, 2021, *available at*
https://www.oig.doc.gov/OIGPublications/OIG-21-033-A.pdf (last
visited July 25, 2022) .............................................................. 16

U.S. DEPT. OF HOMELAND SECURITY, COMBATING TRAFFICKING IN
COUNTERFEIT AND PIRATED GOODS (Jan. 24, 2020),
www.dhs.gov/sites/default/files/publications/20_0124_plcy_counter
feit-pirated-goods-report_01.pdf ............................................. 11

U.S. PATENT AND TRADEMARK OFFICE, PERFORMANCE AND
ACCOUNTABILITY REPORT (2021),
www.uspto.gov/sites/default/files/documents/USPTOFY21PAR.pdf
(last visited July 27, 2022) ..................................................... 8

The American Apparel & Footwear Association ("AAFA"), the Footwear Distributors & Retailers of America ("FDRA"), the Council of Fashion Designers of America, Inc. ("CFDA"), and the Accessories Council respectfully submit this brief amicus curiae in support of Plaintiffs-Appellees Vans, Inc., and VF Outdoor, LLC.[1]

## INTERESTS OF AMICI

AAFA is a national trade association, which represents more than 1,000 name-brand apparel, footwear, travel goods, and other sewn product companies, and their suppliers, including Vans. Through its public policy and political initiatives, AAFA protects American innovation, brands and their intellectual property, workers, and consumers. And through its Brand Protection Council, AAFA vigorously pursues brand protection efforts, with a focus on the global war against counterfeit apparel, footwear, accessories, and other supplier products that have proliferated on online marketplaces and social media platforms.

---

[1] No counsel for any party has authored this brief in whole or in part, and no person other than the *amici* or their counsel have made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

FDRA is the only trade organization focused solely on the footwear industry. Representing 95% of total U.S. footwear sales and supporting nearly 500 companies, including Vans, FDRA's members include most U.S. footwear manufacturers, brands, retailers and importers, from small family-owned business to global brands that reach consumers around the world. FDRA serves its members by proactively surveying the global footwear counterfeit landscape and testifying before federal agencies, including the Office of the U.S. Trade Representative, to provide input on global footwear intellectual property challenges.

The CFDA is trade association with a membership of over 450 of America's foremost womenswear, menswear, jewelry, and accessory designers. The CFDA provides its members with thought-leadership and business development support. It also supports emerging designers and students through professional development programming and numerous grant and scholarship opportunities. In addition to hosting the annual CFDA Fashion Awards, the CFDA organizes the Official New York Fashion Schedule as part of the American Collections Calendar, as well as RUNWAY360, the digital destination for collection releases year-round. Through the CFDA Foundation, Inc., CFDA also mobilizes its

membership to raise funds for charitable causes and engage in civic initiatives.

The Accessories Council is a trade association dedicated to helping accessories, jewelry, and footwear companies grow their businesses. The membership includes over 350 members, from large companies to start-ups. The Council hosts over 100 opportunities for its members each year—including awards events, educational programming, legislative support, mentoring, press support, and sourcing assistance—and publishes a weekly newsletter and a quarterly digital magazine. Many of its members have small budgets and limited resources for protecting their designs from copies.

Members of these organizations will be impacted by any expansion of a First Amendment defense to a Lanham Act claim and offer this brief for the Court's consideration on that question.

## SUMMARY OF ARGUMENT

MSCHF Product Studio, Inc. asks this Court to open the door to a new kind of global counterfeit problem: an influx of infringing products meriting First Amendment protection so long as their creators clear a ground-level hurdle of affixing some artistic expression on them.

3

Applying *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989), as MSCHF asks would foster an artistic license to counterfeit and pose a significant threat to American companies, workers, communities, and consumers. Even if MSCHF and other so-called "art collectives" were "artists, not thieves," *see* Br. of *Amicus Curiae* Daniel Arsham at 10 (Doc. No. 52), MSCHF's *Rogers* expansion would green-light thieves pretending to be artists.

This is unwelcome under any scenario, but counterfeit and knock-off merchandise is already a significant and ever-increasing threat to American companies. While counterfeit products harm American companies and steal their intellectual property, the harms don't stop there. Infringing products are often defective or use inadequate materials, increasing dangers to consumers; they often implicate criminal organizations and other illegal products, financing such groups and exposing consumers to other threats like financial or identity theft; they are often made in facilities that ignore the rights of workers, jeopardizing their health and safety; and they stifle creativity and innovation, threatening economic competitiveness. American companies already face stiff challenges in addressing these threats and can ill afford even more.

