# 22-1006

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

VANS, INC., VF OUTDOOR, LLC,

*Plaintiffs-Appellees,*

v.

MSCHF PRODUCT STUDIO, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of New York, Case No. 1:22-cv-02156-WFK-RML
Honorable William F. Kuntz, II

## BRIEF OF AMICUS CURIAE NIKE, INC.
## IN SUPPORT OF PLAINTIFFS-APPELLEES / AFFIRMANCE

Tamar Y. Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4500

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700

*Counsel for Amicus Curiae NIKE, Inc.*

July 29, 2022

# <u>CORPORATE DISCLOSURE STATEMENT</u>

NIKE, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

<u>/s/ Stanley J. Panikowski</u>
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF AMICUS CURIAE AND CONSENT TO FILE ............... 1

INTRODUCTION ..................................................................... 5

ARGUMENT .......................................................................... 7

    A.   The *Rogers v. Grimaldi* test is ill-suited for trademark infringement cases involving the sale of ordinary consumer products and should not be extended to such cases ................................................................. 7

    B.   Consumers have always used trademarks for expressive purposes, but that does not convert ordinary consumer products into expressive works. ........................... 13

CONCLUSION ..................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
364 F. Supp. 3d 291 (S.D.N.Y. 2019) ................................................. 11

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*,
830 F.2d 1217 (2d Cir. 1987) ............................................................ 7

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
886 F.2d 490 (2d Cir. 1989) .............................................................. 12

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
228 F.3d 56 (2d Cir. 2000) ............................................................... 7

*Harley Davidson, Inc. v. Grottanelli*,
164 F.3d 806 (2d Cir. 1999) .............................................................. 12

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
73 F.3d 497 (2d Cir. 1996) ............................................................... 12

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
156 F. Supp. 3d 425 (S.D.N.Y. 2016), *aff'd*, 674 F. App'x
16 (2d Cir. 2016) ............................................................................. 12

*Matal v. Tam*,
137 S. Ct. 1744 (2017)................................................................... 9, 15

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) ..................................................... *passim*

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009) ............................................................... 12

**Statutes**

15 U.S.C. § 1125(c)(3)(A) ...................................................................... 12

## <u>INTEREST OF AMICUS CURIAE AND CONSENT TO FILE[1]</u>

NIKE, Inc. is the largest seller of athletic footwear and apparel in the world. Its principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services. Nike sells its products directly to consumers through Nike-owned retail stores and digital platforms. It also sells its products to retail accounts and a mix of independent distributors, licensees, and sales representatives in virtually all countries around the world.

The Nike brand focuses on men's, women's, and kids' products. The company also designs products specifically for the Jordan and Converse brands. Nike's athletic footwear products are designed primarily for specific athletic use, although a large percentage of the products are worn for casual or leisure purposes. Nike places considerable emphasis on innovation and high-quality construction in

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus Curiae NIKE, Inc. certifies that (i) no party's counsel authored the brief in whole or in part, (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (iii) no person other than NIKE, Inc. and its counsel contributed money that was intended to fund preparing or submitting the brief.

the development and manufacturing of its products.  In addition to footwear, Nike sells sports apparel, featuring the same trademarks, predominantly through the same marketing and distribution channels as athletic footwear.  Nike also markets apparel with licensed college and professional team and league logos, as well as performance equipment and accessories.

Nike's valuable intellectual property rights are important to its brand, success, and competitive position in the marketplace.  In particular, Nike's trademarks, many of which are famous, signal to consumers that goods bearing those marks originate with Nike.  They are Nike's most powerful tool in avoiding consumer deception and confusion in the marketplace.  Nike uses trademarks on nearly all of its products and maintains strict quality control standards for its products bearing its trademarks.  Because of the trust that Nike's consumers place in those marks, Nike strategically pursues available protections of these rights and vigorously protects them against third-party theft and infringement.  Nike's significant investments in developing and protecting its trademarks assures consumers of the quality and source of authentic Nike goods.

Nike considers its NIKE word trademark and Swoosh Design trademark to be among its most valuable and recognizable assets. Nike has registered these trademarks in almost 170 jurisdictions worldwide. Nike therefore has a vital interest in strong and well-functioning legal regimes for the protection of trademark and other intellectual property rights.

