# In the
# United States Court of Appeals
## For the Second Circuit

———————

August Term, 2022

(Argued:  September 28, 2022   Decided: December 5, 2023)

Docket No. 22-1006

———————

VANS, INC., VF OUTDOOR, LLC.,

*Plaintiffs-Appellees,*

–v.–

MSCHF PRODUCT STUDIO, INC.,

*Defendant-Appellant.*

———————

Before:      JACOBS, CHIN, and ROBINSON, *Circuit Judges.*

———————

Defendant-Appellant MSCHF Product Studio, Inc. ("MSCHF"), the creator of the Wavy Baby sneaker, appeals from the April 29, 2022 order of the United States District Court for the Eastern District of New York (Kuntz, *J.*) granting the request by Plaintiffs-Appellees Vans, Inc., and VF Outdoor, LLC (collectively "Vans") for a temporary restraining order and preliminary injunction enjoining MSCHF's use of Vans' trademark and trade dress in the Wavy Baby sneakers.

On appeal, MSCHF argues that the district court erred by failing to apply enhanced First Amendment protections in its likelihood-of-confusion analysis under the Lanham Act and in assessing the likelihood of confusion; the preliminary injunction is an unconstitutional prior restraint on MSCHF's free expression; the district court erred in requiring MSCHF to place its Wavy Baby revenues in escrow; and the district court erred by failing to make a bond determination.

The main issues in this appeal are governed by the United States Supreme Court's recent decision in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023).  Applying *Jack Daniel's*, we conclude that Vans is likely to prevail in arguing that MSCHF's Wavy Baby shoes used Vans' marks and trade dress as source identifiers, and thus no special First Amendment protections apply to protect MSCHF against Vans' trademark infringement claim.  As such, the district court did not err in concluding that Vans is likely to prevail on the merits of its trademark infringement claim in light of the likelihood of confusion as to the source of the Wavy Baby shoes.  We further conclude that the district court did not err in requiring MSCHF to escrow its revenues from Wavy Baby sales, and that the district court was not required to make a bond determination because MSCHF never requested security.  We therefore AFFIRM.

_____

DAVID H. BERNSTEIN (Megan K. Bannigan, Debevoise & Plimpton LLP, New York, NY; William D. Patterson, Swanson, Martin & Bell, LLP, Chicago IL, *on the brief*), *for Defendant-Appellant.*

LUCY JEWETT WHEATLEY, McGuire Woods LLP, Richmond, VA (Philip A. Goldstein, McGuire Woods LLP, New York, NY; Tanya L. Greene, McGuire Woods LLP, Los Angeles, CA, *on the brief*), *for Plaintiffs-Appellees.*

Vivek Jayaram, Jayaram Law Group, Chicago, IL, *for Amicus Curiae Daniel Arsham in Support of Defendant-Appellant.*

Ronald D. Coleman, Dhillon Law Group Inc., Newark, NJ, *for Amici Curiae Emmanuel Perrotin, Jean-Paul Engelen in Support of Defendant-Appellant.*

Mark A. Lemley, Lex Lumina PLLC, New York, NY, *for Amici Curiae Intellectual Property Professors in Support of Plaintiffs-Appellees.*

John P. O'Herron (Zachary D. Cohen, Rachel W. Adams, *on the brief*), ThompsonMcMullan, P.C., Richmond, VA, *for Amici Curiae American Apparel & Footwear Association, Footwear Distributors & Retailers of America, Council of Fashion Designers of America, Inc., and Accessories Council in Support of Plaintiffs-Appellees.*

Stanley Panikowski, DLA Piper LLP (US), San Diego, CA (Tamar Y. Duvdevani, DLA Piper LLP (US), New York, NY, *on the brief*), *for Amicus Curiae Nike, Inc., in Support of Plaintiffs-Appellees.*

Vijay K. Toke, Rimon P.C., San Francisco, CA (Martin Schwimmer, Leason Ellis LLP, White Plains, NY; David Donahue, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, *on the brief*), *for Amicus Curiae International Trademark Association in Support of neither party.*

Rhett O. Millsaps II, Lex Lumina PLLC, New York, NY (Mark P. McKenna, Christopher J. Sprigman, Rebecca Tushnet, *on the brief*), *for Amici Curiae Authors Alliance, Mason Rothschild, Alfred Steiner in Support of neither party.*

———————

P<span>er</span> C<span>uriam</span>:

In this case, defendant-appellant MSCHF Product Studio, Inc. ("MSCHF"), created a sneaker, the Wavy Baby, that purported to parody the Old Skool shoe, created and marketed by plaintiff-appellee Vans, Inc. ("Vans"), and thereby comment on the consumerism inherent in sneakerhead culture. MSCHF altered the features of an Old Skool sneaker by distorting Vans' trademarks and trade dress, resulting in a shoe that was "exceedingly wavy." After MSCHF engaged in an online marketing campaign, it sold 4,306 pairs of the Wavy Baby in one hour. Vans, unsurprisingly, was not amused.

The central issue in this case is whether and when an alleged infringer who uses another's trademarks for parodic purposes is entitled to heightened First Amendment protections, rather than the Lanham Act's traditional likelihood of confusion inquiry.