These threats undermine the robust intellectual property protection that is at the heart of our market economy, artistic expression, and legal system. Armed with that protection, American companies have risen to the forefront of design, manufacture, and sale of footwear, apparel and other fashion accessories. The resulting benefits are numerous, from jobs, consumer safety and satisfaction, economic growth, and more. At a time when these benefits are already under increasing attack, the amici join the plaintiffs-appellees in asking this Court to reject MSCHF's expansive framework.

## ARGUMENT

## I. MSCHF'S *ROGERS* EXPANSION WILL CREATE AN INDUSTRY OF "EXPRESSIVE COUNTERFEITS."

According to MSCHF, "[u]nder the First Amendment, even where there is a likelihood of consumer confusion, expressive works like *Wavy Baby* cannot give rise to Lanham Act liability if the use of the plaintiff's mark is (1) relevant to the expression and (2) not explicitly misleading as to the source of the works." MSCHF's Br. at 21 (Doc. No. 39). MSCHF and its amici concede how easily one meets this test. One need only have an "expressive" work and avoid explicitly misleading consumers. *Id.*; Br. of Intellectual Prop. Professors, at 19, 23-24 (Doc. No. 46)

5

(noting that under *Rogers*, "the definition of expressive works is quite broad" and the "artistic relevance" prong "is capacious"); *see also Dr. Seuss Enter. LP v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (requiring "the use to be an explicit indication, overt claim, or explicit misstatement about the source of the work."). This is, by design, a low bar.

But in the case of the shoes here—and footwear, apparel and fashion accessories broadly speaking—this expansion would exacerbate the global problem of IP-infringing products by protecting "expressive counterfeits." Consider a counterfeit shoe producer. To sell its product, it designs and manufactures products to look and feel like the real thing. By replicating the brand, the appearance of the shoe is intended to mislead consumers to look like the established brand. While detection and enforcement may vary, the law rightfully prohibits these products from entering the marketplace and, when it can, punishes those responsible.[2]

Still, if MSCHF has its way, a bad actor need only make minor changes to the same product and invoke artistic expression to skirt liability. For example, the counterfeit producer can start with a name-

---

[2] *See* H. MARSHALL JARRETT, ET AL., PROSECUTING INTELLECTUAL PROPERTY CRIMES 1-6, 92 (4th ed.), www.justice.gov/file/442151/download (last visited July 27, 2022).

brand shoe, remove its official logo but otherwise keep the shoe design the same, add an "expressive" flare for artistic expression, add a conspicuous label on the sole or in the packaging clarifying that the shoe is not in fact the name-brand product, and our counterfeiter now enjoys First Amendment protection. This adaptation of counterfeit products is easy and, under MSCHF's application of *Rogers*, threatens to undermine the IP rights of footwear, apparel, and fashion accessories brands. Nothing in MSCHF's reading of *Rogers* requires an expressive counterfeiter to have pure artistic intentions.

And it's not just existing counterfeiters that would pose a new threat. An entirely new industry of knockoffs may emerge because it will be easier to produce and sell "expressive counterfeits." Because an "expressive counterfeit" cannot explicitly mislead the consumer, its creator need not worry about making the product look identical to the real thing. Infringing other brands just enough to profit, but saving the effort of a true counterfeit and its concomitant risk of punishment, is easier. If the cost of entering this marketplace of global knockoffs is as low as MSCHF wants to make it, participants will surely take them up on it.

This global market of "expressive counterfeits" will have considerable consequences. Low-quality products, customs' enforcement difficulty (is this product a counterfeit or a permissible expressive work?), dilution of brand IP, and incentivizing bad actors, to name just a few. It will also exacerbate existing problems at the United States Patent and Trademark Office, where counterfeiters already flout the rules to obtain online legitimacy.[3] Expressive counterfeiters can further flood that agency with bogus applications to springboard their legitimacy on online platforms, such as applying for existing trademarks and meriting *Rogers* protection because of an added expressive element. This, in turn, would also lead to increased problems on social media and e-commerce platforms, which fuel—intentionally or not—the market for knock-off products.

Plus, an "expressive counterfeit" market may impact smaller brands who have not had a counterfeit problem to date. Unlike larger brands,

---

[3] *See* U.S. PATENT AND TRADEMARK OFFICE, PERFORMANCE AND ACCOUNTABILITY REPORT 36 (2021), www.uspto.gov/sites/default/files/documents/USPTOFY21PAR.pdf (last visited July 27, 2022) (noting the need for increased spending to "alter trademark operations to protect the integrity of the register and contend with increasing fraudulent applications").

they already face an uphill battle when it comes to brand recognition and protecting their intellectual property. And unlike larger brands, these companies often lack the resources to effectively fight knock-off products. A wave of "expressive counterfeits" would present a new problem that many have never had to face and lack the resources to effectively combat. This, in turn, strains the entire industry, sows distrust in consumers, creates brand reputation issues, and undermines IP protections and brand strength.