Avoiding source confusion among its consumers is of the utmost importance to Nike. As a result, Nike often takes action against third parties that are duping consumers into purchasing products bearing confusingly similar trademarks. Nike is also sometimes a defendant in cases where someone else asserts that Nike has infringed its trademark. Nike therefore appreciates the importance of balancing interests in free expression—primarily through the likelihood of confusion test and defenses like classic fair use—with the protection of valid trademark rights when needed to avoid consumer confusion.

Nike was the plaintiff in a 2021 trademark infringement and dilution lawsuit against MSCHF. *See Nike, Inc. v. MSCHF Prod. Studio, Inc.*, No. 1:21-cv-01679-EK-PK (E.D.N.Y. filed Mar. 29, 2021). In that case, the district court entered a temporary restraining order

against MSCHF's sales of customized Nike Air Max 97 shoes that MSCHF had materially altered to prominently feature a satanic theme. *See id.*, ECF No. 18 (Apr. 1, 2021). The parties resolved the case shortly after entry of the TRO. Regardless of the particular plaintiff and defendant in this case, however, Nike has a compelling interest in advocating against the unwarranted extension of the *Rogers v. Grimaldi* test to ordinary consumer products. Such an extension would cause upheaval in trademark law, severely impair the paramount consumer protection function of trademarks as source-identifiers, and threaten the painstakingly-earned good will embodied in Nike's valuable trademarks.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Nike certifies that all parties have consented to the filing of this amicus brief.

## **INTRODUCTION**

MSCHF and its amici invite this Court to eviscerate trademark rights by extending the *Rogers v. Grimaldi* test to ordinary consumer products. This deeply flawed invitation should be rejected. This Court has never applied *Rogers* to ordinary consumer products. Rather, it has applied *Rogers* only to artistic works. And for good reason: the whole point of *Rogers* is that artistic works implicate elevated First Amendment concerns when balancing free expression with the avoidance of consumer confusion in Lanham Act cases. The concerns that animate *Rogers* do not apply to ordinary consumer goods. Instead, the traditional tools of trademark law—principally the likelihood of confusion test itself, along with rules governing parody, classic fair use, and nominative fair use—are fully up to the task of balancing the First Amendment with consumer protection. This well-established, eminently workable approach—properly applied by the district court here—is and should remain the law.

Moreover, the distinction between ordinary consumer products and artistic works is a common sense one that is easy to apply. For example, shoes and shirts are ordinary consumer products. Books and

movies are artistic works.  Ordinary consumer products of course may include expressive or artistic elements.  The law of trademark, trade dress, design patents, and copyright recognizes as much.  In fact, trademarks exist to communicate something about the product's source, sponsorship, affiliation, and/or quality.  Artistic works likewise may serve utilitarian purposes, as anyone who has ever used a book as a doorstop or a paperweight can attest.

But these unremarkable facts do not change the fundamental character of these categories and the relative ease of sorting different types of goods into them.  Just because expression or art is used in connection with an ordinary consumer product does not convert the product into an artistic or expressive *work* itself.  And just because an artistic work can be useful does not transform it into an ordinary consumer good under *Rogers*.  Even if there is some border region that may present difficult questions at the margins, most categories of goods—including the ordinary consumer products (shoes) at issue in this case—fall well outside any potential gray area.  The efforts of MSCHF and its amici to blur these simple distinctions should be rebuffed.

MSCHF and its amici radically urge that any expressive element or purpose can bring an ordinary consumer product within the ambit of *Rogers*. But this novel approach would steamroll consumer interests and trademark owners' rights in a way that completely undermines the Lanham Act, which is primarily intended to protect consumers against deception and confusion regarding the origin of goods in the marketplace. Their approach also would replace a limited and manageable objective inquiry under current law with arbitrary and uncertain assessments of subjective purpose and degrees of expression. MSCHF's and its amici's unsound approach should be rejected, and the district court's decision should be affirmed.