The Supreme Court recently addressed this issue in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023). There, the Court held that, even if an alleged infringer used another's trademarks for an expressive purpose, special First Amendment protections did not apply if the trademarks were used for source identification—that is, if the alleged infringer was "trading on the good will of the trademark owner to market its own goods." *Id.* at 156 (citation omitted). Applying

*Jack Daniel's*, we conclude that no special First Amendment protections apply to insulate MSCHF against Vans' trademark infringement claim.[1]  As to those trademark infringement claims, the district court did not err in concluding that Vans is likely to prevail on the merits.  We further conclude that the district court did not err in requiring MSCHF to escrow its revenues from Wavy Baby sales, and that the district court was not required to make a bond determination because MSCHF never requested security.  We therefore AFFIRM.

## BACKGROUND[2]

**I.**      **Facts**

**A.**      *Vans*

Vans is a globally known footwear and apparel company that specializes in skateboard-friendly shoes and sneakers.  The company, founded in 1966, originally catered to customers in Southern California.  Vans became popular among skateboarders, celebrities, and the public.  One of Vans' most recognizable products is its "Old Skool" shoe, shown below:

---

[1] After we heard oral argument, we held the case pending a decision by the Supreme Court in *Jack Daniel's*.  After the Supreme Court ruled, the parties submitted supplemental briefing.

[2] This account is drawn from the record relied upon by the district court, comprising the parties' declarations and exhibits.



*Vans Old Skool Shoe*

Jt. App'x at 13, 15.

The Old Skool trade dress consists of a combination of elements, including: (1) the Vans Side Stripe Mark on the upper shoe; (2) a rubberized sidewall of uniform height around the shoe's perimeter; (3) a three-tiered or grooved sidewall; (4) a textured toe box; (5) visible stitching; and (6) the placement and proportion of each of these elements in relation to one another. Jt. App'x at 256. It also features a distinctive "waffle sole" design. *Id.* at 258. The Old Skool is one of Vans' most popular shoes and sold for about $60 a pair. Most Old Skool shoes are black and white, but Vans has expanded the shoes to come in a variety of colors or color arrangements.

Vans often collaborates with artists and celebrities to design and sell special edition versions of its shoes, including the Old Skools. Beyond official collaborations, many of the rich and famous have been photographed wearing the Vans Old Skool. In short, the Old Skool is an iconic Vans sneaker, easily

recognizable by both "sneakerheads" and the uninitiated. *Id.* at 273 (explaining that sneakerheads are people who collect shoes to display them, but "rarely" to wear them).

### B. *MSCHF*

MSCHF is a Brooklyn-based art collective "known as (and for) MSCHF." *Id.* at 271. MSCHF's mission is to use artwork "to start a conversation about consumer culture . . . by participating in consumer culture." *Id.* at 486–87. MSCHF recontextualizes everyday objects as a means of commenting on contemporary society. MSCHF's work has been displayed in museums, galleries, auction houses, and art shows worldwide, including Phillips Auction House, Art Basel, the Design Museum of London, and the Perrotin gallery.

MSCHF's works are often sold with "manifestos" that explain the work's commentary and are sold in "drops," or prescribed sales periods. Recent drops have critiqued music, the political system, consumerism, digital media, standardized testing, holidays, and the legal system. And often, MSCHF's "drops" will sell out in a day.

MSCHF has recently focused its artistic expression on "sneakerhead culture." Sneakers are utilitarian objects for most, but for sneakerheads, shoes are expressive, "collect[ed], trade[d], and display[ed] as a hobby." *Id.* at 497. MSCHF

critiques the consumerism present in sneakerhead culture, as well as sneaker companies' practice of collaborating with "anyone and everyone to make money." *Id.* at 352.

### C. *The Wavy Baby*

This case is about MSCHF's sneaker drop of the "Wavy Baby" shoe, depicted below:



*MSCHF "Wavy Baby"*

Jt. App'x at 14, 17.

MSCHF's co-Chief Creative Officer explained MSCHF's conception of the connection between Vans' Old Skool shoe and MSCHF's Wavy Baby in the following manner: "The Wavy Baby concept started with a Vans Old Skool sneaker" because no other shoe embodies the dichotomies between "niche and

mass taste, functional and trendy, utilitarian and frivolous" as perfectly as the Old Skool.  *Id.* at 353.  The Wavy Baby design process thus started with an image of a classic Vans Old Skool skate shoe.  *Id.*  MSCHF used a digital filter tool to warp the shoe into a new image, "transform[ing] the once iconic shoe into the modern, wobbly, and unbalanced realities."  *Id.* at 353–54.  One evident feature of the parody is that the distortion destroys the original premise of the Old Skool's popularity—its utility as a skateboarding shoe due to its flat sole.

Wavy Baby incorporates and distorts the Old Skool black and white color scheme, the side stripe, the perforated sole, the logo on the heel, the logo on the footbed, and the packaging.  Examples of the critical similarities, and distortions, are reflected in the graphics below.

| Vans' Trademarks/Trade Dress | WAVY BABY Design |
|:---:|:---:|
|  |  |
|  |  |

| Vans' Trademarks/Trade Dress | WAVY BABY Design |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

| Vans' Trademarks/Trade Dress | WAVY BABY Design |
|:---:|:---:|
|  | |

Jt. App'x at 171–72; 252–53.