How American companies could combat an emerging market of "expressive counterfeits" is hard to fathom. Customs officials, brands, and courts would have to engage in amorphous line-drawing on artistic expression and intent to mislead that will ultimately liberate bad actors, threaten American companies, and complicate existing frameworks for protecting IP and punishing infringing conduct. Even if MSCHF and other so-called "art collectives" hold themselves out as artists, not thieves, MSCHF's *Rogers* expansion will green-light thieves all the same.

Given the scope of IP threats that already exist, this is something footwear, apparel, and fashion accessories companies can ill afford.

9

II.    **THE FOOTWEAR, APPAREL, AND FASHION ACCESSORIES
       INDUSTRIES ALREADY FACE A GLOBAL PROBLEM OF
       KNOCKOFFS AND COUNTERFEITS.**

The apparel and footwear industries collectively employ three million
U.S. workers and contribute more than $350 billion in annual U.S. re-
tail sales.[4] The footwear industry alone invests millions of dollars every
year in innovations to their products, 2.5 billion pairs of which are sup-
plied to the U.S. market every year.[5] Given their size, the apparel and
footwear industries provide critical contributions to our national econ-
omy and American cultural identity. To do so, companies in these indus-
tries commit substantial resources to develop their products and
brands, foster and protect creativity and innovation, and serve consum-
ers across the world.

But despite their importance to the U.S. economy, these industries
are under constant attack from a global industry of counterfeit and

---

[4] Letter from Stephen Lamar, President and CEO of Am. Apparel &
Footwear Assoc., to Hon. Daniel Lee, Office of the U.S. Trade Rep. (Oct.
11, 2021), https://www.regulations.gov/comment/USTR-2021-0013-0023
(last visited July 27, 2022) ("Lamar Letter").

[5] Letter from Matt Priest, President and CEO of Footwear Distrib. &
Retailers of Am., to Hon. Thom Tillis and Hon. Chris Coon, Senate
Judiciary Comm. (Dec. 5, 2019), https://fdra.org/wp-content/up-
loads/2020/05/FDRA-Letter-of-Support-Counterfeit-Goods-Seizure-Act-
of-2019-.pdf (last visited July 27, 2022).

knockoff products. These infringing products present a smorgasbord of problems, from financial harm to companies, safety, financial and health risks to consumers, and increased funding to criminal and terrorist organizations.[6]

"Counterfeit" goods are "any goods, including packaging, bearing without authorization a trademark which is identical to the trademark validly registered in respect of such goods, or which cannot be distinguished in its essential aspects from such a trademark, and which thereby infringes the rights of the owner of the trademark in question under the law of the country of importation."[7] Counterfeit goods ride on the coattails of established brands' reputation, quality, and popularity

---

[6] *See generally* U.S. CHAMBER OF COMMERCE, GLOBAL INTELLECTUAL PROPERTY CENTER, MEASURING THE MAGNITUDE OF GLOBAL COUNTERFEITING 5–10 (2016), www.uschamber.com/assets/archived/images/documents/files/measuringthemagnitudeofglobalcounterfeiting.pdf (last visited July 27, 2022) (hereinafter "MEASURING THE MAGNITUDE"); U.S. DEPT. OF HOMELAND SECURITY, COMBATING TRAFFICKING IN COUNTERFEIT AND PIRATED GOODS (Jan. 24, 2020), www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

[7] Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), sect. 4, art. 51 n.14.

to deliver a lower-quality and lower-cost version.[8] Relatedly, "knockoffs" describe goods that do not bear identical trademarks but are deliberately designed to resemble established trademarks and profit from their success.[9]

The United States Chamber of Commerce estimates that the worldwide trade in counterfeit and fake goods is approximately $500 billion annually and growing.[10] The footwear, and apparel and accessories industries are particularly susceptible to counterfeits due to their place in popular and youth culture. Both categories of products are consistently among the top products seized by U.S. Customs & Border Protection: in 2020, apparel and accessories accounted for 14% of all seizures while footwear accounted for 13%.[11] The retail value of these seizures was

---

[8] MEASURING THE MAGNITUDE 7–9.

[9] *See* BARBARA KOLSUN & DOUGLAS HAND, THE BUSINESS AND LAW OF FASHION AND RETAIL 488 (1st ed. 2020).