## ARGUMENT

A. **The *Rogers v. Grimaldi* test is ill-suited for trademark infringement cases involving the sale of ordinary consumer products and should not be extended to such cases.**

As this Court has noted, the purpose of the Lanham Act is "'to prevent consumer confusion regarding a product's source . . . and to enable those that fashion a product to differentiate it from others on the market.'" *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61-62 (2d Cir. 2000) (quoting *Centaur Commc'ns, Ltd.*

*v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1220 (2d Cir. 1987)). This Court's *Rogers* test does not and should not govern the use of a plaintiff's trademark in connection with an ordinary consumer product. By its very terms and in its subsequent applications, *Rogers v. Grimaldi* is reserved for "artistic works." 875 F.2d 994, 999 (2d Cir. 1989). In consumer product cases, the traditional likelihood of confusion test serves to balance any interest in free expression with the need to protect consumers from confusion and protect a trademark owner's good will. That test robustly accounts for assertions of parodic use as well. The defenses of classic fair use and nominative fair use are also available when their elements are met. The *Rogers* test, however, has no place in such cases as a matter of law.

It is no revelation that many consumer products have artistic elements. Indeed, an "artisan" is a worker in a skilled trade, and many of the world's most famous apparel and shoe designers are considered artisans. Sometimes these artistic elements themselves are protected by trademark, trade dress, design patent, and/or copyright law. Further, a trademark is inherently a form of expression about the source, sponsorship, or affiliation of a product. As the Supreme Court

has explained, "trademarks often have an expressive content.

Companies spend huge amounts to create and publicize trademarks

that convey a message. It is true that the necessary brevity of

trademarks limits what they can say. But powerful messages can

sometimes be conveyed in just a few words." *Matal v. Tam*, 137 S. Ct.

1744, 1760 (2017). Consumer products may also bear words or symbols

other than trademarks that constitute expression, such as an

inspirational, humorous, or political message on a t-shirt or coffee mug.

But the fact that a consumer product has artistic or expressive

elements or that a defendant supposedly intends to use the product as a

conduit for expression does not transform it into an artistic or

expressive *work* within the meaning of *Rogers*. Moreover, this common-

sense distinction between an ordinary consumer product and an artistic

work is clear and routinely applied. The language of *Rogers* itself

establishes these points: "Though consumers frequently look to the title

of a work to determine what it is about, they do not regard titles of

artistic works in the same way as the names of *ordinary commercial*

*products*. Since consumers expect an *ordinary product* to be what the

name says it is, we apply the Lanham Act with some rigor to prohibit

- 9 -

names that misdescribe such goods." *Rogers*, 875 F.2d at 1000 (emphasis added).  By contrast, "[m]ovies, plays, books, and songs are all indisputably works of artistic expression and deserve protection. Nonetheless, they are also sold in the commercial marketplace like *other more utilitarian products*, making the danger of consumer deception a legitimate concern that warrants some government regulation . . . .  Poetic license is not without limits. The purchaser of a book, *like the purchaser of a can of peas*, has a right not to be misled as to the source of the product." *Id.* at 997 (emphasis added).

*Rogers* therefore recognizes that ordinary consumer products like shoes, shirts, and cans of peas are the rule, and artistic works like books, movies, and songs are the exception.  The traditional likelihood of confusion test suffices to balance expressive interests with consumer protection and preserving rightsholders' good will in cases involving ordinary commercial products.  But when artistic works are at stake, a trademark plaintiff must surmount a higher hurdle to overcome the elevated protection that the First Amendment accords to the expression embodied in such works.

Because artistic works have some of the features of "more utilitarian products," they are not categorically exempt from the Lanham Act: they are just given additional breathing space through the *Rogers* test. 875 F.2d at 997. But the presence of artistic or expressive elements in an ordinary commercial product does not sweep it within the ambit of *Rogers*. Were that the case, *Rogers* would swallow the traditional likelihood of confusion test whole and create a major new obstacle to trademark enforcement. Neither Congress nor this Court intended such a paradoxical and deleterious result. MSCHF's and its amici's proposal to revolutionize trademark law—and gut trademark rights in the process—therefore should be rejected.

Neither this Court nor district courts within this Circuit have applied *Rogers* to ordinary commercial products, even where those products have expressive elements. Rather, the traditional likelihood of confusion test achieves the proper balance. *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 321-22 (S.D.N.Y. 2019) (rejecting argument that *Rogers* applies "because t-shirts have been recognized as an expressive medium" and agreeing with argument that "the *Rogers* test is not designed to protect commercial products

and, further, that any First Amendment concerns are already addressed by the consumer confusion test applicable to commercial products"). In addition, defenses like classic fair use and nominative fair use are available when their elements are met. *Rogers* is inapplicable, but the First Amendment is hardly left adrift.