Prior to the Wavy Baby's release, MSCHF engaged in a marketing campaign in collaboration with musical artist Michael Stevenson, also known as Tyga. *Id.* at 363. MSCHF advertised the Wavy Baby collaboration before releasing the sneakers for sale—garnering hype and excitement through MSCHF's website, Instagram and YouTube accounts, and sneaker-focused platforms. Tyga also released a music video in which he wore the Wavy Baby shoe. *Id.* at 377.

Upon learning of the impending drop of the Wavy Baby shoe, Vans sent a cease and desist letter to Tyga on April 5, 2022, and to MSCHF the following day, putting them on notice of their claim that the Wavy Baby shoes infringed their trademarks and trade dress. MSCHF, however, continued to promote the planned drop and on April 18, 2022, after this suit commenced, launched the pre-planned

one-hour drop of 4,306 Wavy Baby shoes.  Customers purchased the shoes only on MSCHF's proprietary app for $220.

## II.      District Court Proceedings

Vans filed a complaint in United States District Court for the Eastern District of New York on April 14, 2022, alleging six claims under state and federal law, including a federal claim for trademark infringement under the Lanham Act.  15 U.S.C. § 1114.

On April 15, 2022, Vans filed a motion for a temporary restraining order and preliminary injunction asking the district court to enjoin MSCHF from: (1) fulfilling orders for or otherwise releasing for sale to the public any of the "Wavy Baby" shoes, or colorful imitations or reconstructions thereof (the "Prohibited Shoes"); (2) using Vans' Old Skool trade dress or marks or confusingly similar marks (collectively, the "Prohibited Marks"); (3) referring to or using any Prohibited Marks in any advertising, marketing, or promotion; and (4) aiding any other person or entity in taking the prohibited actions.  Jt. App'x at 65, 147.  Vans attached to its motion several supporting declarations with exhibits.  MSCHF opposed the motion with numerous declarations and exhibits.

After oral argument on April 27, 2022, the district court granted the temporary restraining order and preliminary injunction, concluding primarily

that because Vans had shown a significant danger of consumer confusion, Vans would likely prevail on its trademark infringement claims; it had shown that it would suffer irreparable harm without injunctive relief; and the balance of hardships and public interest supported preliminary relief. *Vans, Inc. v. MSCHF Product Studio, Inc.*, 602 F. Supp. 3d 358, 368, 371–73 (E.D.N.Y. 2022).

In concluding that Vans would likely prevail on the consumer confusion issue, the court considered the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). *See Vans*, 602 F. Supp. 3d at 367–70. In particular, the Court concluded that MSCHF's distortion of the Old Skool marks and trade dress on the Wavy Baby shoes was not sufficient to dispel the consumer confusion arising from the similarity of the marks. *Id.* at 368. It relied on evidence that various consumers "misunderstood the source of the Wavy Baby shoes as a collaboration between [Vans] and [MSCHF]," *id.*, and admissions by MSCHF's own representatives that the "base" of the Wavy Baby shoe before MSCHF's transformation was the Vans Old Skool. *Id.*

The court further concluded that the "sophistication of the buyers" factor weighed in Vans' favor because MSCHF advertised the Wavy Baby broadly in conjunction with Tyga, sold the shoes directly to the general public, and shoes are generally a common consumer item. *Id.* at 368–69.

Moreover, the court concluded that the market proximity of the Wavy Baby shoes and Vans' Old Skool shoes enhanced the likelihood of consumer confusion. *Id.* at 369. The court rejected MSCHF's suggestion that the Wavy Baby shoes were not, like Old Skool shoes, intended to be worn but were instead "collectible work[s] of art," that were "likely to be kept in glass cases or on shelves." *Id.* In rejecting MSCHF's claim, it pointed to statements of MSCHF's own representative, the quantity of shoes produced (4,306 pairs), and the fact that MSCHF held back some shoes in case the shoes shipped were the wrong size, thereby suggesting the Wavy Baby is to be worn. *Id.*

The district court rejected MSCHF's contention that Wavy Baby, as a parodic work of artistic expression, was subject to special First Amendment protections rather than the traditional likelihood of confusion test. *Id.* at 370–71. The court acknowledged that courts have "accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or a trademarked product," but emphasized that they "have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product." *Id.* at 370 (quoting *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999)). Moreover, the court observed that even while purporting to represent "the original," a successful parody must simultaneously convey "that it is *not* the

original and is instead a parody." *Id.* (emphasis added) (quoting *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989)). The court concluded that the Wavy Baby shoes on their face did not clearly indicate to the ordinary observer that MSCHF is "not connected in any way with the owner of the target trademark." *Id.* at 370–71 (quoting *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 435 (S.D.N.Y. 2016), *aff'd*, 674 F. App'x 16 (2d Cir. 2016)).