[10] *See* Scott Hall, *10 Tips to Spot Counterfeit and Fake Goods While Holiday Shopping*, U.S. CHAMBER OF COMMERCE (Nov. 17, 2021), https://www.uschamber.com/intellectual-property/shopsmart.

[11] *See* U.S. CUSTOMS AND BORDER PROT., INTELLECTUAL PROP. RIGHTS SEIZURE STATISTICS: FISCAL YEAR 2020 at 20-21, https://www.cbp.gov/sites/default/files/assets/documents/2021-Sep/101808%20FY%202020%20IPR%20Seizure%20Statistic-%20Book%2017%20Final%20spreads%20ALT%20TEXT_FI-NAL%20%28508%29%20REVISED.pdf (last visited July 27, 2022).

approximately $220 million dollars.[12] The actual amount of counterfeit goods that reach U.S. consumers likely dwarfs that amount, as counterfeiters continue to innovate their methods by, for example, shipping the product and labels separately or relying on small packages that can evade detection.[13]

Counterfeits and knockoffs also litter online marketplaces and platforms, with the rise of e-commerce and social media platforms exacerbating these problems. As e-commerce has grown in popularity, it has ushered in an "explosion" of counterfeits.[14] Online platforms are a preferred marketplace for counterfeiters because they facilitate casting a wide net while avoiding detection. Meanwhile, the failure of online platforms to vet sellers, identify infringing content and products, ban repeat

---

[12] *Id.* at 22–23.

[13] Letter from Matt Priest, President and CEO of Footwear Distrib. & Retailers of Am., to Hon. Daniel Lee, Office of the U.S. Trade Rep., at 3 (Jan. 31, 2022), https://fdra.org/wp-content/uploads/2022/02/FDRA_2022-Special-301_Review_Comment.pdf (last visited July 27, 2022) ("Priest Letter").

[14] *Id.* at 2.

offenders, and protect brands' intellectual property make e-commerce a particularly fertile ground for those counterfeiters.[15]

Specifically, online platforms often fail to verify seller contact information, making it hard—if not impossible—for brands to identify the individual(s) infringing their intellectual property rights.[16] Online platforms also vary in how effectively brands can locate the existence of infringing content. And assuming brands can locate counterfeit products and identify the source, "notice and takedown" procedures are too often inadequate to protect the impacted companies.[17] Many platforms, for example, fail to verify seller information, allowing infringers to create new accounts with impunity even after they have been discovered.[18]

---

[15] Lamar Letter at 3. The White House has also taken notice of this pressing issue. *See* Fact Sheet: President Biden's Safer America Plan (July 21, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/07/21/fact-sheet-president-bidens-safer-america-plan/ ("To tackle organized retail theft, the plan calls on Congress to pass legislation to require online marketplaces, like Amazon, to verify third-party sellers' information, and to impose liability on online marketplaces for the sale of stolen goods on their platforms.").

[16] Priest Letter at 2; *see* Lamar Letter at 4 (AAFA members describing the process of locating counterfeit and infringing listings as "impossible" and "very difficult").

[17] Priest Letter at 2.

[18] Lamar Letter at 6.

And due to what are often inadequate intellectual property tools, minimal if any proactive measures to prohibit the publishing of counterfeit listings, and delay in acting upon submitted notices, the volume of infringing products only increases.[19] This presents a true "whack-a-mole" problem for apparel, footwear, and fashion accessories companies.

Online platforms have also enabled counterfeiters to benefit from the prevalence of so-called "influencers" on social media who share and review fake products for their social media followers.[20] Dupe influencers use a variety of tactics to promote counterfeits, including unboxing videos, sponsorship and giveaways, tutorial videos, hidden links, and influencer shopping apps.[21] As a result, dupe influencers legitimize, facilitate, and promote the sale of counterfeit products online.

Similar problems have plagued the United States Patent and Trademark Office. Counterfeiters have flooded the USPTO with applications for fraudulent trademark filings, using digitally created or altered

---

[19] *Id.* at 3–5.

[20] *See generally* Am. Apparel & Footwear Assoc., *Dupe Influencers: The Concerning Trend of Promoting Counterfeit Apparel, Footwear, and Accessories on Social Media* (May 2021), www.aafaglobal.org/DupeInfluencers (last visited July 25, 2022); *see also* Lamar Letter at 4.