Further, under this Court's precedent, the First Amendment interests implicated by parody are also considered in connection with the likelihood of confusion analysis. *See, e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009); *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996). While a parody defense is not without its limits[2], it fits comfortably within a context-specific assessment of the *Polaroid* factors. *See Louis Vuitton*

---

[2] To qualify as such, "[a] parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Hormel Foods Corp.*, 73 F.3d at 503 (2d Cir. 1996) (quoting *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989)). Notably, use of a plaintiff's trademark cannot qualify under parody when the allegedly infringing term or design is itself used as a designation of source for its own goods. *See Starbucks Corp.*, 588 F.3d at 112 (citing 15 U.S.C. § 1125(c)(3)(A)).

*Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 440-44

(S.D.N.Y. 2016), *aff'd*, 674 F. App'x 16 (2d Cir. 2016) ("considering all

eight *Polaroid* factors and looking at the products in their totality" to

conclude "defendant's use of the mark is an obvious parody or pun,

readily so perceived, and unlikely to cause confusion among consumers"

(citations and quotations omitted)). *Rogers* is both unnecessary and

unwarranted to balance the relevant interests in such cases.

Consistent with this Court's precedent, the district court in this

case eschewed *Rogers* and instead accounted for the asserted nature of

the challenged use in its likelihood of confusion analysis. That

framework is the correct one, and this case ultimately is routine. There

is no need to fix what is not broken. *Rogers* applies to artistic works,

but it has no place when ordinary commercial products are at issue.

**B.  Consumers have always used trademarks for expressive purposes, but that does not convert ordinary consumer products into expressive works.**

MSCHF and its amici trumpet their observation that consumers

will often use or display a trademark-bearing product to achieve some

self-expressive purpose beyond simply identifying the source of the

goods. But this unremarkable fact does nothing to support their radical

proposed expansion of *Rogers* into the vast realm of ordinary consumer products.  It instead points in the opposite direction.

Trademark rights accrue when, for example, a word or a symbol takes on a secondary meaning to the consumer or when an inherently distinctive term or design is used to convey to the consumer that a product originates from a specific source.  The rightsholder develops "good will" in that designation of source by using the trademark to convey something about the brand.  This "brand message," in turn, may inspire consumers to choose products bearing the mark not just because it assures a certain quality, but also because the consumer wishes to communicate something about themselves through that choice.

For example, a consumer may wear Nike shoes and apparel for a variety of reasons, including to express their loyalty to the brand, their identity as an athlete, their enthusiasm for a team or player who is also identified on the product, or their shared commitment to some of Nike's most important values of hard work and persistence in the face of obstacles.  These self-expressive dimensions of the consumer's choice do not stand apart from the source-identifying nature of the Nike trademarks on the consumer's shoes or apparel.  Rather, they are

possible *precisely because* Nike's trademarks serve a source-identifying function. The trademarks associate the goods with Nike and the brand messages that are meaningful to the consumer. *See Matal*, 137 S. Ct. at 1760.

MSCHF's and its amici's dichotomy between the source-identifying function of trademarks and a consumer's expressive purposes in wearing products with those trademarks is thus a false one. In fact, the extent to which a trademark is capable of being used by consumers for their own expressive purposes is likely to correlate directly with the strength of that trademark as a source-identifier in the first place. The stronger the mark, the more likely others are to perceive the message. Moreover, whatever the *consumer's own expressive purpose* in choosing a commercial product bearing a certain trademark, the objective *character of the product* remains unchanged. It remains a shoe, a shirt, or a can of peas. It does not become a book, movie, song, or some other type of artistic work that implicates *Rogers* concerns.

## CONCLUSION

*Rogers v. Grimaldi* applies to artistic works and not to ordinary consumer products. There is no good reason to expand the *Rogers* test to include the latter. Moreover, such an expansion would disable the legitimate enforcement of trademark rights by superimposing a difficult and unsuitable threshold inquiry on garden-variety trademark cases. This upheaval would destroy the balance between expressive interests and consumer protection that Congress already has built into the Lanham Act. If MSCHF and its amici are unhappy with this balance, they should direct their arguments to Congress and not to the courts. The district court in this case applied the correct legal standards in a reasonable fashion, and its decision should be affirmed.

Dated: July 29, 2022                Respectfully submitted,

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700

Tamar Y. Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020

*Counsel for Amicus Curiae NIKE, Inc.*

- 16 -

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c) because it contains 2,975 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700