For these reasons, the district court granted Vans' motion for a temporary restraining order and preliminary injunction, prohibiting MSCHF from advertising or fulfilling orders for the Wavy Baby shoes, and ordering MSCHF to cancel any orders that had been placed for the shoes at the time of the court's order, and to escrow the funds received from orders that could not be reversed. MSCHF appealed.

## DISCUSSION

On appeal, MSCHF argues that the district court erred in concluding that Vans was likely to succeed on the merits of its trademark infringement claim because Vans' claims are precluded by the First Amendment. For the same reason, MSCHF argues that the district court's injunction prohibiting Vans from advertising the Wavy Baby shoes amounts to an unconstitutional prior restraint of

speech. Finally, MSCHF argues that the district court erred in requiring it to escrow all revenues from Wavy Baby sales, and in failing to require Vans to give security.

After considering the applicable standard of review, we consider each argument in turn.

## I. Standard of Review

We review a district court's grant of a temporary restraining order ("TRO") or preliminary injunction for abuse of discretion. *See Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). "An abuse of discretion may be found when the district court relies on clearly erroneous findings of fact or on an error of law in issuing the injunction." *Cliffs Notes*, 886 F.2d at 493 (citation omitted).

Although we review a district court's grant of a preliminary injunction for abuse of discretion, *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010), any "allegations of error in a preliminary injunction [that] involve questions of law" are reviewed without deference. *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015) (citing *Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998)).

## II.     Trademark Infringement, the First Amendment, and Wavy Baby

To evaluate whether the district court abused its discretion in concluding

that Vans was likely to succeed on its infringement claims, we must first

determine whether Wavy Baby is subject to trademark law's traditional

likelihood of confusion analysis or whether it is an expressive work entitled to

heightened First Amendment scrutiny under *Rogers v. Grimaldi*, 875 F.2d 994 (2d

Cir. 1989).  We begin with an overview of the two frameworks before addressing

the Supreme Court's recent guidance in *Jack Daniel's*, applying the lessons of that

decision to this case, and evaluating the district court's application of the *Polaroid*

factors.

### A.     *The Lanham Act*

The Lanham Act defines a trademark as "any word, name, symbol, or

device, or any combination thereof" that a manufacturer uses to distinguish the

manufacturer's goods from those manufactured or sold by others and to "indicate

the source of the goods." 15 U.S.C. § 1127.  As the *Jack Daniel's* Court observed, a

trademark "enables customers to select 'the goods and services that they wish to

purchase, as well as those they want to avoid.'"  *Jack Daniel's*, 599 U.S. at 146

(quoting *Matal v. Tam*, 582 U.S. 218, 224 (2017)).  A trademark holder "derive[s]

significant value from its marks" because such marks "ensure that the producer

itself—and not some 'imitating competitor'—will reap the financial rewards associated with the product's good reputation." *Id.* (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995)).

To prevail on a trademark infringement claim under the Lanham Act, the plaintiff must show that: (1) plaintiff owns a valid protectable mark; and (2) defendant's use of a similar mark is likely to cause consumer confusion as to the origin or association of the goods or services. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, 696 F.3d 206, 216–17 (2d Cir. 2012). MSCHF does not challenge the district court's conclusion that Vans owns valid and protectable marks in its Old Skool shoes; in any case, Vans' marks are registered, which is *prima facie* evidence that they are valid and protectable. *See Matal v. Tam*, 582 U.S. 218, 226–27 (2017). Accordingly, the focus of our inquiry on appeal is the second prong: likelihood of consumer confusion.

This Court applies the eight-factor test identified in *Polaroid*, 287 F.2d at 495, to assess the likelihood that an allegedly infringing product will create consumer

confusion.[3]   The eight factors are: (1) strength of the trademark; (2) similarity between the two marks; (3) proximity of the products and their competitiveness with one another; (4) likelihood the prior owner may "bridge the gap" in the markets for their products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) quality of the defendant's product compared with the plaintiff's product; and (8) sophistication of the buyers.  *Id.*  Collectively, these factors establish whether the allegedly infringing product creates consumer confusion.

## B.  *The* Rogers *Test*

The traditional infringement inquiry may be applied more narrowly if the allegedly infringing good or service is a work of "artistic expression."  *See Rogers*, 875 F.2d at 1000.  In *Rogers*, this Court held that the Lanham Act should not apply to "artistic works" as long as the defendant's use of the mark is (1) artistically relevant to the work, and (2) not "explicitly misleading" as to the source or content of the work.  *Id.* at 999; *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd*, 996 F.2d

---

[3] Other circuits apply balancing tests that are substantially the same.  *See, e.g.*, *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259–63 (4th Cir. 2007) (applying the *Pizzeria Uno* factors as articulated in *Pizzeria Uno Corp. v Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)); *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (applying the *Sleekcraft* factors as articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

1366, 1379 (2d Cir. 1993) (requiring the likelihood of confusion to be "particularly compelling" to outweigh the First Amendment concerns).