[21] *See id.* at 8–16.

specimens and flouting the requirement that applicants retain U.S.

counsel. *See* U.S. Dept. of Commerce, Office of Inspector Gen., "USPTO

Should Improve Controls over Examination of Trademark Filings to En-

hance the Integrity of the Trademark Register," Final Report No. OIG-

21-033-A, Aug. 11, 2021, at 3-9, *available at*

https://www.oig.doc.gov/OIGPublications/OIG-21-033-A.pdf (last visited

July 25, 2022). These methods lead to approved applications, which the

fraudulent applicants then use to gain false legitimacy and security on

e-commerce platforms, where they continue their fraudulent conduct.

The challenge of national and international enforcement of IP

rights—including trademarks, trade dress, and copyrights—often puts

the onus squarely on these industries to police illegal counterfeit activi-

ty. This is an uphill battle. The footwear, apparel and fashion accesso-

ries industries collectively spend millions of dollars every year protect-

ing their brands through a variety of measures: online and physical

training and enforcement efforts; hiring vendors to police online third-

party marketplaces and social media platforms; conducting extensive

consumer and public education and outreach; and even making pur-

chases of suspected fake products. While these protection efforts are

enough to strain any company, they are acutely felt by smaller companies with fewer resources at their disposal.

MSCHF's expansion of the *Rogers* test will make these problems worse and further threaten the value of these industries' intellectual property.

## III. THE FOOTWEAR, APPAREL, AND FASHION ACCESSORIES INDUSTRIES NEED ROBUST IP PROTECTION.

Protecting intellectual property is vital. Strong intellectual property protection allows companies to maintain long-term exclusivity over the trademarks or trade dress that are fundamental to their brand's identity, supports U.S. jobs, and more.[22] IP protection also fosters innovation of core designs and brands: companies can capitalize on short-term trends while maintaining long-term brand identity for consumers. For example, the long-term exclusivity that IP protection provides is valuable for iconic designs like Vans' Old Skool shoe because it allows Vans to innovate their design and products while capitalizing on its long-term success. *See id.*

New and smaller brands benefit too. Before they have brand recognition and the financial resources to fully protect it, new companies can

---

[22] *See* Jonathan Hyman, et al., *If the IP Fits, Wear It: IP Protection for Footwear—A U.S. Perspective,* 108 Trademark Rep. 645, 648 n. 10 (2018).

17

be assured that their investment in and strategy for building their brand will be protected. While trends and fashion seasons come and go, a well-established brand serves as the foundation for both a company's innovation and its financial sustainability. *See generally Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) ("The future of the nation depends in no small part on the efficiency of industry, and the efficiency of industry depends in no small part on the protection of intellectual property.").

IP protection also enables footwear, apparel, and fashion accessories brands to pursue licensing agreements, business deals, and design collaborations. *See* Hyman et al., *supra* note 22, at 649. Before entering such deals, investors and licensees often look to see whether designers have invested resources into protecting their designs, as a robust IP portfolio communicates a brand's sophistication in the market. *See id.* ("IP rights, or lack thereof, could affect the valuation of a brand" and a company's available to capitalize on it). While companies regularly collaborate with other brands, celebrities, or artists, these collaborations are strategic: they are not created on a whim or without a company's consent. This ensures that their IP continues to act as intended: as a

source-identifier distinguishing their brand from others. Anything less would compromise the many years of hard work and investment spent on building their brands.

## CONCLUSION

The benefits of robust IP protection are numerous. As the United States and its many industries continue to defend those rights against the global threats of counterfeit products, MSCHF asks this Court to invite more of them. The amici urge this Court to reject the invitation. AAFA, FDRA, CFDA, and the Accessories Council ask this Court to affirm the district court.

Date: July 29, 2022

By: /s/ John P. O'Herron
John P. O'Herron (VSB No. 79357)
Zachary D. Cohen (VSB No. 74770)
Rachel W. Adams (VSB No. 92605)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
joherron@t-mlaw.com
zcohen@t-mlaw.com
radams@t-mlaw.com
*Counsel for Amici Curiae*

CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App.
      P. 28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*3,418*] words, excluding the parts of the
      brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [    ] this brief uses a monospaced typeface and contains [*state the
      number of*] lines of text, excluding the parts of the brief exempted
      by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App.
      P. 32(a)(5) and the type style requirements of Fed. R. App. P.
      32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced
      typeface using [*Microsoft Word 2016*] in [*14pt Century
      Schoolbook*]; *or*

      [    ] this brief has been prepared in a monospaced typeface using
      [*state name and version of word processing program*] with [*state
      number of characters per inch and name of type style*].


Dated: July 29, 2022                    /s/ John P. O'Herron
                                        *Counsel for Amici Curiae*

20

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 29th day of July, 2022, I caused this Brief of Amici Curiae to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record as registered CM/ECF users.

/s/ John P. O'Herron
*Counsel for Amici Curiae*

21