Although *Rogers* involved a dispute over a film title, lower courts adopting *Rogers* have applied its test to other kinds of works but have "confined it to similar cases, in which a trademark is used not to designate a work's source, but solely to perform some other expressive function." *Jack Daniel's*, 599 U.S. at 154. Courts in this Circuit have been careful to apply *Rogers* to a limited category of expressive works, including the title and cover of books and magazines, *see, e.g.*, *Rogers*, 875 F.2d at 1001–02 (film title); *Twin Peaks*, 996 F.2d at 1379–80 (book title); *Cliffs Notes*, 886 F.2d at 495 (book title), and the use of trademarked products in feature films and video games, *see, e.g.*, *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (film); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 479–80 (S.D.N.Y. 2020) (video game).

C.    *Jack Daniel's*

The Supreme Court's recent decision in *Jack Daniel's* clarified when the *Rogers* test, and its heightened First Amendment protections, does *not* apply: when the allegedly infringing mark is used as a source identifier—that is, "as a designation of source for [the alleged infringer's] own goods." 599 U.S. at 153.

*Jack Daniel's* is a case "about dog toys and whiskey." *Id.* at 144. Respondent VIP Products created a dog toy called "Bad Spaniels" that was designed to look like a bottle of Jack Daniel's whiskey, with some playful changes. *See id.* For example, VIP Products changed "Jack Daniel's" to "Bad Spaniels," "Old No. 7 Brand Tennessee Sour Mash Whiskey" to "The Old No. 2 On Your Tennessee Carpet," and "40% alc. by vol. (80 proof)" to "43% poo by vol." and "100% smelly." *Id.* at 149–50. Jack Daniel's did not appreciate the joke.

The central question before the Supreme Court was whether the *Rogers* test should have applied to Jack Daniel's trademark infringement claims against VIP Products, where VIP Products' Bad Spaniels dog toy (the allegedly infringing product) was an expressive or parodic work.[4] Though the Court acknowledged that parodies are inherently expressive, it concluded that *Rogers* does not apply when the alleged infringer uses trademarks to designate source. *Id.* at 153 ("[W]e hold that [*Rogers*] does not [apply] when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods.").

---

[4] Some sister circuits have adopted the *Rogers* test. *See, e.g., Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 896, 902 (9th Cir. 2002) (adopting *Rogers* test); *Westchester Media v. PLR USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000) (noting that Fifth Circuit has adopted the approach in *Rogers*). The Supreme Court expressly used the *Rogers* test as a proxy for *any* threshold First Amendment filter in the Lanham Act context. *Jack Daniel's*, 599 U.S. at 153 n.1.

The Court explained that, historically, *Rogers* has been confined to cases where the trademark is not used to designate a work's source, and instead is used "*solely* to perform some other expressive function." *Id.* at 154 (emphasis added). In contrast, the use of another's trademark that "convey[s] information (or misinformation) about who is responsible for a product . . . 'implicates the core concerns of trademark law' and creates 'the paradigmatic infringement case.'" *Id.* at 157 (alterations adopted) (citation omitted).

Moreover, the Court declined to adopt the Ninth Circuit's holding that *Rogers* applied to all "expressive work[s]." *Id.* at 151–52. It reasoned that such an expansive read of *Rogers* would "conflict with courts' longstanding view of trademark law," as "few cases would even get to the likelihood-of-confusion inquiry if all expressive content triggered the *Rogers* filter." *Id*. at 158–59. Because the Court concluded that VIP Products used its Bad Spaniels "trademark and trade dress as source identifiers of its dog toy," it held that *Rogers* did not apply to Jack Daniel's claims of infringement. *Id.* at 159–61 (internal citation omitted).

Far from disregarding the parodic nature of the Bad Spaniel's toy, however, the Supreme Court noted that "a trademark's expressive message—particularly a parodic one . . . — may properly figure in assessing the likelihood of confusion." *Id.* at 161; *see also id.* at 159 (noting that "the likelihood-of-confusion inquiry does

enough work to account for the interest in free expression").  This is because, where a message of "ridicule or pointed humor" is clear, "a parody is not often likely to create confusion" for "consumers are not so likely to think that the maker of a mocked product is itself doing the mocking."  *Id.* at 161, 153; *see id.* at 161 ("[A]lthough VIP's effort to ridicule Jack Daniel's does not justify use of the *Rogers* test, it may make a difference in the standard trademark analysis.").

### D.    *MSCHF's Use of Vans' Marks as Source Identifiers*

The Supreme Court's decision in *Jack Daniel's* forecloses MSCHF's argument that Wavy Baby's parodic message merits higher First Amendment scrutiny under *Rogers*.  As the Court held, even if a defendant uses a mark to parody the trademark holder's product, *Rogers* does not apply if the mark is used "'at least in part' for 'source identification.'"  *Id.* at 156 (quoting *Tommy Hilfiger Licensing, Inc., v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 414–15 (S.D.N.Y. 2002)).

Here, MSCHF used Vans' marks in much the same way that VIP Products used Jack Daniel's marks—as source identifiers.  As discussed above and illustrated below, VIP Products used the Jack Daniel's bottle size, distinctive squared-off shape, and black and white stylized text to invoke an image of Jack Daniel's famous whiskey bottle.

 

*Jack Daniel's*, 599 U.S. 148–49.

Likewise, MSCHF's design evoked myriad elements of the Old Skool trademarks and trade dress. Among other things, MSCHF incorporates, with distortions, the Old Skool black and white color scheme, the side stripe, the perforated sole, the logo on the heel, the logo on the footbed, and the packaging. *See* Part I, above. MSCHF included its own branding on the label and heel of the Wavy Baby sneaker, just as VIP Products placed its logo on the toy's hangtag. But even the design of the MSCHF logo evokes the Old Skool logo. And unlike VIP Products, MSCHF did *not* include a disclaimer disassociating it from Vans or Old Skool shoes. *See Jack Daniel's*, 599 U.S. at 150 (noting the dog toy included a disclaimer that read: "This product is not affiliated with Jack Daniel Distillery").

A trademark is used as a "source identifier" when it is used "to identify or brand a defendant's goods or services" or to indicate the "'source or origin' of a

product." *Id.* at 156 (alterations adopted). MSCHF used Vans' trademarks—
particularly its red and white logo—to brand its own products, which constitutes
"quintessential 'trademark use'" subject to the Lanham Act. *Id.* at 155 (citation
omitted); *see also Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812–13
(mechanic's use of Harley-Davidson's bar and shield motif in his logo, despite
the "humorous[]" message, was traditional trademark use subject to the
likelihood of confusion analysis).

Moreover, although MSCHF did not purport to sell the Wavy Baby under
the Vans brand, it admitted to "start[ing]" with Vans' marks because "[n]o other
shoe embodies the dichotomies—niche and mass taste, functional and trendy,
utilitarian and frivolous—as perfectly as the Old Skool." Jt. App'x at 353. In
other words, MSCHF sought to benefit from the "good will" that Vans—as the
source of the Old Skool and its distinctive marks—had generated over a decades-
long period. *See Jack Daniel's*, 599 U.S. at 156. Notwithstanding the Wavy Baby's
expressive content, MSCHF used Vans' trademarks in a source-identifying
manner. Accordingly, the district court was correct when it applied the
traditional likelihood-of-confusion test instead of applying the *Rogers* test.

### E.    *Application of the* **Polaroid** *Factors*

Having determined that the district court did not err in declining to apply the *Rogers* test in evaluating Vans' claims, we consider whether the district court erred in its conduct of the traditional likelihood-of-confusion analysis.[5]  We review the district court's overall likelihood-of-confusion determination without deference.  "[I]nsofar as the determination of whether one of the *Polaroid* factors favors one party or another involves a legal judgment—which it often does—" we review that determination without deference to the district court.  *Souza v. Exotic Island Enterprises*, 68 F.4th 99, 109 (2d Cir. 2023) (alteration adopted).  And we review the district court's factual findings for clear error.  *See RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022).

We agree with the district court's assessment that Vans is likely to prevail on the issue of whether the Wavy Baby causes consumer confusion.  Like the district court, we consider the factors identified in *Polaroid* in considering whether MSCHF's Wavy Baby is likely to cause consumer confusion as to the source of the shoe.  *Polaroid*, 287 F.2d at 495.

---

[5] We disagree with Vans' argument that the likelihood-of-confusion analysis is not before us.  *See* Vans FRAP 28(j) Letter (June 20, 2023) at 1–2.  Although the core of MSCHF's argument on appeal is that the district court erred in failing to apply *Rogers*, part of MSCHF's opening brief challenges the district court's *Polaroid* analysis.  *See* Appellant Br. at 42–60.  Although its argument has evolved slightly post-*Jack Daniel's*, it was adequately preserved.

The strength of the marks at issue supports Vans. MSCHF expressly chose the Old Skool marks and dress because it was the "most iconic, prototypical" skate shoe there is, as conceded by MSCHF's co-Chief Creative Officer. Jt. App'x at 353, ¶ 24.

The similarity of the marks presents a closer question, as the marks on Wavy Baby, while derived from the Old Skool shoes, are distorted. But MSCHF's creative officer, Lukas Bentel, admitted that the Wavy Baby sneaker design intentionally evoked an image of Vans' Old Skool sneaker. *See* S. App'x at 8–9 ("Yes, [Vans Old Skools] are the anchor of the shoe . . . ."); *see also Harley-Davidson*, 164 F.3d at 812–13 (concluding, in part, because defendant "admits that his use of [Harley Davidson's] bar-and-shield logo purposefully suggests an association with Harley," such use was impermissible under the Lanham Act. (internal quotation marks omitted)).

This admission is embodied in the Wavy Baby design: the Wavy Baby features a combination of elements (*e.g.*, a three-tiered appearance, textured toe box, visible stitching, and red tags on the back), which are placed relative to one another such that the Wavy Baby's appearance evokes Vans' Old Skool sneaker.

Plus, context matters.  Though Vans has never warped its design in the same "liquified" or "microwaved" manner as MSCHF's work with the Wavy Baby,[6] Vans has previously created special editions of its Old Skool sneaker often collaborating in launching the sneakers with celebrities and high-profile brands including Marc Jacobs, Supreme, Stussy, Kenzo, The North Face, and Disney.  Jt. App'x at 257–58, ¶ 12.

The admittedly mimicked features of the Wavy Baby, combined with Vans' history of collaborating with artists and other brands, support our conclusion that the "similarity" factor favors Vans.

In considering competitive proximity, we are concerned with "'whether and to what extent the two products compete with each other' and 'the nature of the products themselves and the structure of the relevant market.'" *Morningside Grp. Ltd. v. Morningside Capital Grp.*, 182 F.3d 133, 140 (2d Cir. 1999) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)).  "Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Cadbury Beverages*, 73 F.3d at 480.

---

[6] MSCHF describes the Wavy Baby as a "'liquified' version of a classic skate shoe silhouette."  Jt. App'x at 501.

The district court did not clearly err in rejecting MSCHF's factual claim that the Wavy Baby is a work of art meant to be displayed rather than a pair of sneakers meant to be worn. Although it is hard to see why some people would wear the Wavy Baby as a functional shoe, we owe that finding deference. Many people are martyrs to fashion and dress to excite comment.

Considering the Wavy Baby as a wearable sneaker, we agree with the district court that the shoes are relatively proximate. MSCHF advertised the Wavy Baby as a wearable piece of footwear in promotional social media posts and in the promotional music video featuring Tyga. Vans' own Old Skool limited releases are often sold on the same secondary platforms as those that sell Wavy Baby shoes to sneakerheads. Jt. App'x at 854. And where the Wavy Baby sold 4,306 units as a limited-edition collaboration with Tyga at $220 per pair, Vans offers special editions of its Old Skool sneakers made in collaboration with celebrities or artists, sometimes selling for $180 per pair, and often selling a limited edition of 4,000 units. *Id.* at 785, 813, 893. Because we conclude that the products are competitively proximate, we need not consider whether Vans may "bridge the gap" by developing a product in MSCHF's market.

The district court did not clearly err in finding actual evidence of consumer confusion, and we conclude as a matter of law that this factor favors Vans. The

district court relied on evidence in the record that customers were actually confused. For example, it pointed to comments made on a sneaker-centric podcast with guest appearance by MSCHF's chief creative officer, Lukas Bentel. Bentel acknowledged the host's comment that "[e]veryone [the host has] spoken to about" the Wavy Baby agrees that if a person saw someone wearing Wavy Baby sneakers on the street, "they'd say they're wearing a pair of Vans." *Vans*, 602 F. Supp. 3d at 368; Complex Sneakers Podcast Recording at 31:16–33:46.

It may be true that consumers who purchase the Wavy Baby shoes directly from MSCHF and receive the accompanying "manifesto" explaining the genesis of the shoes may not be confused. But the Lanham Act protects against several categories of consumer confusion, "including *point-of-sale* confusion . . . *initial interest* confusion, . . . and *post-sale* confusion." *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 n.2 (2d Cir. 2005) (emphases in original) (internal citations omitted); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir. 1986) (explaining that "post-sale confusion would involve consumers seeing appellant's [product] outside of the retail store, perhaps being worn by a passer-by" and that "in this post-sale context appellants' labels, most of which having been long since discarded, will be of no help"). The comments relied upon by the district court demonstrate both initial

and post-sale confusion.  The district court's factual finding of actual consumer confusion was not clearly erroneous, and its conclusion that this factor favors Vans was legally correct.

The district court's finding that the Wavy Baby sneakers are lower quality shoes is not clearly erroneous, though we do not embrace the district court's legal conclusion that this factor favors Vans.  In comparing the quality of MSCHF's product to that of the Old Skool sneaker, the district court found "particular deficiencies" in the Wavy Baby sneakers that demonstrated a lower quality shoe. *Vans*, 602 F. Supp. 3d at 369.  The Wavy Baby's stylized bottom may create instability where a skate shoe should be stable—a fact that is conceded by MSCHF. *See id.* at 368 ("[I]f you put them on and walked around, you'll see this is not the greatest foot-feeling shoe."); *see also* Jt. App'x at 286 (MSCHF acknowledging itself that "[i]t is difficult to walk in *Wavy Baby* for long distances . . . and they cannot safely be worn to walk down stairs"); Jt. App'x at 362 ("[T]hey cannot be worn as an actual sneaker.");  Jt. App'x at 501–02 ("We took a functional, iconic skate shoe and made it a non-functional—or at least 'non-functional' relative to the ways sneakers traditionally function.").  The district court's finding that the Wavy Baby is a lower quality skate shoe is not clearly erroneous.

We are skeptical, however, that the Wavy Baby's inferior quality as a skate shoe weighs in favor of Vans. The Wavy Baby's primary purpose is to convey a message or fashion statement rather than to serve as a functional shoe. It seems unlikely that consumers would expect the Wavy Baby—a shoe with an obviously uneven sole—to be as comfortable or functional as the Old Skool. But even if the district court erred by weighing this factor in Vans' favor, this one factor does not change our conclusion that Vans is likely to prevail on the merits of its trademark infringement claim. *Accord Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." (citation omitted)).

Finally, the district court was correct to conclude that sophistication of the buyers also favored Vans. MSCHF engaged in broad advertising to the "general public," and customers of sneakers are not professional buyers.[7]

The fact that the Wavy Baby was conceived as a parody does not change that assessment. The Wavy Baby is a parody, just not one entitled to protection

---

[7] The district court made no finding with respect to MSCHF's good faith and we do not rely on this factor in our own *Polaroid* analysis.

under *Rogers*.  As noted above, to succeed, a parody must create contrasts with the subject of the parody so that the "message of ridicule or pointed humor comes clear."  *Jack Daniel's*, 599 U.S. at 161.  If that is done, "a parody is not often likely to create confusion."  *Id.*  But if a parodic use of protected marks and trade dress leaves confusion as to the source of a product, the parody has not "succeeded" for purposes of the Lanham Act, and the infringement is unlawful.

For these reasons, we conclude that the Wavy Baby does create a likelihood of consumer confusion, and the district court correctly concluded that Vans is likely to prevail on the merits.  It did not exceed its discretion by enjoining MSCHF's marketing and sale of the Wavy Baby.[8]

---

[8] MSCHF's opening brief also argues that the district court's injunction was an unconstitutional prior restraint on MSCHF's expression.  Generally, if a product is found to infringe, preliminary injunctions under the Lanham Act are *not* considered prior restraints.  *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979) (holding that an injunction pursuant to the Lanham Act was not a prior restraint because trademark infringement implicated property rights, not speech rights); *see also Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) (upholding a preliminary injunction even for noncommercial speech); Deceptive Commercial Speech, 6 McCarthy on Trademarks and Unfair Competition § 31:142 (5th ed.) ("[T]he prior restraint prohibition does not apply to most trademark preliminary injunctions. . . .").  MSCHF's argument that the preliminary injunction was an unlawful prior restraint piggybacks on its argument that the district court's assessment of Vans' likelihood of prevailing on the merits failed to properly account for First Amendment concerns, and thus fails for the same reasons.

### III.    Escrow Order

MSCHF argues that the district court exceeded its discretion in ordering it to escrow all of its revenues from the Wavy Baby sales it had completed. Specifically, the district court ordered MSCHF, for any purchase that could not be reversed and/or cancelled, to escrow "any funds received from all orders taken to date for the Prohibited Shoes so that, if Vans prevails in this action, [MSCHF] may return those funds to customers who ordered [MSCHF's] Prohibited Shoes under the mistaken belief that Vans was the source of the shoes or otherwise approved or sponsored the shoes." *Vans*, 602 F. Supp. 3d at 373. MSCHF contends that an order to escrow *net profits* might make sense if necessary to ensure the availability of funds to provide the plaintiff's requested equitable relief, but not an order to escrow *gross revenues*.

We disagree. Under 15 U.S.C. § 1117, Vans is entitled to MSCHF's profits, damages, and attorneys' fees if it establishes trademark infringement under the Lanham Act. In assessing profits, the plaintiff is required to prove the defendant's sales only; the defendant must prove all elements of cost or deduction claimed. *See* 15 U.S.C. § 1117(a). And, this Court has held that "district courts have the authority to issue a prejudgment asset restraint injunction in favor of plaintiffs

seeking an accounting against allegedly infringing defendants in Lanham Act cases." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132 (2d Cir. 2014).

In this case, Vans has sought an accounting. Moreover, MSCHF has not established its costs of production. Under these circumstances, we cannot conclude that the district court exceeded its discretion when it ordered MSCHF to essentially freeze its revenues from the Wavy Baby. We express no opinion as to the propriety of the ultimate relief the district court suggested in its order—refunds to consumers—and uphold the district court's order without prejudice to MSCHF's ability to renew its arguments before the district court on remand.

## IV.    Bond Determination

MSCHF's final claim is that the district court erred under Fed. R. Civ. P. 65(c) by failing to either require Vans to post security or to find, expressly, that no security was required. Vans argues that MSCHF waived this challenge by failing to seek a bond determination before the district court.

Under Rule 65(c), before issuing a preliminary injunction, the court must order the moving party to provide a security ("post bond") in an amount the court determines would cover damages sustained in the event a party has been wrongfully enjoined. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

But where the party opposing an injunction does not request security, the district court does not err in failing to order it. *See Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976). In *Clarkson* we ruled that, "[b]ecause no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, . . . the district court may dispense with the filing of a bond." *Id.* (internal citations omitted).

We reject MSCHF's suggestion that our decision in *Corning Inc. v. PicVue Electronics., Ltd.*, 365 F.3d 156 (2d Cir. 2004), overrules or limits our holding in *Clarkson*. In *Corning*, we said, "While it might have been within the discretion of the district court to decide that, under the circumstances, no security was required, . . . the district court was required to make this determination before it entered the preliminary injunction." *Id.* at 158 (internal citation omitted). Nothing in *Corning* suggests that its holding applies *even if the enjoined party never requested security*. Accordingly, we conclude the district court did not err in failing to require security from Vans. Nothing in our analysis precludes MSCHF from seeking security pursuant to Fed. R. Civ. P. 65(c) in the district court.

## CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's grant of the preliminary injunction and the temporary restraining order.